# ORIGINAL ●                          ●

CARLSMITH BALL LLP

ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Continental Micronesia, Inc. dba
Continental Micronesia and
Continental Airlines, Inc.



FILED
DISTRICT COURT OF GUAM

NOV 21 2003

MARY L. M. MORAN
CLERK OF COURT

97

## IN THE DISTRICT COURT OF GUAM

|  |  |
|---|---|
| TONY H. ASHTIANI,<br><br>        Plaintiff,<br><br>    vs.<br><br>CONTINENTAL MICRONESIA, INC. dba<br>CONTINENTAL MICRONESIA and<br>CONTINENTAL AIRLINES, INC.,<br><br>        Defendant. | CIVIL CASE NO. CV02-00032<br><br>**DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT;<br>MEMORANDUM IN SUPPORT OF<br>MOTION; AFFIDAVIT OF DIXON<br>MCKINZIE; DECLARATION OF<br>DAVID LEDGER; EXHIBITS A - S;<br>DECLARATION OF SERVICE** |

4824-3338-3936.2.013280-00079

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................... 1

II.    BACKGROUND FACTS ............................................................................................... 1

       A.    CONTINENTAL'S ATTENDANCE POLICIES ................................................... 1

       B.    ASHTIANI'S EMPLOYMENT HISTORY ............................................................ 2

       C.    ASHTIANI'S SON'S ILLNESS AND ATTEMPTS TO OBTAIN LEAVE
             UNDER THE FAMILY MEDICAL LEAVE ACT ............................................ 4

       D.    INSURANCE POLICY FOR ACCIDENTAL DEATH AND
             DISMEMBERMENT ........................................................................................ 5

       E.    ASHTIANI'S SECOND AMENDED COMPLAINT ........................................... 5

III.   STANDARD FOR SUMMARY JUDGMENT ................................................................ 5

IV.    ANALYSIS .................................................................................................................. 6

       A.    TITLE VII CLAIM FOR UNLAWFUL DISCRIMINATION BASED ON
             RACE AND NATIONAL ORIGIN ........................................................................ 6

       B.    RETALIATION AND DISCRIMINATION POST 9/11 ...................................... 8

       C.    NEGLIGENT SUPERVISION .......................................................................... 9

       D.    CONSTRUCTIVE TERMINATION ................................................................. 10

       E.    WRONGFUL TERMINATION ........................................................................ 10

       F.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ........................ 11

       G.    FAMILY MEDICAL LEAVE ACT ................................................................. 13

       H.    SALES OF FRAUDULENT INSURANCE POLICY ........................................ 14

V.     CONCLUSION ......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

CASES

Beaulieu v. Northrop Grunman Corp.,
161 F. Supp. 2d 1135, 1148 (D. Haw. 2000) ........................................................................ 9

Bergene v. Salt River Project Agricultural Improvement and Power Dist.,
272 F.3d 1136, 1144 (9th Cir. 2001) ................................................................. 10

Blough v. Hawkins Market, Inc.,
51 F. Supp. 2d 858, 865-66 (N.D. Ohio 1999) ........................................................ 9

Braunling v. Countrywide Home Loans, Inc.,
220 F.3d 1154 (9th Cir. 2000) ....................................................................... 12

Celotex Corp. v. Catrett ,
477 U.S. 317, 323 (1986) ............................................................................. 6

Folkerson v. Circus Circus Ents., Inc.,
107 F.3d 754, 755 (9th Cir. 1997) .................................................................... 8

Gantt v. Sentry Ins.,
824 P.2d 680 (Cal. 1992) ............................................................................ 10

Green v. Ralee Eng'g Co.,
960 P.2d 1046 (Cal. 1998) ........................................................................... 11

Hine v. Dittrich,
278 Cal. Rptr. 330, 333 (Ct. App. 1991) .............................................................. 10

Hott v. VDO Yakazi Corp.,
922 F. Supp. 1114, 1124 (W.D. Va. 1996) .............................................................. 8

Johnson v. Hondo, Inc.,
125 F.3d 408, 418 (7th Cir. 1997) ..................................................................... 9

McDonnell Douglas Corp. v. Green,  411 U.S. 792, 802 (1973) ................................................ 6, 7

Oates v. Discovery Zone,
116 F.3d 1161, 1171 (7th Cir. 1997) ................................................................... 7

Padilla v. Carrier Air Conditioning,
67 F. Supp. 2d 650 (E.D. Tex. 1999) ................................................................... 9

Pickett v. Colonel of Spearfish,
209 F. Supp. 2d 999 (D.S.D. 2001) .................................................................... 9

Roberto v. Aguon,
519 F.2d 754 (9th Cir. 1975) ........................................................................ 11

Sengupta v. Morrison-Knudsen Co., Inc.,
804 F.2d 1072, 1075 (9th Cir. 1986) ................................................................... 7

# TABLE OF AUTHORITIES

Page

Shoemaker v. Myers,
    276 Cal. Rptr. 303 (Cal. 1990 .................................................................................................... 12

Stevenson v. Superior Court,
    66 Cal. Rptr. 2d 888 (1997) ........................................................................................................ 11

Texas Dep't of Cmty. Affairs v. Burdine,
    450 U.S. 248, 253-54 (1981) ........................................................................................................ 7

Tolentino v. Greenhill,
    CV00-00001 (Apr. 10, 2001 Order) ........................................................................................... 12

Transpacific Export Co. v. Oka Towers Corp.,
    2000 Guam 3, ¶ 23 ...................................................................................................................... 14

STATUTES

22 G.C.A. § 9101 et seq ..................................................................................................................... 9

22 G.C.A. § 9104 ................................................................................................................................ 9

22 G.C.A. § 9106 ................................................................................................................................ 9

Family Medical Leave Act ("FMLA") ....................................................................................... 4, 5, 13, 14

RULES

Fed. R. Civ. P. 56 ............................................................................................................................... 6

OTHER AUTHORITIES

Rest. 2d Torts § 46 ............................................................................................................................. 12

## MOTION FOR SUMMARY JUDGMENT

Defendants hereby move for summary judgment pursuant to Federal Rule of Civil

Procedure 56, on the basis that there are no genuine issues of material fact with respect to any of

Plaintiff's eight causes of action. Accordingly, Defendants are entitled to judgment as a matter

of law, and hereby respectfully request the Court to enter such judgment.

This motion is supported by the Memorandum In Support of Motion commencing on the

next page, the Affidavit of Dixon McKinzie, Exhibits A-S and the Declaration of David Ledger.

Dated this 21st day of November 2003.

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD

Attorneys for Defendant
Continental Micronesia, Inc. dba
Continental Micronesia and
Continental Airlines, Inc.

4811-5877-4272.1.013280-00079

## I. INTRODUCTION

There are no genuine issues of material fact that Defendant Continental Micronesia Inc. terminated Plaintiff Tony H. Ashtiani for a legitimate, nondiscriminatory reason, specifically, his continued absence from work without notifying his supervisors. Unwilling to accept the fact that he did not comply with Continental and union procedures governing attendance at work and reporting absenteeism, and that Continental therefore had cause to terminate him, Ashtiani has brought this meritless lawsuit before this Court, alleging in total eight counts of action against Continental. However, like his racial discrimination claim, there are also no genuine issues of material fact to sustain his other seven claims for relief, which run the full gamut of possible causes of action. Because none of these claims have any support in either the law or in the facts, summary judgment is proper on all counts in this case.

## II. BACKGROUND FACTS

### A. CONTINENTAL'S ATTENDANCE POLICIES

The principal facts at issue in this case pertain to Ashtiani's attendance at Continental during the month of June 2001. In this case, the procedures Ashtiani must follow for reporting an absence from work were governed by the Agreement between Continental and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "IBT Agreement"). See Affidavit of Dixon McKinzie (hereinafter "McKinzie Aff.") at ¶ 5. The IBT Agreement specifies that "an employee hereunder who is prevented from reporting for duty shall notify *the supervisor on duty* prior to the start of his shift and shall give the reason for his inability to report for duty." Ex. A, Art. 18, § A (emphasis added). The IBT Agreement further states that an "employee may be discharged for cause if he is absent from work for two (2) consecutive days without notifying the Company of the reason for his absence." Ex. A, Art. 18, § B.1.

Continental also maintains and enforces its own attendance policy. McKinzie Aff. at ¶ 6. The attendance policy states that a "NO SHOW is the most serious type of absenteeism." Ex. B. "More than one incident of no show may result in an acceleration of discipline. Two (2) consecutive days . . . absence from duty without notification may result in discipline that does not exclude termination." Id.

B.    ASHTIANI'S EMPLOYMENT HISTORY

Throughout his employment until his termination on July 3, 2001, Ashtiani was employed as an aircraft mechanic at Continental. Compl.[1] at 3, 5; McKinzie Aff. at ¶ 4. During his employment at Continental, Ashtiani had received a number of disciplinary warnings. McKinzie Aff. at ¶ 8; Ex. D. Towards the end of his employment, Ashtiani developed a serious attendance problem. For example, in 2000, as his Absentee Record demonstrates, Ashtiani began trading days off with other employees to such an extent that, combined with a few "sick" days, he completely failed to report for work from August 14, 2000, through December 12, 2000. Ex. E.

Continental continued to endure Ashtiani's serious attendance problems in 2001. In that year, prior to his termination, Ashtiani worked only 61 days. McKinzie Aff. at ¶ 10; Ex. F. On June 3, 2001, Ashtiani left work early on the basis that his son was ill. Ashtiani later requested, and was granted, "sick" time for June 4 and 5, 2001, again, because of his son's condition. McKinzie Aff. at ¶ 11; Ex. H. After his regularly scheduled days off on June 7 through June 9, Ashtiani requested "personal business" time off, which was later approved by one of his supervisors, William Herrera. McKinzie Aff. at ¶ 11; Exs. H and I. Herrera also approved days off from June 10 through 12. McKinzie Aff. at ¶ 11; Ex. H.

On June 16, Ashtiani called supervisor Glenn Mendoza for approval of a

---

[1] All references to "Compl." refer to Ashtiani's Second Amended Complaint, filed on May 15, 2003.

4824-3338-3936.2.013280-00079

2

"personal business" day, which Mendoza approved. McKinzie Aff. at ¶ 12; Exs. F and J. Ashtiani, however, failed to appear for work on June 17, 18, and 19, 2001, and failed to secure approval for his absences on those days. McKinzie Aff. at ¶ 13; Exs. J and K. As he did not report his absences to a supervisor, as required under the IBT Agreement and Continental's Attendance Policy, he was subject to discipline.

On June 19, Ashtiani called Herrera and expressed interest in taking a formal Leave of Absence from the company. McKinzie Aff. at ¶ 14; Exs. L and M. Herrera informed Ashtiani that he needed to consult with the Human Resources department to formally apply and obtain such leave. McKinzie Aff. at ¶ 14; Exs. L and M. During that conversation, Ashtiani did not request for, and Herrera did not grant, any further time off from work. McKinzie Aff. at ¶ 14; Exs. L and M.

On June 23, Ashtiani again failed to show up to work and failed to notify his supervisor on duty - Glenn Mendoza - that he will not be coming in to work. McKinzie Aff. at ¶ 15. Ashtiani claims that he called in to work on June 23 and spoke to Joseph Pangelinan, another aircraft mechanic, and asked Pangelinan to inform Mendoza that he would not be in to work on that day. See Compl., Ex. I. Joseph Pangelinan was not Ashtiani's supervisor. McKinzie Aff. at ¶ 21. Furthermore, a phone call to another aircraft mechanic to relay a message that one will not be in to work does not constitute proper Continental protocol for reporting such absence. McKinzie Aff. at ¶ 16. Rather, as the IBT Agreement requires, the employee must speak directly with a supervisor and provide the reasons for his non-appearance at work. Ex. A, Art. 18.

On June 24, once again Ashtiani failed to call in to or report for work. McKinzie Aff. at ¶ 15. On that day, Herrera called Ashtiani, who stated that he thought he was given time off until June 25. Ex. L. Neither Herrera nor Mendoza had ever approved June 23 and 24 as

Case 1:02-cv-00032    Document 105    Filed 11/21/2003    Page 8 of 76

further days off.  McKinzie Aff. at ¶ 17; Exs. L and N.  As Ashtiani failed to receive authorization to take those days off, under Continental's attendance policy and the IBT Agreement, he was subject to discipline, including termination.  <u>See</u> Exs. A and B.

Finally, on June 25, Ashtiani appeared for work.  <u>See</u> Ex. F.  On June 26, Herrera met with Ashtiani and his union representative to discuss the absences on June 23 and 24.  Ex. L. At that meeting, Ashtiani explained that he believed he was permitted to take those days off.  Ex. L.  He was then suspended pending further investigation.  Ex. L.  On June 27, Herrera emailed Ashtiani regarding a further meeting on July 2 pertaining to his absences, and requesting confirmation of his attendance at the meeting.  McKinzie Aff. at ¶ 18; Ex. O.  Ashtiani failed to confirm, and failed to appear at that meeting.  Ex. L.  Continental then terminated Ashtiani on July 3, 2001, for his no-shows on June 23 and 24, 2001.  Ex. C.[2]

C.    ASHTIANI'S SON'S ILLNESS AND ATTEMPTS TO OBTAIN LEAVE
        UNDER THE FAMILY MEDICAL LEAVE ACT

Ashtiani attributes his absences to his son's illness.  Compl. at ¶ 58.  Ashtiani was initially offered to apply for a leave of absence under the Family Medical Leave Act ("FMLA") on June 11, but Ashtiani declined that offer.  McKinzie Aff. at ¶ 19; Exs. L and Q.  Ashtiani was once again offered to apply for FMLA leave on June 26, at which point he accepted the FMLA forms.  Exs. L and Q.  Ashtiani made no attempt to return the FMLA forms until July 10, 2001, after his discharge on July 3, 2001.  McKinzie Aff. at ¶ 19.

One form included a physician's certification from Dr. Appellanes that indicated that Ashtiani's son was not observed in Dr. Appellanes' clinic during the month of June but was only observed on July 2, 2001, that "the patient right now is asymptomatic," and that the patient does not require assistance with medical, personal, safety, or transportation needs.  Ex. P.

---

[2] Not pertinent to this motion at this time, Ashtiani appealed his termination and was offered reinstatement, which he then declined.  McKinzie Aff. at ¶ 20.

Absent from the certification is any indication that Ashtiani's son suffered from a serious health condition.

### D. INSURANCE POLICY FOR ACCIDENTAL DEATH AND DISMEMBERMENT

Lastly, in reference to Ashtiani's claim that Continental fraudulently sold an accidental death and dismemberment policy, Continental offered its employees insurance for accidental death and dismemberment, the carrier of which plan is AIG Life Insurance Company. For this benefit, Ashtiani paid $12.50 per month for a $500,000.00 policy. See Compl., Ex. J. Ashtiani claims that a personal investigation revealed that the insurance policy was not valid in Guam. However, Ashtiani proceeds on false information, as AIG does recognize and honor accidental death and dismemberment claims for Guam subscribers. See Ex. R..

### E. ASHTIANI'S SECOND AMENDED COMPLAINT

Ashtiani's Second Amended Complaint, filed on May 15, 2003, contains eight counts: (1) Intentional Infliction of Emotional Distress; (2) Negligent Supervisor; (3) Unlawful Discrimination Based Upon Race and National Origin, (4) Intentional Discrimination and Intentional Retaliation Post 9/11; (5) Violation of FMLA; (6) Constructive Termination; (7) Wrongful Termination; (8) Sales of Fraudulent Insurance Policies by Defendant to Employees. See Compl.

## III. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. There can be no "genuine issue of material fact" if there is a complete failure of proof concerning an essential

element of the nonmoving party's case, since such a failure renders all other facts immaterial. Celotex Corp. v. Catrett , 477 U.S. 317, 323 (1986). In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248 (1986). The mere existence of some alleged factual dispute is insufficient; there must be a genuine issue of material fact, to preclude summary judgment. Id. at 249-50.

"As to materiality, the substantive law will identify which facts are material. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which are irrelevant that governs." Id. at 248. Summary judgment is appropriate "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. at 250.

Lastly, the Court's role in determining whether to grant a motion for summary judgment "is the threshold inquiry of determining whether there is a need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

## IV.  ANALYSIS

### A.  TITLE VII CLAIM FOR UNLAWFUL DISCRIMINATION BASED ON RACE AND NATIONAL ORIGIN[3]

Under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), a plaintiff claiming to be a victim of racial discrimination must demonstrate in a prima facie case (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; (4) that, after his rejection, the position remained open and the employer continued to seek applicants

_____

[3] See Compl. at 9-11.

from persons of complainant's qualifications. Adopting the <u>McDonnell Douglas</u> factors to a discriminatory discharge context, an employee claiming discharge or termination on the basis of race must demonstrate (1) that he was within the protected class; (2) that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance; and (3) that his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills. <u>Sengupta v. Morrison-Knudsen Co., Inc.</u>, 804 F.2d 1072, 1075 (9th Cir. 1986).

   Only if Ashtiani proves all elements of his prima facie case does the burden shift to Continental to produce evidence that Ashtiani was terminated for legitimate, non-discriminatory reasons. <u>See</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253-54 (1981). The burden then shifts back to Ashtiani to show Continental's reason was a pretext for discrimination. <u>Id</u>. at 265.

   Within his prima facie case, Ashtiani must show that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance. However, Ashtiani's absenteeism demonstrates inadequate job performance. <u>See, e.g.</u>, <u>Oates v. Discovery Zone</u>, 116 F.3d 1161, 1171 (7th Cir. 1997) ("an employee's 'performance is not necessarily confined to an appraisal of his or her substantive work," but rather includes whether he follows established attendance policies). There are no genuine issues of material fact that Ashtiani failed to follow Continental procedures for calling in to work to report his non-attendance. Ashtiani simply and blatantly failed to report for work or to follow the correct notification procedures for absences on June 23 and 24. While Ashtiani claims that on June 23, he reported his absence to Joe Pangelinan, Pangelinan was not his supervisor, and thus that phone call did not qualify as a call-in to report an absence under the terms of the IBT Agreement. <u>See</u> McKinzie Aff. at ¶ 21.

However, without even considering the "no-shows" on June 23 and 24, the basis of the termination, Ashtiani failed to show up for or call in to work on June 17 through June 19, which provides additional justification for Continental's decision to terminate him under its attendance policy and the IBT Agreement.

Additionally, his non-attendance constitutes a legitimate, nondiscriminatory reason for Continental's decision to terminate his employment. See, e.g., Hott v. VDO Yakazi Corp., 922 F. Supp. 1114, 1124 (W.D. Va. 1996) (excessive absenteeism constitutes a legitimate business reason for termination of employment). Ashtiani cannot provide any evidence that such reasons were pretextual.

B.    RETALIATION AND DISCRIMINATION POST 9/11[4]

Upon review of the Complaint, Ashtiani's claim entitled "Intentional Discrimination and Intentional Retaliation post 9/11" is not actually a discrimination and retaliation claim, but rather a claim that Continental lied to the EEOC during the EEOC proceedings. See Compl. at 11-14. However, no such cause of action exists. Furthermore, Ashtiani has not suffered any harm, as the same issues brought before the EEOC are being litigated in this forum.

Furthermore, the elements of retaliation are (1) the plaintiff engaged in conduct protected by Title VII of the Civil Rights Act of 1964; (2) the plaintiff was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. Folkerson v. Circus Circus Ents., Inc., 107 F.3d 754, 755 (9th Cir. 1997). Even if Ashtiani is asserting that Continental "retaliated" against him, as a matter of law, because the alleged retaliatory activity - lying to the EEOC - occurred after Ashtiani was terminated, Continental could *not* have subjected Ashtiani to adverse employment action.

---

[4] See Compl. at 11-14.

Case 1:02-cv-00032    Document 105    Filed 11/21/2003    Page 13 of 76

In sum, Ashtiani's retaliation claim is wholly unsustainable by the law and by the facts of this case.

C.    NEGLIGENT SUPERVISION[5]

Under his claim of negligent supervision, Ashtiani alleges that Continental failed to protect him from the negligent acts of his supervisors. However, Guam's Worker's Compensation Laws bar Ashtiani's claim of Negligent Supervision. See 22 G.C.A. § 9101 et seq. Under the worker's compensation law, an employee who receives a personal injury arising out of or in the course of his employment is entitled to compensation. 22 G.C.A. § 9104. Employer liability under the worker's compensation law is exclusive and in place of all other liability of the employer to the employee. 22 G.C.A. § 9106. In this case, Ashtiani's negligent supervision claims, which are considered personal injuries arising out of the course of employment, are barred by the Guam's Worker's Compensation law.

Other jurisdictions routinely dismiss negligence claims barred by state worker's compensation laws, based on exclusivity provisions within such legal frameworks. See, e.g., Johnson v. Hondo, Inc., 125 F.3d 408, 418 (7th Cir. 1997) (negligent supervision claim barred by Wisconsin Worker's Compensation Act); Pickett v. Colonel of Spearfish, 209 F. Supp. 2d 999 (D.S.D. 2001); Beaulieu v. Northrop Grunman Corp., 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000); Blough v. Hawkins Market, Inc., 51 F. Supp. 2d 858, 865-66 (N.D. Ohio 1999); Padilla v. Carrier Air Conditioning, 67 F. Supp. 2d 650 (E.D. Tex. 1999).

Guam's Worker's Compensation Law works no differently. Acts of negligence committed in the workplace constitute work injuries arising from the conditions of employment. See 161 F. Supp. 2d at 148. The proper and exclusive remedy for an injured employee is to seek compensation under Guam's Worker's Compensation law. As Ashtiani failed to follow this

---

[5] See Compl. at 7-9.

procedure, his Negligent Supervision claim is barred.

Moreover, Ashtiani's Negligent Supervision claim is no more than a wrongful termination claim couched in the language of negligence. Such a claim cannot stand independently, as the alleged negligence is simply part of the allegedly discriminatory conduct resulting in Ashtiani's termination. See Hine v. Dittrich, 278 Cal. Rptr. 330, 333 (Ct. App. 1991) (a plaintiff "can no more turn a contractual wrongful discharge action into a negligent supervision tort claim than could a terminated employee plead negligence simply because the employer negligently failed to follow prescribed procedures before the firing").

D.    CONSTRUCTIVE TERMINATION[6]

To prove his claim for constructive termination, Ashtiani must demonstrate that Continental intentionally made his working conditions so intolerable that a reasonable person would feel compelled to resign. Bergene v. Salt River Project Agricultural Improvement and Power Dist., 272 F.3d 1136, 1144 (9th Cir. 2001). As Ashtiani himself recognizes, Compl. at ¶ 44, he was terminated by Continental. He therefore was not constructively terminated, he was *actually* terminated. Ashtiani therefore has no cause of action for constructive termination.

E.    WRONGFUL TERMINATION[7]

Generally, a wrongful termination cause of action, also known as "retaliatory discharge," holds that an employee may not be discharged for acting in furtherance of public policy. See Gantt v. Sentry Ins., 824 P.2d 680 (Cal. 1992) (en banc) overruled on other grounds by Green v. Ralee Eng'g Co., 960 P.2d 1046 (Cal. 1998).[8] Actions "in furtherance of public policy" include: (1) refusing to violate a statute, (2) performing a statutory obligation, such as

---

[6] See Compl. at 15.

[7] See Compl. at 16.

[8] Guam law has not defined the elements of a wrongful termination claim. Continental therefore analyzes the claim within the context of California law. See Roberto v. Aguon, 519 F.2d 754 (9th Cir. 1975).

jury duty, (3) exercising a statutory right or privilege, such as union activities, or (4) reporting an alleged violation of a statute of public importance. 824 P.2d at 684. Overall, the claim must involve questions genuinely concerning public policy, as opposed to ordinary disputes between employer and employee. Stevenson v. Superior Court, 66 Cal. Rptr. 2d 888 (1997).

Ashtiani has pointed to events occurring *prior to his discharge* that he considers evidence that he was wrongfully terminated. First, Ashtiani states that he threatened to report Continental to the EEOC in a grievance filed in 1999, and that Mendoza withheld information to other supervisors in reference to his call to work. See Declaration of David Ledger (hereinafter "Ledger Decl.") at ¶ 4; Ex. S at Response to Request No. 5. Neither of these events are actions "in furtherance of public policy." A *threat* to report Continental to the EEOC, as opposed to an actual report to the EEOC, does not constitute an *act* in furtherance of public policy. Also, the allegation that Mendoza withheld information to other supervisors is incomplete with regard to fulfilling the elements of a wrongful termination claim, as no act on Ashtiani's behalf in furtherance of public policy occurred. Under either allegation, no public policy concerns exist, only individual employee concerns. Accordingly, as a matter of law, Ashtiani simply cannot fulfill the elements of a wrongful termination claim.

F.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS[9]

The conduct complained of with regard to Ashtiani's claim for intentional infliction of emotional distress includes Continental "creating a hostile work environment" through "verbal abuse, imposition of totally unreasonable job assignment," and McKinzie's failure to investigate Ashtiani's complaints.

First and foremost, as with the claim for Negligent Supervision, Ashtiani's claim for Intentional Infliction of Emotional Distress is likewise barred by Guam's Worker's

---

[9] See Compl. at 6-7.

Compensation Law. As already stated, the worker's compensation law provides compensation to an employee in the event of an injury arising out of and in the course of employment. As the worker's compensation law provides the exclusive remedy for litigating the IIED claim, such claim is therefore barred. See Johnson, 125 F.3d 418; Beaulieu, 161 F. Supp. 2d at 1148; Shoemaker v. Myers, 276 Cal. Rptr. 303 (Cal. 1990).[10]

Furthermore, in order to prove his claim for Intentional Infliction of Emotional Distress, Ashtiani must demonstrate (1) acts committed by Continental amounted to extreme and outrageous conduct transcending the bounds of decency; (2) such acts were committed intentionally or recklessly; (3) causation; and (4) damages amounting to severe emotional distress. Inland Mediation Bd. v. City of Pomona, 158 F. Supp. 2d 1120 (C.D. Cal. 2001). The "extreme and outrageous conduct" complained of must exceed the bounds of what is generally tolerated in a civilized society. Braunling v. Countrywide Home Loans, Inc., 220 F.3d 1154 (9th Cir. 2000). Unreasonable job assignments, verbal abuse, and a failure to investigate an employee's complaint hardly rises to the level of extreme and outrageous conduct exceeding the bounds of a civilized society. See, e.g., Rest. 2d Torts § 46, com. d (liability does not extend to insults).

Ashtiani has not produced any evidence that he suffered severe emotional distress. A report by Dr. Alix Chenet revealed no such indications of emotional distress. See Ledger Decl. at ¶ 5. Furthermore, Ashtiani failed to release any other doctor's reports under the guise of psychotherapist-patient privilege. See Ledger Decl. at ¶ 6. Without the release and admission of any such evidence, Ashtiani cannot demonstrate that he suffered severe emotional distress, and thus cannot prove his claim for intentional infliction of emotional distress.

---

[10] This Honorable Court also reached the same conclusion in a similar employment case, Tolentino v. Greenhill, CV00-00001 (Apr. 10, 2001 Order).

Case 1:02-cv-00032     Document 105     Filed 11/21/2003     Page 17 of 76

G.     FAMILY MEDICAL LEAVE ACT[11]

The Family Medical Leave Act, 29 U.S.C. § 2601 et seq., entitles employees to take reasonable leave for the care of a child with a serious health condition. The FMLA defines an "eligible employee" as one employed for at least 1,250 hours of service with the employer during the previous twelve-month period. 29 U.S.C. § 2611. Furthermore, a person suffers from a "serious health condition" when the illness, injury, impairment or physical or mental condition that involves inpatient care in a hospital or residential medical care facility or continuing treatment by a health care provider. Id. Importantly, the employee must follow requirements for certification for FMLA leave in order to qualify for such leave. This requires obtaining a physician's certification that the child suffers from a serious health condition, and providing that certification to the employer in a timely manner. 29 U.S.C. § 2613. To be sufficient, the certification must state, among other requirements, (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; and (3) the duration of time needed for the employee to care for the child. Id.

There are no genuine issues of material fact that Ashtiani did not qualify for FMLA and did not receive any FMLA benefits. First, Ashtiani was not entitled to FMLA leave because, first, he did not provide an adequate certification of his son's illness. The certification does not contain information such as when the son's health condition commenced, the duration of the condition, and the duration of time needed for Ashtiani to take off to care for the child. This is due in large part to Ashtiani's never having taken his son to a health care provider until July, despite his son's alleged illness. Second, Ashtiani's son did not suffer from a "serious health condition," but rather, as Doctor Appellanes' certification states, Ashtiani's son was "asymptomatic." Ex. P. Third, the certification was also submitted untimely on July 10, 2001,

---

[11] See Compl. at 14-15.

Case 1:02-cv-00032    Document 105    Filed 11/21/2003    Page 18 of 76

after Ashtiani was terminated.

Ashtiani furthermore did not qualify because he worked less than the amount of hours required for an employee to qualify for FMLA leave. From June 27, 2000, until June 27, 2001, Ashtiani worked approximately 80 days, which is the equivalent of 800 hours.[12] Therefore, Ashtiani did not meet the FMLA requirement that he work 1,250 hours for the previous twelve-month period.

Continental did not violate the Family Medical Leave Act, as Ashtiani did not qualify for leave under FMLA in any respect.

H.    SALES OF FRAUDULENT INSURANCE POLICY[13]

To prove that Continental fraudulently sold Ashtiani an invalid insurance policy, Ashtiani must demonstrate: (1) Continental engaged in a false representation or concealment of a fact; (2) Continental knew of such falsity; (3) Continental intended to induce Ashtiani's reliance on such representation; (4) Ashtiani justifiably relied on such representation; and (5) Ashtiani suffered damages therefrom. Transpacific Export Co. v. Oka Towers Corp., 2000 Guam 3, ¶ 23.

Continental did not fraudulently sell an invalid insurance policy to Ashtiani. In contrast, the insurance policy offered to Ashtiani - and to all Continental employees - is valid in Guam and recognized by AIG, the carrier. Even if the policy was not valid, Continental had no knowledge of the policy's invalidity, as the policy is ultimately issued and handled by AIG, not Continental. Continental simply acts as an intermediary in offering the policy and plan to its employees.

---

[12] Ashtiani was credited 10 hours per workday, under the terms of the IBT Agreement, which states that "[f]ive (5) consecutive work days of eight (8) hours each followed by two (2) consecutive days off shall constitute a standard work week of four (4) consecutive days of ten (10) hours each followed by three (3) consecutive days off shall constitute a standard work week." Ex. A, Art. 7, § B.
[13] See Compl. at 16-17.

## V.    CONCLUSION

Ashtiani's allegation that race was the motivating factor in Continental's decision to terminate him is simply unsustainable by any genuine issue of material fact. Rather, the facts clearly show that he was terminated because over and over again, he failed to show up for work and to report his absence to his supervisors. Ashtiani has no direct or indirect evidence that would support a claim for racial discrimination.

Despite the lack of evidence, Ashtiani brings this claim before this Honorable Court, along with countless other meritless claims that simply have no basis in the fact or in the law. The Court should grant summary judgment in favor of Continental on all counts.

DATED: Hagåtña, Guam, November 21 , 2003.

CARLSMITH BALL LLP

for

ELYZE MCDONALD
Attorneys for Defendant
Continental Micronesia, Inc. dba
Continental Micronesia and
Continental Airlines, Inc.

CARLSMITH BALL LLP

ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Continental Micronesia, Inc. dba
Continental Micronesia and
Continental Airlines, Inc.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TONY H. ASHTIANI,<br><br>    Plaintiff,<br><br>  vs.<br><br>CONTINENTAL MICRONESIA, INC. dba<br>CONTINENTAL MICRONESIA and<br>CONTINENTAL AIRLINES, INC.,<br><br>    Defendant. | CIVIL CASE NO. CV02-00032<br><br>**AFFIDAVIT OF DIXON MCKINZIE IN**<br>**SUPPORT OF DEFENDANTS'**<br>**MOTION FOR SUMMARY**<br>**JUDGMENT** |

GUAM, U.S.A.      )
           ) ss:
Municipality of Hagåtña   )

    I, DIXON MCKINZIE, being first duly sworn, depose and say:

    1.   All the statements made in this Affidavit are based on my personal

knowledge.

    2.   All exhibits referred to herein and attached are business records found in

Tony H. Ashtiani's personnel file at Continental Micronesia, Inc., and kept in the ordinary course

of business at Continental. I have reviewed all of these documents in my capacity as the Director of Human Resources at Continental, and thus have personal knowledge of these documents and the information contained therein.

3.      I am currently the Director of Human Resources at Continental Micronesia Inc., and acted in that capacity at all times relevant to Ashtiani's Second Amended Complaint.

4.      Attached hereto as Exhibit A is a true and correct copy of pertinent pages of the Agreement between Continental and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("IBT Agreement"). Ashtiani, a former Continental aircraft mechanic, was a member of the IBT during the periods relevant to his Complaint.

5.      The IBT Agreement and Continental's Attendance Policy governs the procedures that Continental employees who are also IBT members must follow for reporting an absence from work.

6.      Attached hereto as Exhibit B is a true and correct copy of Continental's Attendance Policy, which Continental enforces for all of its employees.

7.      Attached hereto as Exhibit C is a true and correct copy of the July 3, 2001 letter terminating Ashtiani's employment with Continental.

8.      Throughout Ashtiani's employment with Continental, he received a number of disciplinary warnings. True and correct copies of several of those warnings are attached hereto as Exhibit D.

9.      Attached hereto as Exhibit E is a true and correct copy of Ashtiani's 2000 Absentee Record.

10.     Attached hereto as Exhibit F is a true and correct copy of Ashtiani's 2001

Absentee Record, which demonstrates that he only worked 61 days during that year prior to his termination on July 3, 2001.

11.     Ashtiani was granted "sick" time off on June 3 through June 5, and "personal business" time off on June 7-9, and June 11-12, 201. Attached hereto as Exhibits H and I are true and correct copies of Absence from Duty Reports exhibiting approval for the days off mentioned in this paragraph.

12.     On June 16, 2001, Ashtiani called Continental maintenance department supervisor Glenn Mendoza for approval of a "personal business" day off which Mendoza granted. Exhibit F reflects that approval. Also, attached hereto as Exhibit J is a true and correct copy of an email sent by Mendoza to another Continental maintenance department supervisor, William Herrera, reflecting the approval of the "personal business" day off on June 16, 2001.

13.     Ashtiani, however, failed to show up for work or secure approval for his absences on July 17-19, 2001. Exhibit F reflects that these absences were considered absences without leave. Also, Exhibit J demonstrates that he failed to secure approval for his absences on those days. Additionally, attached hereto as Exhibit K are true and correct copies of emails written by Herrera regarding Ashtiani's no-shows on July 17-19, 2001.

14.     Attached hetero as Exhibit L is a true and correct copy of notes kept by William Herrera in the ordinary course of business pertaining to the events surrounding Ashtiani's attendance in June 2001. Exhibit L shows that on June 19, Ashtiani expressed interest in taking a formal leave of absence from Continental. As Herrera did not have the authority to grant a formal leave of absence, he directed Ashtiani to contact the Human Resources department. However, as Herrera states in his notes, he "did not tell [Ashtiani] no to come in until [June 25, 2001]." Ashtiani's request is also recorded in an email by Herrera, a true and

correct copy of which is attached hereto as Exhibit M.

15. On June 23 and 24, 2001, Ashtiani failed to appear for work or to notify his supervisors that he would not be in on that day. Exhibit F reflects these absences were considered absences without leave.

16. As the IBT Agreement and Continental's Attendance Policy state, when reporting an absence from work, an employee must speak directly with a supervisor. A phone call to non-supervisory personnel, such as to another aircraft mechanic, does not constitute proper Continental protocol for reporting such absence.

17. Attached hereto as Exhibit N is a true and correct copy of a letter drafted by Mendoza and kept in the ordinary course of business stating that he did not give Ashtiani June 24 off. Neither Mendoza nor Herrera gave Ashtiani June 23 and 24 off.

18. Attached hereto as Exhibit O is a true and correct copy of an email from Herrera to Ashtiani informing him of the July 2, 2001 meeting.

19. Attached hereto as Exhibit P is a true and correct copy of a Family Medical Leave Act Physician's Certification Form submitted by Mr. Ashtiani to Continental on July 10, 2001. Ashtiani had previously been offered FMLA forms, which he denied on June 11, 2001, and then later accepted on June 26, 2001. Attached hereto as Exhibit Q are true and correct copies of business correspondence reflecting Ashtiani's initial refusal and subsequent acceptance of the FMLA forms.

20. Ashtiani appealed his termination, and was later offered reinstatement with certain conditions, which he declined.

21. Joseph Pangelinan is employed as an aircraft mechanic at Continental Micronesia Inc., and was employed as such in June 2001. He was a temporary leadman aircraft

mechanic on June 23, 2001. Mr. Pangelinan in June 2001 did not have any supervisory role or supervisory capacity at Continental.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Further the Affiant sayeth naught.

Executed this __21st__ day of November, 2003 at Tamuning, Guam.

_____
DIXON MCKINZIE

SUBSCRIBED AND SWORN to before me, this __21st__ day of November 2003, by Dixon McKinzie.



_____
NOTARY PUBLIC

EUNICE J. MENDIOLA
NOTARY PUBLIC
In and for Guam, U.S.A.
My Commission Expires: April 8, 2006
257 Assumption Drive Piti, Guam 96915

CARLSMITH BALL LLP

ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Continental Micronesia, Inc. dba
Continental Micronesia and
Continental Airlines, Inc.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TONY H. ASHTIANI, <br><br> Plaintiff, <br><br> vs. <br><br> CONTINENTAL MICRONESIA, INC. dba CONTINENTAL MICRONESIA and CONTINENTAL AIRLINES, INC., <br><br> Defendant. | CIVIL CASE NO. CV02-00032 <br><br> **DECLARATION OF DAVID LEDGER** |

I, David P. Ledger, declare:

1.    I am an attorney at law licensed to practice before the Courts of the Territory of Guam and before this Court. I am a partner with the law firm of Carlsmith Ball LLP, attorneys of record for Defendant Continental Micronesia, Inc.

2.    If called as a witness, I would and could competently testify thereto to all facts within my personal knowledge except where stated upon information and belief.

3.      Attached hereto as Exhibit R is a true and correct copy of an Affidavit by Jeanne Wilson, legal counsel for Defendant Continental Airlines, Inc. The original copy of the Affidavit will be filed immediately upon receipt at my office.

4.      Attached hereto as Exhibit S is a true and correct copy of Plaintiff Tony H. Ashtiani's Response to Defendant's First Request for Production of Documents.

5.      Defendant subpoenaed Dr. Alix Chenet, Ashtiani's physician, for doctor's reports indicating evidence of emotional distress. Dr. Chenet complied with the subpoena, and none of the documents provided contained any such indications of emotional distress. Defendant is prepared to provide those documents to the Court for examination upon the Court's request.

6.      Defendant also subpoenaed Dr. Juan Rapadas, Ashtiani's psychologist. Dr. Rapadas object on grounds of privilege, and Ashtiani refused to waive the psychotherapist-patient privilege to allow Dr. Rapadas to turn over the documents.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed this 21st day of November, 2003, at Hagåtña, Guam.


_____
DAVID P. LEDGER

## ARTICLE 7

### HOURS OF SERVICE

A. Eight (8) consecutive hours, exclusive of an unpaid meal period, shall constitute a normal day or afternoon shift and eight (8) consecutive hours, inclusive of a thirty (30) minute meal period shall constitute a normal night shift. Based on the needs of the service, a ten (10) hour shift may be established as set forth in paragraph B below. A thirty (30) minute lunch will be given during the fourth or fifth hour of an employee's regularly assigned shift. Where a meal period is delayed and does not commence during the fourth and fifth hours, an employee shall be entitled to thirty (30) minutes at time and one half for the lunch period.

B. Five (5) consecutive work days of eight (8) hours each followed by two (2) consecutive days off shall constitute a standard work week or four (4) consecutive days of ten (10) hours each followed by three (3) consecutive days off shall constitute a standard work week. The working hours shall be properly posted on the bulletin board.

C. For the purpose of relaxation, all employees shall be granted a ten (10) minute rest period during the first half of their work shift and a ten (10) minute rest period during the second half of their work shift and a ten (10) minute rest period after completion of a regular shift before working overtime. Also, ten (10) minutes rest period for every two (2) hours of overtime worked without loss of time.

D. Shift and days off will be rebid without penalty:

1.  Shift and days off will be bid without penalty each quarter of the year. Deviation may be made in order to accomplish this bid concurrently with a schedule change that takes place at approximately the same time.

2.  Bids will be awarded in accordance with Article 20, Seniority. In order for an employee to participate along with the eligible employees in a rebid, he must be actively at work. If an employee is on vacation he must leave a preferential bid with the union and the company.

3.  Each shift starting time during the rebid period for each classification may be changed by two (2) hours in either direction without penalty, two (2) times during each rebid period.

4.  The Company will post a bid date along with the approximate number of available positions and days off for each shift. The employee will have seven (7) days from the date of posting to return his completed written bid sheet. The first incident of failure to file a preferential bid will result in the employee being assigned a shift equal to his present shift and days off if available at his point of seniority bidding. If unavailable, the employee will be assigned a shift as close as possible to his current shift. If there is more than one (1) failure to bid within each calendar year, the second incident will result in the employee being bypassed and assigned a shift equal to his present shift and days off if available. If unavailable, the employee will be assigned a shift as close as possible to his current shift.

12



**EXHIBIT A**

E. When it becomes necessary to temporarily assign an employee to another shift between rebid periods, the following procedure will be followed:

1. Employees on the shift where the transfer is to be made from will be polled by seniority as to their preference for accepting the temporary assignment. If no one accepts the temporary transfer, inverse seniority will be used to select the employee to be transferred.

2. Such assignment will provide for a penalty of one and a half times the base rate for the first four (4) hours of assignment to the temporary shift.

3. If a seven-and-a-half-hour rest period is not provided to the employee between the shifts, the four-hour penalty will not apply, but the overtime provisions of Article 9 will be applicable for penalty payments.

4. A temporary assignment between shifts shall not be of more than twenty (20) normal working days. An extension of this period shall be by mutual agreement between the Company and the Union.

F. No full-time employee will be called to work or required to report for a work shift of less than eight (8) hours of pay, except on a recall after having worked a previous shift the same day, when the minimum allowance will be four (4) hours pay at the regular hourly rate.

Any employee who reports for work when there is temporarily no work because of an act of God or other circumstances over which the Company has no control (including strikes by employees of the Company curtailing flight operations by fifty percent (50%) or more system-wide), will receive a minimum of four (4) hours pay at the regular hourly rate unless notified that there will be no work at the close of the last shift worked, or four (4) hours before the start of the employee's regular shift, whichever period is shorter. Notification can also be via media releases from the Company.

G. Vacation Relief Procedural Rules

1. Vacation relief may be assigned to all or any portion of a vacation period.

2. Vacation relief assumes the shift and days off the employee on vacation. Except in the event of a shift rebid, the vacation relief will assume the new shift and days off the employee on vacation.

3. When not working vacation relief, the relief employee has a basic shift and days off.

4. If the vacation relief constitutes less than an eighty (80) hour pay period at the employee's option, the relief employee will be assigned to work additional time without penalty.

13



## H. DAY AND SHIFT TRADES

1. Employees may agree among themselves, qualifications permitting, to: (1) trade one or more of their days off with each other ("day trade"); (2) exchange shifts on the same day, or another day ("shift trade"); or (3) work in place of another employee without the other employee doing likewise ("one way trade") in accordance with paragraph 5. below. If one employee is on ten hour shifts and the other employee is on eight hour shifts, then both employees will work each other's assigned shifts. The foregoing trades may result in an employee working more than four (4) days (in the case of 10 hour shifts) or five (5) days (in the case of 8 hour shifts) in a work week, and/or more than eight (8) or ten (10) hours, as the case may be, in a twenty-four (24) hour period. In all such cases those employees will be paid straight time.

2. Employees who agree to make a specific trade should fill out and sign a form stating the dates and times of the trade. That form must then be submitted to the appropriate supervisor who shall acknowledge receipt of it with his signature, even though his approval of the trade is not required. Each of the employees is then responsible for his own attendance on the dates and times of the agreed trade, as well as ensuring both parties are qualified in accordance with the Company's definitions of qualifications. Upon reporting for work, a trading employee must give the appropriate supervisor the name of the employee whose place he is taking.

3. However, an employee who orally arranges for a trade without filling out the appropriate form, and without obtaining a supervisor's written receipt, will be held responsible for his own attendance and that of the other employee agreeing to the trade.

4. If it is necessary to temporarily transfer an employee from one shift to another, the supervisor will ask for a volunteer. If no one volunteers, a qualified employee will be selected by the supervisor by reverse craft seniority.

5. One way trades are limited to two (2) days per two week pay period, unless otherwise authorized by the appropriate supervisor. Two way trades are limited to five (5) days/shift per pay period, unless otherwise authorized by the appropriate supervisor. Trades must be completed within a bid period.

14



## ARTICLE 18

### ABSENCE FROM DUTY

A.   Unless otherwise provided by special departmental bulletin, an employee hereunder who is prevented from reporting for duty shall notify the supervisor on duty prior to the start of his shift and shall give the reason for his inability to report for duty. Such notification shall be necessary only once in any continuous period of absence providing that the employee has notified his immediate supervisor of the approximate duration of his absence and the date on which he will return to work.

B.   An employee hereunder shall not be absent from duty without prior permission in writing, except for sickness, injury, or other cause beyond the control of the employee.

   1.   An employee may be discharged for cause if he is absent from work for two (2) consecutive days without notifying the Company of the reason for his absence. However, he shall not be discharged if a satisfactory reason is given for not notifying the Company.

   2.   It is the employee's responsibility to initiate the Absence from Duty report and submit to his immediate supervisor for processing on each absence from duty for any cause whatsoever. Such report should be submitted prior to the employee taking any scheduled time off. However, it must be submitted prior to the employee returning to his first scheduled shift. The only exceptions to the prior approval are occupational injury or sickness. All other items listed in Article 9, Paragraph D must have prior approval or he will not receive any pay for such absence until such document is submitted regardless of other provisions of this Agreement.

C.   When it is necessary for an employee to be absent from duty because of death in his immediate family (wife, husband, child, mother, father, sister, brother, grandparents of employee, his mother-in-law or his father-in-law, grandchildren and dependents living in the employee's household), he shall have four (4) twenty-four (24) hour work periods to be taken within ten (10) twenty-four (24) hour periods starting from the time of death, during which he will not be required to report for duty and shall not suffer any loss of his base pay. If the above defined death in the immediate family occurs, the employee taking such time off will be allowed at that time up to and including a maximum of forty (40) hours of unused vacation days or earned unused sick leave in conjunction with the above referenced four (4) days bereavement time. Such use of sick time will not count for attendance/disciplinary purposes.

.42.

D.  Employees may request a day or portion of a day off without pay to attend to business that cannot be accomplished except during their normal working hours. When a justifiable reason exists and when the requirements of the service will permit, such time off will be permitted on a first-request basis. Failure to secure such authorization at least twenty-four (24) hours in advance (except in the event of personal emergency) or other abuses of the privilege, shall result in loss of the right to request and be granted such privilege for a period of one (1) calendar year.

E.  An employee required to serve as a juror shall furnish evidence to his supervisor of the required time and place of reporting.

   1.  An employee absent from work while on jury duty shall suffer no loss of pay provided the employee furnishes the Company a Court Validated Statement of Attendance.

   2.  When an employee serves on jury service for six hours or more on any scheduled work day, he shall not be required to report for work on that day.

43



# ATTENDANCE POLICY

Regular attendance and punctuality are essential factors in insuring the personal success of each Employee, the success of the Department to which we are assigned and the successful achievement of Continental Micronesia's Corporate Goals. Excessive absenteeism and lateness places an unfair burden on our fellow Employees and has a profound adverse effect on our ability to achieve our personal success and the continued success of Continental Micronesia. This attendance program is designed to assist each Employee by setting forth a standard for acceptable attendance so each Employee knows what is expected of them. It is also designed to assist our Management team in monitoring and managing Employee attendance and punctuality in a fair and consistent manner.

Eight (8) incidents within a twelve month period is normally considered to be excessive and can subject the Employee to serious disciplinary action.

## A. DEFINITIONS

1.  **ACCOUNTABLE ABSENCES** are defined as an instance when an Employee is absent from work (a) due to sickness involving the Employee or his/her spouse or dependent child, (b) is late reporting for duty of more than 5 minutes, (c) is unable to report with prior notice to supervisor, (d) fails to report (no show) without prior notification to supervisor, and (e) departs early without authorization.

2.  **NO SHOW** is the most serious type of absenteeism. When an Employee fails to show for work, it creates a hardship on the operation and other Employees. More than one incident of no show may result in an acceleration of discipline. Two (2) consecutive days (or duty assignments) absence from duty without notification may result in discipline that does not exclude termination.

3.  **SICK** is an incident due to the illness of the Employee or his/her spouse or dependent child. Absence due to sickness is considered one incident even if it extends for consecutive days. The Employee must notify his/her supervisor in advance of each shift or duty assignment unless a doctor has prescribed a certain number of days free from work and the supervisor has been provided this information.

4.  **LATE REPORT** – An employee is considered late for disciplinary purposes if he/she reports for work more than 5 minutes late. Three incidents of reporting five or less minutes late within a six month period will trigger the issuance of one Late incident to the Employee's attendance record and will disqualify the Employee from participation in the ATTENDANCE INCENTIVE AWARDS PROGRAM.

5.  **PATTERNS AND TRENDS OF ABSENCE** – An Employee's attendance record will be reviewed to determine attendance patterns and trends. Patterns and trends may include absenteeism consistently falling in conjunction with an Employee's scheduled days off, scheduled vacation, holidays, surrounding day trade off, or when absenteeism frequently occurs on the same days of the month. In some cases, the attendance guidelines may be accelerated to promote attendance improvement by the Employee.

**EXHIBIT B**

Case 1:02-cv-00032    Document 105    Filed 11/21/2003    Page 33 of 76

6.    **NON-ACCOUNTABLE ABSENCES** – Absences from duty for the following reasons will not count for discipline related attendance tracking and will not disqualify the Employee from participation in the ATTENDANCE INCENTIVE AWARDS PROGRAMS.

a.    Vacation

b.    Holidays

c.    Trade Days Off

d.    Death/Critical Illness*

e.    Jury Duty

f.    Approved leaves of Absence

g.    Occupational Injury Time

h.    Compensatory Time Off

i.    Approved Unpaid Time Off

j.    Company Declared Adverse Weather Time Off

k.    Lates in accordance with Paragraph A.4. above


**B.    ATTENDANCE POLICY GUIDELINES**

Employees incurring attendance incidents will be counseled according to the following:

**LEVEL ONE**                              **1 Accountable Incident**

Notation is to be placed on Employee's Attendance Tracking Sheet/File. A copy of the notation is placed in Employee's mail file.

**LEVEL TWO**                              **2 Accountable Incidents**

Notation is to be placed on Employee's Attendance Tracking Sheet/File. A copy of the notation is placed in Employee's mail file.

**LEVEL THREE**                            **3 Accountable Incidents**

Supervisor will personally give Employee a copy of the third incident notification on the Employee's attendance file. If the incidents indicate a potential pattern (see definition of patterns/trends), supervisor will discuss with Employee.

**LEVEL FOUR**                             **4 Accountable Incidents**

Supervisor will personally give Employee a copy of the fourth incident notification on the Employee's attendance file and will counsel Employee on the 8th incident policy to ensure the Employee understands expectations. If the incidents indicate a potential pattern (see definition of patterns/trends), supervisor will again discuss with Employee.

HRMG (6/97)
Attendance Pg. 2

**000960**

| LEVEL FIVE | 5 Accountable Incidents |
|---|---|

Employee will be given a written letter of counseling (1st Written Warning) indicating the incidents on record and clear notification that further disciplinary action mby be necessary if attendance improvement is not shown. If there is reason to believe that Employee Assistance may be needed, Supervisor should request assistance from Employee Relations/Human Resources.

| LEVEL SIX | 6 Accountable Incidents |
|---|---|

Employee will be given a second Written Warning letter expressing the need for immediate corrective action.

| LEVEL SEVEN | 7 Accountable Incidents |
|---|---|

Employee is placed on written termination warning. Employee Relations/Human Resources is notified of the termination warning and may request a meeting with supervisor and/or Employee for intervention purposes.

| LEVEL EIGHT | 8 Accountable Incidents |
|---|---|

Employee is subject to discharge. Supervisor should consult with Employee Relations/Human Resources prior to discharge of Employee.

C.    **ADMINISTRATION OF POLICY**

1.    **Rolling 12 Months Calendar** – The above guidelines are administered on a rolling 12-month period from the date of the first incident. Although incidents drop off in a rolling calendar year, once an Employee has reached termination warning, termination will be considered with each absence over the next twelve months until such time as the attendance record returns to a Level Five.

Consideration will be given to individuals with extenuating circumstances. These special situations should be reviewed by supervision and Human Resources to establish a more lenient progression if circumstances warrant. It is also possible that supervision may, in some cases, accelerate the program depending upon the severity of the incident the overall record, and the Employee's length of service.

2.    **Abuse** – Employees, including supervision, are expected to work as a team toward maintaining satisfactory attendance. Dishonesty associated with sick leave or any other absence is a serious matter. An Employee who calls in sick when they are not, who misleads the Company, who uses travel benefits without prior permission, is dishonest regarding a lost time incident, or refuses a duty assignment is subject to termination of employment.

3.  Medical Verifications – Supervision will advise the Employee when a written medical verification by a doctor is required which includes:

    a.  Diagnosis/Prognosis

    b.  Date and time of visit

    c.  Date of next visit, if applicable

    d.  Medication prescribed

    e.  Anticipated date Employee will return to work

The verification must be submitted to the supervisor on or before report time of the Employee's first duty assignment following the absence. Failure to provide such verification may result in the Employee being withheld from duty.

**000962**

To:        Hamid (Tony) Ashtiani

From:      William A. Herrera

Subject:   Disciplinary Action

Date:      July 3, 2001

At the end of our discussion on June 26, 2001 with Prudencio Aguilo and IBT
Representative, Mike Pablo present, you were advised that you would be contacted for a
meeting on Monday. I had also advised you to contact me by Tuesday, 1600 if you had not
heard from me. The meeting was scheduled to discuss your no-call/no-show of your shifts of
June 23 and 24, 2001.

After numerous attempts, starting with my e-mail sent on June 27 to the address you had
provided and also voice messages left on the answering machine associated with telephone
number 653-5575, we have been unable to set a formal meeting date. Because of the faxed
received at 1701 on July 3, 2001 it is apparent that you don't want to meet to complete this
investigation. With the information that I have available and based on no reasonable
explanation for not securing authorization for your absences on June 23 and 24, 2001 I have
made the decision to terminate your employment with Continental Micronesia effective July
3, 2001.

Because your refusal to meet and discuss this situation any further, it is with regret that I am
reduced to sending this certified letter concerning your status with Continental Micronesia.
Your final paycheck is available and may be retrieved from the Human Resources
department by contacting Robbi Crisostomo, 642-8727 or Teresa Sage, 642-8852.

Should you elect to appeal this termination, you may do so in accordance with Article 24 of
the current bargaining agreement between Continental Micronesia, Inc. and The International
Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

William A. Herrera

Cc:    Baltazar Atalig
       Employee Relations
       Union Representative
       P-file

_William_  1/24/02

**000983**

**EXHIBIT C**

## Planning / M.O.C. Discrepancy report

Date: 9-12-95

Control #: 95-09-01

Completed by: BILL BALOWIN

Title: SUP. A/C PLANNING

Department: M.O.C. or A/C Planning

Aircraft # 073

Date 9-11-95

Time 15:15

Items overflown:

M&E #: 02-0512-8-0055

M&E #:

M&E #:

Description: I/P 4982443 DIP TI INSA MAG PLUG W/I 100 FLT HRS

Description:

Description:

Explanation/Cause of discrepancy: LOG PAGE 49E2443 WAS OPENED BY GUM MX ON 9/1. MX DID NOT ENTER THE L/P IN SCEPTRE TIL 9/8. BEING THE WEEKEND RECORDS PERSONEL DID NOT START TRACKING THE TIME TIL MONDAY 9/11 APPOX. ~1200 9/11 PLANNING WAS NOTIFIED THE A/C HAD ALREADY OVERFLOWN IT'S LIMIT BY 8.06 HRS.

Action taken: MAG PLUG INSPECTION WAS C/W IN EWR DEF T-12 9/11/95

Corrective action: MR. BUD PARRY HAS BEEN FAXED A COPY OF THIS DISCREPANCY REPART FOR HIS EXPLANATION OF THE CORRECTIVE ACTION

(Note: If a discrepancy is caused by other than M.O.C. or A/C Planning, that department is to provide a written explanation of corrective action taken to the Director of Quality Assurance within 5 business days.)

Distribution: Director of Quality Assurance
Director of Aircraft Planning
Director of Maintenance Control

**000964**

**EXHIBIT D**

Gunther/Tom

This did not get
accomplished in the
regd time limit
because the individual
did not complete a DIP.
I feel the individual
should get a do-
better/warning letter.
Please advise so
I need to close out
with the ~~F&S~~.

Johnson

000965

# Continental Micronesia



09/17/95

MANAGER OF Quality control
THomAs RAMiRE3.

Continental Micronesia
P.O. Box 8778
Tamuning, Guam 96931

Tel 671 649 9102
Fax 671 649 9106

Dear THomAs.

I knowleged Recieving THe mentioned Documents AND complied with steps 1 THRu 4 of THe procedures AlTHeugH observing "x" mark on THe inspection Block AT THe Top of THe page, I logisTiclly Believed A fax copy was sent To CAI - QC offices, sinces continental micronesia Has no jearistriction over DC-10-30's fleet's DIP AND control #:

in All RetroRespect I performed my duty To THe best of my ability How ever if I Am known To Be AT fault I will Take full responsibility and will stand THe consequences without dispute To THe reasanable level of REPIRMENT.

sincerly yours.

**000966**

# Continental Micronesia



02 March 1993

To:     Tony Ashtiani

Subj:   Exceeding AOA Speed Limits/Absence From Assigned Work
        Area

At approximately 11:15 A.M., 03-02-93, you left your assigned job
area on ACFT 790 B-check and was witnessed leading up to the Terminal
area on tow tractor exceeding AOA speed limit.

This letter is to serve as a notification of warning that any future
occurences of this nature will result in a higher state of discip-
linary action.

Thank you,

Frank Perez

cc:   Bud Parry
      Fred Comas
      Personal File

**000967**

TO: HAMID ASHTIANI
FR: GLENN MENDOZA
SUBJ: ATTENDANCE
DATE: 14NOV99

ON NOV 20, 1999, YOU WERE SCHEDULED TO WORK SWINGSHIFT. YOU WERE REGARDED A "NO SHOW" FOR FAILURE TO SHOW FOR WORK AND NO NOTICE GIVEN TO A SUPERVISOR. DUE TO THE SERIOUS NATURE OF THIS INCIDENT AND YOUR PASS ATTENDANCE RECORD, I WILL PLACE YOU AT THIRD INCIDENT LEVEL WHICH REQUIRES ME TO COUNSEL YOU AND PLACE THIS DOCUMENT IN YOUR PERSONAL FILE. TONY, YOUR "NO SHOW" CREATED A HARDSHIP TO THE OPERATION AND YOUR FELLOW EMPLOYEE, PLEASE REMEMBER THE STATUS YOU HOLD IN REGARDS TO SENIORITY. THE EXAMPLE YOU SET AFFECTS A GREAT NUMBER OF OUR AIRCRAFT TECHNICIANS. IF YOU HAVE ANY QUESTIONS REGARDING THIS LETTER, PLEASE ASK.

GLENN MENDOZA
LINE MX SUPV.

338

# Continental.

## EMPLOYEE ABSENTEE RECORD
### CALENDAR YEAR 2000

EMPLOYEE NAME __ASHTIANI, Hamid "Tony"__

EMPLOYEE NO. __05963__

COMPANY SENIORITY ____

FORM: 40.000.
DATE: REV 11/99

PREVIOUS YEAR TOTAL (INSTANCES)
SICK ____ OCC. ____
P.B. ____ AWL ____
TARDY ____
OTHER ____

## ABSENCE FROM DUTY CODES

DO - REGULAR DAY OFF
S - SICKNESS
OI - OCCUPATIONAL INJURY
V - VACATION
W - ABSENCE WITHOUT LEAVE
H - HOLIDAY
P - PERSONAL BUSINESS
CC - COMPANY CONVENIENCE
PC - PERSONAL CONVENIENCE
J - JURY DUTY
K - DEATH IN IMMEDIATE FAMILY
L - TARDY
TO - TRADE DAY-OFF
TW - TRADE DAY WORKED
T - 737 training

Calendar grid with months January through December (rows 2-31), filled with handwritten codes (mostly "10", "D", "V", "S", "T", etc.)

## ACTION TAKEN BY SUPERVISOR

Annual Audit - Notification
letter Level 2
1/05/0 LVL 1 lmc
4/11/0 certified LTR sent
to emp directing rtn
to work on 16 Dec.00,
pending drug test. Ltn
16 Dec 00   comp conference
await drug test results

Handwritten notes in margin:
"slip. Need to
take 1 extra
day vac."

000969

# of Days Worked in 2001 : 61

## Continental

### EMPLOYEE ABSENTEE RECORD
CALENDER YEAR 2001

EMPLOYEE NAME: TONY ASATUANI
EMPLOYEE NO.: 057663
COMPANY SENIORITY: 1/14/85   class: 8/6/01



FORM: 40.0004
DATE: REV #01

PREVIOUS YEAR TOTAL (INSTANCES)
SICK ___  OCC. ___
P.B. ___  AWL ___
OTHER ___

000975

**ABSENCE FROM DUTY CODES**

- DO - REGULAR DAY OFF
- S - SICKNESS
- OI - OCCUPATIONAL INJURY
- V - VACATION
- W - ABSENCE WITHOUT LEAVE
- H - HOLIDAY
- P - PERSONAL BUSINESS
- CC - COMPANY CONVENIENCE
- PC - PERSONAL CONVENIENCE
- J - JURY DUTY
- K - DEATH IN IMMEDIATE FAMILY
- L - TARDY
- TO - TRADE DAY-OFF
- TW - TRADE DAY WORKED

**ACTION TAKEN BY SUPERVISOR**

S = SICKNESS
V = VACATION
P = PERSONAL BUSINESS
SW = SUSPENSION

EXHIBIT F

Case 1:02-cv-00032   Document 105   Filed 11/21/2003   Page 44 of 76

**NO DOCUMENTS SUBMITTED FOR EXHIBIT G**

**EXHIBIT G**

# Continental Micronesia

## ABSENCE FROM DUTY REPORT

Employee Number: 05963

Date Prepared: 6/11/01

1. SICK LEAVE: Immediately upon return to work or at the end of each pay period whichever first occurs.
2. OCCUPATIONAL INJURY LEAVE: Immediately when injury necessitates absence from duty.
3. VACATION: Prior to the start of the vacation period; OR when a paycheck is desired before the start of the vacation period, this form must be **received** in Payroll FOURTEEN (14) CALENDAR days **prior** to the date the check is desired.
4. OTHER: Immediately upon return to work or at the end of each pay period whichever first occurs.

Distribution: White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Employee

---

**SICK LEAVE**

(Attach Doctor's Certificate When Requesting)

I, Tony Ashtiani , employed at GUMMX WORK LOCATION and ____ / COST CENTER

Employee Number 05963 , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE 6/3 - 6/8 - 2001      TOTAL HOURS 20  26.25

BRIEF DESCRIPTION, NATURE OF ABSENCE Son Sick

Signature of Employee For Tony      ACKNOWLEDGED _____ SUPERVISOR    6/11/01 DATE

CIRCLE REGULAR DAYS OFF: S M T W T F S

---

**OCCUPATIONAL INJURY LEAVE**

(Attach Doctor's Certificate When Requesting)

I, _____ , employed at _____ WORK LOCATION and ____ / COST CENTER

Employee Number _____ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE _____      TOTAL HOURS _____

Signature of Employee _____      ACKNOWLEDGED _____ SUPERVISOR    DATE

CIRCLE REGULAR DAYS OFF: S M T W T F S

---

**VACATION**

I, _____ , employed at _____ WORK LOCATION and ____ / COST CENTER

Employee Number _____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicated below.

000257

VACATION (HOURS) _____

DEFERRED HOLIDAYS (HOURS) _____

DATES OF VACATION (FROM) _____ (TO) _____      TOTAL HOURS _____

MY PAYCHECK TO BE ISSUED ON _____ ( DATE ) is herewith requested for _____ ( DATE )

Signature of Employee _____      ACKNOWLEDGED _____ SUPERVISOR    DATE

CIRCLE REGULAR DAYS OFF: S M T W T F S

---

**OTHER**

(Personal Business, Authorized Leave, Jury Service, etc.)

I, Tony Ashtiani , employed at GUMMX WORK LOCATION and ____ / COST CENTER

Employee Number _____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicted below.

DATE OF ABSENCE 6/11 - 6/12 2001      TOTAL HOURS 20

REASON FOR ABSENCE PB

If because of death in the immediate family, what relation to the employee? _____

Signature of Employee For Tony      ACKNOWLEDGED _____ SUPERVISOR    6/11/01 DATE

CIRCLE REGULAR DAYS OFF: S M T W T F S

Distribution: White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Employee

EXHIBIT H

FORM: P-138CM
FILE#: 00-0703-3-1415
REV: 02/95

# Continental Micronesia 

**Employee Number:** 05963

## ABSENCE FROM DUTY REPORT

**Date Prepared:** 6/11/01

1. SICK LEAVE: Immediately upon return to work or at the end of each pay period whichever first occurs.
2. OCCUPATIONAL INJURY LEAVE: Immediately when injury necessitates absence from duty.
3. **VACATION:** Prior to the start of the vacation period; OR when a paycheck is desired before the start of the vacation period, this form must be **received** in Payroll FOURTEEN (14) CALENDAR days **prior** to the date the check is desired.
4. OTHER: Immediately upon return to work or at the end of each pay period whichever first occurs.
   **Distribution:** White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Employee

---

**(Attach Doctor's Certificate When Requesting)**

I, _Tony Ashtiani_ , employed at _GUAM MV_ and _____
    PRINT NAME          WORK LOCATION / COST CENTER

Employee Number _05963_ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE _SICK 6/9 - 6/10 2001_ TOTAL HOURS _20_

BRIEF DESCRIPTION, NATURE OF ABSENCE _SICK_

Signature of Employee _For Tony_ ACKNOWLEDGED _Betty_ 6/11/01
                                                               SUPERVISOR         DATE

CIRCLE REGULAR DAYS OFF: S   M   T  (W) (T) (F)  S

---

**OCCUPATIONAL INJURY LEAVE**

**(Attach Doctor's Certificate When Requesting)**

I, _____ , employed at _____ and _____
    PRINT NAME          WORK LOCATION / COST CENTER

Employee Number_____ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE_____ TOTAL HOURS_____

Signature of Employee _____ ACKNOWLEDGED _____
                                                    SUPERVISOR         DATE

CIRCLE REGULAR DAYS OFF: S   M   T   W   T   F   S

---

**VACATION**

I, _____ , employed at _____ and _____
    PRINT NAME          WORK LOCATION / COST CENTER

Employee Number_____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicated below.

VACATION (HOURS) _____

DEFERRED HOLIDAYS (HOURS) _____

DATES OF VACATION (FROM) _____ (TO) _____ TOTAL HOURS _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MY PAYCHECK TO BE ISSUED ON _____ is herewith requested for _____
                 ( DATE )                                      ( DATE )

Signature of Employee _____ ACKNOWLEDGED _____
                                                    SUPERVISOR         DATE

CIRCLE REGULAR DAYS OFF: S   M   T   W   T   F   S

---

**OTHER**

**(Personal Business, Authorized Leave, Jury Service, etc.)**

I, _____ , employed at _____ and _____
    PRINT NAME          WORK LOCATION / COST CENTER

Employee Number_____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicted below.

DATE OF ABSENCE _____ TOTAL HOURS _____

REASON FOR ABSENCE _____

If because of death in the immediate family, what relation to the employee? _____      **000256**

Signature of Employee _____ ACKNOWLEDGED _____
                                                    SUPERVISOR

CIRCLE REGULAR DAYS OFF: S   M   T   W   T   F   S      **EXHIBIT I**

**Distribution:** White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Empl...

**Crisostomo, Robbi**

| | |
|---|---|
| **From:** | Herrera, William A |
| **Sent:** | Monday, July 02, 2001 2:17 PM |
| **To:** | Crisostomo, Robbi |
| **Subject:** | FW: |

-----Original Message-----

| | |
|---|---|
| **From:** | Mendoza, Glenn R |
| **Sent:** | Sunday, June 17, 2001 15:15 |
| **To:** | Herrera, William A |
| **Subject:** | |

*Per Glenn, [handwritten note, illegible]*

BILL, TONY A. CALLED FOR AN EXTRA PB ON SAT 16JUN, I APPROVED IT. ON SUNDAY 17JUN I DID NOT GET ANY CALLS FROM HIM, HE WAS DUE TO WORK, SO FAR IT'S A NO CALL/ NO SHOW UNLESS YOU SOMETHING I DON'T KNOW. FROM WHAT I CAN SEE HE WAS SICK 3,4,5,9, AND 10JUN. ON 11 AND 12 JUN HE GOT PB. HIS WIFE CALLED ON 16JUN 1300 HRS TO ASK FOR AN EXTENSION ON HIS PB, I GRANTED IT. NOW 17 JUN NO CALL/NO SHOW. I WILL BE FLYING TO OKJ MONDAY 18JUN SEE ME IF YOU HAVE ANY QUESTIONS. GLENN

**000925**

**EXHIBIT J**

**Cruz, Adrienne**

| | |
|---|---|
| **From:** | Herrera, William A |
| **Sent:** | Monday, June 18, 2001 9:32 PM |
| **To:** | Cruz, Adrienne |
| **Cc:** | Babauta, Benjamin C; Tydingco, Bertha S; Mendoza, Glenn R; Baltazar Atalig |
| **Subject:** | ~~Tony Ashtiani~~ |

*Adrienne,*

*I just wanted something in writing concerning Tony Ashtiani and his current status of 2 days No-Call/No-Show. I e-mailed him earlier today and left numerous messages on his answering machine. I had Mike Pablo call him again at 2100 and he too left a message to call us and talk to a Supervisor. Crew scheduling shows that his wife is off for the rest of the month-I was checking to see if I can talk to her to get better information as to his disposition. I am writing this to you to serve as a memo for record to ensure I have tried to cover all the bases as far as trying to get a hold of Tony. Let me know if you have any other ideas anything short of going to his house to ensure he okay.*

*Bill*

*William A. Herrera*
*CMI Maintenance Supervisor*
*(671)632-8910/8912*
*wherrera@csair.com*

**000020**



1

**EXHIBIT K**



**Subject: CONTACT WORK**
   **Date:** Mon, 18 Jun 2001 17:29:56 +1000
   **From:** "Herrera, William A" <wherrera@csair.com>
      **To:** "'ashtiani@ite.net'" <ashtiani@ite.net>
      **CC:** "Cruz, Adrienne" <acruz@csair.com>, Baltazar Atalig <batalig@csair.com>,
         Benjamin Babauta <bbabauta@csair.com>, Bertha Tydingco <btydingco@csair.com>,
         Frank Perez <fperez@csair.com>, Glenn Mendoza <gmendoza@csair.com>,
         James Lujan <jlujan2@csair.com>, William Herrera <wherrera@csair.com>

Tony,
It is imperative that you call work and talk to a supervisor.  Glenn tried
to contact you yesterday and I have been trying to reach you for several
hours today.  I need to know you are alright due to the fact that you have
been a no call-no show for the last two days and the contact numbers you
have provided have gone unanswered.  Again, please call the maintenance
department ASAP.
Bill

William A. Herrera
CMI Maintenance Supervisor
(671 ) 632-8910/8912
wherrera@csair.com

**000021**

7/25/01 5:34 AM

**June 11, 2001:**

My second day back from days off. I talked to Tony around 1105 and he requested 2 days of Personal Business (P.B.). to take care of his son who was sick, due to his wife having flights with layovers this month. I offered him FMLA-he declined stating that he did not want the company paying him sick leave to take care of his child. I authorized the two days P.B.

Ref: 1

**June 18, 2001:**

First day back from days off, Glenn mentions that Tony has not shown up for work the last couple of days. I tried calling his home and cell throughout the afternoon, but was not successful. I sent e-mail in the evening (1730) stating that he has been considered no show and advised him to call the maintenance department ASAP to find out what was going on.

I made several phone calls to his cell and home numbers, but was unsuccessful. I asked Mike Pablo the shift union steward to try and get a hold of him at 2100. He was not able to talk to him either. I went to crew scheduling to see if they had another number available for Cathy (Tony's spouse) so I can use it to get a hold of Tony-the same numbers I had been using was given.

I sent e-mail to Adrienne at 2130 to let her know what I did earlier today.

Ref: 2, 2a

**June 19, 2001:**

Tony called me at 1105 to let me know he was interested in taking a Leave of Absence because he has been doing the aircraft maintenance thing for a long time and was burned out and needed a break. He wanted to submit paperwork to me to forward to our Maintenance Manager and I explained that he needed to contact the Human Resources department to submit his request, as that was the procedure to my understanding. He explained that he was going to do that on Monday.

I wished him luck in that, and reminded him of our meeting on Monday, June 25th to discuss my investigation on the incident of aircraft 081. He acknowledges and we hang up.

Ref: 3, 3a

**June 24, 2001:**

First day back from days off. Turnover from Glenn that Tony did not show up for work this week. I called Tony, after he didn't show up for my shift. I got a hold of him and asked him why he was not at work. He said he misunderstood what I told him on the 18th concerning the meeting I had set up for the June 25th. He said that he thought he was off until the meeting with Robbi at HR concerning his LOA request. I explained that I had nothing to do with the request and I did not tell him not to come in until Monday. I told him that he must come in tomorrow Monday, June 25, 2001.

Ref: 4

**June 25, 2001:**

Tony shows up for work, but the workload prevents me from meeting with him.

**000987**

**EXHIBIT L**

**June 26, 2001:**
I had a meeting with Tony, Mike Pablo and Pru Aguilo to find out about the Jun 23rd/Jun 24th absences. Tony explains that he thought he had secure the time off. I asked him who authorized it after realizing that this version was different than my conversation with him on the 24th. He stated the Glenn Mendoza had and wanted to know what the big deal was, he was just trying to take care of his son. I asked him about his LOA request and he stated that he read a section in the "Working Together" guidelines that showed the company did not have to offer him his job back if his position was already filled-shows me page 44.

I offered him FMLA again and he accepted this time.

I informed him that I was suspending him until I concluded my investigation. I took possession of his company I.D; AOA badge and Kronos card. I advised him that I should be able to contact him by Monday because I would be on days off, but if he did not hear from me by 1600 Tuesday July 3, 2001 to contact me.
Ref: 5, 5a

**June 27, 2001:**
Sent email message to advise Tony that I set up a meeting at HR on July 2, 2001 at 1600 after I completed my investigation. Did not get a confirmation from Tony via e-mail or telephone.
Ref: 6

**July 2, 2001:**
I requested the Adrienne get a hold of Tony to ensure he knows to show up for the 1600 meeting. Adrienne could not get a hold of him after several attempts.

Ref: 7

**July 3, 2001:**
Received fax regarding "limited" contact with me is not advised and after consulting with HR department. I signed the termination letter for Tony and requested that Adrienne send it out certified mail per the IBT agreement.
Ref: 8

**\*Reference:**
1=FMLA REFUSAL-6/11/01
2=TONY CONTACT WORK-6/18/01
2A=E-MAIL TO ADRIENNE 6/18/01
3=TONY CALLED-6/19/01
3A=LOA REQUEST FAX 6/22/01
4=MENDOZA TURNOVER 6/23/01
5=FMLA ACCEPTANCE 6/26/01
5A=SUSPENSION ADVISEMENT 6/26/01
6=EMAIL ON JUL 2 MEETING AT HR
7=ADRIENNE'S CONTACT EFFORTS 7/2/01
8=LIMITED CONTACT FAX
9=TERMINATION LETTER

1/24/02

**000988**

**From:** Herrera, William A
**Sent:** Tuesday, June 19, 2001 14:47
**To:** Herrera, William A
**Subject:** MEMO FOR RECORD

Tony called me at 1107 today, he indicated that he is considering a Leave of Absence request. I wished him good luck in that endeavor, however I need to see him on Monday, June 25, 2001 to settle or clarify the 081 incident involving the delaminated/separated wing root panel.

*William A. Herrera*
*CMI Maintenance Supervisor*
*(671 )632-8910/8912*
*wherrera@csair.com*

1/24/02

Robbie,
REMEMBER - I DR
ADMINISTATIVE
ON weekdays, to
get thing.

**001050**

3

EXHIBIT M

January 24, 2002

On 9 Jun 2001, when Tony Ashtiani's wife called work to tell us that he will not be into work, this was when I told her to have Tony call a supv asap. I told her we needed to know what was happening so we could offer FMLA or emergency leave. She said she will pass the message to Tony.

On 16 June 2001, at approx. 1320 hrs I was told by Joe P. that Tony's wife had called requesting a PB extension and that he told her it would not be a problem. I informed Joe he did not have the authorization to grant any time off and he should have told her to have Tony call me himself. Being Joe was my acting leadman and he had told Tony's wife it would not be a problem I granted the 16th of June PB off for Tony.

On 23 June 2001, at approx. 1340 hrs while I was conducting shift briefing Joe P. told me to check Bill's mailbox for a fax Tony had sent. He told me it might be the reason Tony's not in to work today. After the briefing I took the fax out of Bill's mailbox and read it. I did not know what it meant, so I assumed because it was addressed to Bill he had it under control. At approx 1650 hrs I sent an e-mail to Bill questioning the whereabouts of Tony. I was curious because of the fax he had sent concerning the LOA he was going to ask for. At approx 1745 hrs I get a phone call in my office from Tony himself. I asked him where's he's been and why didn't he come into work today. He asked me did I read his fax to Bill and I answered yes. He than told me he was to meet with Bill on Monday for the LOA. He gave me the impression Bill had given him time off until Monday. He thanked me for my help and hoped the guys enjoyed the food he offered to them.

On 24 June 2001, Bill called me at home to ask me did I give Tony Sunday 24 Jun off. I told him "no" but Tony gave me the impression Bill gave him 23rd Sat off on my shift. Bill told me he did not give Tony 23rd and 24th off and that he will call him to get to the bottom of this.

_____     24 Jan 02
Glenn Mendoza                Date

**000973**

**EXHIBIT N**

**From:** Herrera, William A
**Sent:** Wednesday, June 27, 2001 19:06
**To:** Herrera, William A; 'ashtiani@ite.net'
**Cc:** Cruz, Adrienne; Crisostomo, Robbi; Sage, Teresa; Atalig, Baltazar; Babauta, Benjamin C; Tydingco, Bertha S; Mendoza, Glenn R
**Subject:** RE: Meeting

*Tony,*

*I have scheduled a meeting at HR on Monday July 2, 2001 at 1600 (4 p.m.) please respond acknowledging this. You need to be there at the scheduled time and you may have a union representative present as well.*

*If you have any questions feel free to address them to myself or the supervisor on duty.*

*William A. Herrera*
*CMI Maintenance Supervisor*
*(671 )632-8910/8912*
*wherrera@csair.com*

William 11/24/02

**001023**

Engine Exhibit I

**EXHIBIT O**

# Physician Certification
# for Family or Medical Leave


**Continental
Micronesia**

**PLEASE PRINT**

> This form contains medical-related information and must be maintained in files separate from employee personnel files, in locked cabinets with only designated persons having access.

## To be Completed and Signed by Employee

Name _Tony Ashtiani_     Title _Technician_

Department _Maintenance_     Employee Number _05763_

Status: ☑ Full time   ☐ Part Time   ☐ Temporary    Date _06 / 29 / 01_

I am requesting family or medical leave from work with: _Continental Micronesia Inc._
<span>Name of Employer</span>

The physician or health care provider is treating: _Mathew Ashtiani_
<span>Name of Patient</span>

The Patient is: ☐ Self    ☐ Spouse    ☐ Parent    ☑ Child

☐ I am requesting leave from _Jun 03 / 01_ until _Jun 24 / 01_ or an intermittent or reduced schedule on the following dates (if known):_____

Will the leave be intermittent but the dates of absence not yet known? ☐ Yes    ☑ No

☐ (If applicable) I will be providing the following care/services for a family member with a serious health condition. Please estimate the period during which the care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:
_____
_____
_____

☐ (If applicable) The essential functions of my job are (or attach job description):
_Son has fever, diarrhea – lost of Appetite._
_Maintain schedule of taking medication_

Employee Signature _T. Ashth_         _6/29/01_
                                                    Date

---

The remainder of this form is to be completed by an authorized health care provider in order to verify the necessity of Family or Medical Leave as requested by the above employee. Under the Family and Medical Leave law, an authorized health care provider is:

- Any health care provider recognized by the employer or the employer's group health plan;

- a doctor of medicine or osteopathy authorized to practice medicine or surgery by the state in which he or she practices;

- podiatrists, dentists, clinical psychologists, optometrists and chiropractors (limited to manual manipulation of the spine to correct a subluxation found by X-ray to exist) authorized to practice, and performing within the scope of their practice, under state law;

- nurse practitioners, nurse-midwives and clinical social workers authorized to practice, and performing within the scope of their practice, as defined under state law, or

- Christian Science practitioners listed with the First Church of Christ, Scientist in Boston, MA.

**RECEIVED**

JUL 1 0 2001

**EMPLOYMENT** 12:45

CMI FMLA 99.01                                          **000872**    1

**EXHIBIT P**

The information sought on this form relates only to the condition for which the employee is taking FMLA leave. Please read the six definitions beginning on page three before completing this form. After receiving this *completed* form, the employer is not permitted to contact the health care provider for additional information. A health care provider representing the employer may contact the health care provider for clarification of information contained on this form.

<u>To be Completed by Physician or Authorized Health Care Provider:</u>

### Please review the job requirements provided to you before completing this form.

1. Pages 3 and 4 describe what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the patient's condition qualify under any of the categories described? If so, please check the applicable category. *For the following, Patient was not seen*

   ☐ 1   ☐ 2   ☐ 3   ☐ 4   ☐ 5   ☐ 6   ☑ None of the above *in PMC last month*

2. Describe the medical facts that support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories. <u>Please provide more than just a diagnosis:</u>

   *As per Father, Patient had diarrhea & cold last month.*

3. a. State the appropriate date the condition commenced and the probable duration of the condition (and the probable duration of patient's incapacity[1], if different): _____

   *Patient right now is asymptomatic - But fath states that patient had cough, cold, blue discharge & [illegible] last mo*

   b. Will it be necessary for the employee to work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in item #4)? ☐ Yes   ☑ No
   If yes, give probable duration: _____ *As per father, the sick kid was brought for checking in the clinic*

   c. If the condition is a chronic condition (Category #4) or pregnancy, state whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity (see page 4): _____
   *N/A*

4. a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery, if any: _____
   *N/A none*

   b. If any of these treatments are going to be provided by another provider of health services (e.g., physical therapist), please state the nature of treatments: _____
   *N/A*

   c. If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment _____
   *N/A*

   ## 000873

5. a. If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind ? (See job requirements): ☐ Yes   ☐ No
   *N/A*

   *Patient is the child of the employee, Patient is seen in the clinic only this date 07/02/01*

CMI FMLA 99.01                                                                                              2

b. If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job? (Please review the essential job functions before answering this question.)  ☐ Yes  ☐ No

If yes, list the essential functions the employee is unable to perform: _____

_____

c. If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment?
☐ Yes  ☐ No   *[handwritten] At ph Falls (employee) - child was sick*

6. a. If a leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance with medical, personal, safety, or transportation needs?
☐ Yes  ☐ No

b. If No, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery? ☐ Yes  ☐ No

c. If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need: *[handwritten] Pt. is now asymptomatic >*

_____

[1] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefrom, or recovery therefrom.

| | | |
|---|---|---|
| *[signature]* | 07/02/01 | *PMC group prac* |
| Physician or Authorized Health Care Provider Signature | Date | Type of Practice |

Physician or Authorized Health Care Printed Name

Office Mailing Address: *PMC*

DR. ANTONIO APELLANES, M.D.   ~~ISLA HE~~ ~~SYSTEM~~  17~~ ALAN PAS~~ ~~SUITE F~~
TAMUNING, GUAM 96911  ( ~~Phone #~~ )

## FMLA:  What Is a "Serious Health Condition?"

"Serious Health Condition" means an illness, injury, impairment, or physical or mental condition that involves the following:

1. **Hospital Care**
   Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care.

2. **Absence Plus Treatment**
   Treatment includes examinations to determine if a serious health condition exists and evaluation of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. A period of incapacity of more than three consecutive calendar days (including any subsequent treatment or period of incapacity relating to the same condition), that also involves:

   a. Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider, or

CMI FMLA 99.01

**000874**

3



b. Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment **does not include** the taking of over-the-counter medications, such as aspirin, antihistamines or salves; or bed rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

3. **Pregnancy**
   Any period of incapacity due to pregnancy or for prenatal care.

4. **Chronic Conditions Requiring Treatments**
   A chronic condition which:

   a. Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
   b. Continues over an extended period of time (including recurring episodes of single underlying condition);
   c. May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.) but, does not necessarily require a visit to a physician at the time of occurrence. For example, a patient with asthma who has been advised to stay home when pollen count is high or a pregnant woman with morning sickness.

5. **Permanent/Long-Term Conditions Requiring Supervision**
   A period of incapacity which is permanent or long term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke or the terminal stages of a disease.

6. **Multiple Treatments (Non-Chronic Conditions)**
   Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

**000875**

4

CMI FMLA 99.01

DIAGNOSTIC
LABORATORY
SERVICES, INC.
BIOPATH
ACCOUNT NO.

TEL: 646-5770 • FAX: 646-2461

## LABORATORY USE ONLY

C ISLA HEALTH SYSTEM
7-C CHALAN PASAHERU
(IRPORT ROAD)
MUNING, GUAM  96911

ERRING PHYSICIAN

ANTONIO APELLANES, M.D.

POUR DATE
RT TO

☐ STAT

| SEND BILL TO | ☐ PATIENT / INS | ☐ PHYSICIAN / INSTITUTION | | | |
|---|---|---|---|---|---|
| PATIENT NAME (LAST, FIRST, M.I.) Kshiani, matthew | | | SEX ☐ M ☐ F | DATE OF BIRTH 12 / 10 /97 |
| ADDRESS | | | PATIENT SOC. SEC. NO. | |
| CITY | STATE | ZIPCODE | HOME | TELEPHONE | WORK |

(FOR MULTIPLE INSURANCE, INDICATE ORDER (1, 2, ETC.)
☐ NANBO'S  ☐ CALVO'S  ☐ MIP  ☐ STAYWELL  ☐ BILL PATIENT
☐ CNMI  ☐ MEDICAID  ☐ MEDICARE  ☐ MOYLAN'S  ☐ CASH
☐ OTHER

INSURANCE NUMBER/GRP. NO./CODE RELATION | INSURED'S NAME

RELATIONSHIP TO PATIENT
☐ SELF  ☐ SPOUSE
☐ DEPENDENT

| FAST | COLLECTION DATE | COLLECTION TIME | INITIALS |
| NON FAST | / / | ☐ AM ☐ PM | |

DATE OF INJURY / PREGNANCY (LMP) | ACCIDENT WORK ☐ AUTO ☐ OTHER ☐ | DIAGNOSIS / SYMPTOM / ICD-9 CODE (REQUIRED) A.O.B.

CIMEN
ST # ☐ BLUE #
AV # ☐ URINE #
RN # ☐
VOLUME / HOURS

LOC. NO. | TIMED URINE

I REQUEST THAT PAYMENT OF AUTHORIZED BENEFITS BE MADE ON MY BEHALF TO DLS/BIOPATH. I AUTHORIZE ANY HOLDER OF MEDICAL OR OTHER INFORMATION ABOUT ME TO BE RELEASED TO MY INSURANCE CARRIER OR ITS AGENTS TO DETERMINE THESE BENEFITS FOR RELATED SERVICES. I AM FINANCIALLY RESPONSIBLE FOR ALL CO-PAYMENTS, DEDUCTIBLES AND SERVICES NOT COVERED BY MY INSURANCE.

PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE _____ DATE: _____

HECK PHYSICIAN'S NAME BELOW:
--------------------------------
_7022 A. Chenet  __7612 A. Appellanes
_7221 V. Akimoto  __7105 R. Terlaje
_7075 H. Nguyen  __7106 P. Tompkins
_7224 J. Ruggio  __7206 L. Dean
_7084 D. Preston  __7214 M. Simard
_7220 J. Fleming  __7216 M. Liu
_7118 K. Zvonik  __7109 S. Velsmid
_7735 S. Hanson

**PACIFICARE PATIENT?
☐ YES, BILL ACCOUNT 7904
☐ NO (PLEASE PROVIDE INSURANCE INFORMAT
10518__CBC
10013__ABO & RH
10014__ANTIBODY SCREEN
495__HEPATITIS BS AG
10695__RPR
10427__RUBELLA

**000876**

| CHEMISTRY PROFILES | | HEMATOLOGY, COAGULATION, URINALYSIS | | | MICROBIOLOGY |
|---|---|---|---|---|---|
| ELECTROLYTES (Na, K+, Cl, CO₂) | 518 | CBC W/DIFF | 514 | PT (PROTHROMBIN TIME) | *SPECIMEN SOURCE/COLLECTION METHOD |
| BASIC METABOLIC PROFILE | 522 | CBC W/DIFF & PLATELET COUNT | 516 | PTT, ACTIVATED | |
| •Lytes •Glu •BUN •Calcium •Creat | 537 | HEMOGLOBIN & HEMATOCRIT | 609 | HCG-URINE | ANTIBIOTIC SENSITIVITIES WILL BE DONE AND BILLED ONLY WHEN INDICATED BY CULTURE RESULT, UNLESS OTHERWISE ORDERED |
| COMPREHENSIVE METABOLIC PROFILE | 520 | HEMOGRAM (CBC W/O DIFF) | 635 | URINALYSIS, COMPLETE | 484 ☐ CHLAMYDIA DNA* 479 ☐ GC DNA* |
| •Basic •Alb •Alk Phos •ALT •AST | 534 | SED RATE | 652 | URINALYSIS W/REFLEX TO C&S | 632 ☐ WET MOUNT 613 ☐ KOH |
| •Total Bili •Total Protein | | GENERAL LAB | | | 651 | AFB SMEAR AND CULTURE* |
| HEPATIC PROFILE | 13 | ABO GROUP & RH | 495 | HEPATITIS B SURFACE ANTIGEN | 624 | CULTURE, MISCELLANEOUS* |
| •Alb •Alk Phos •ALT/SGPT •AST/SGOT | 467 | ANA (ANTI-NUCLEAR AB) | 542 | HEPATITIS C VIRUS AB | 603 | CULTURE, SPUTUM* |
| •Total Bili •Direct Bili •T. Protein | 437 | DIGOXIN | 841 | HIV-1 AB CONSENT FORM REQUIRED | 622 | CULTURE, STOOL |
| LIPID PROFILE | 415 | FERRITIN | 287 | IRON, TOTAL | 616 | CULTURE, THROAT |
| •Cholesterol, Total •HDL •Triglycerides | 271 | FSH, SERUM | 276 | IRON & TIBC | 626 | CULTURE, URINE* |
| •Calculated LDL | | | | LH, SERUM | 602 ☐ OCCULT BLD, SCREEN 602D ☐ NON-SCRN |

| CHEMISTRY | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6 | AMYLASE | 148 | CO₂ | 271 | FSH, SERUM | 276 | IRON & TIBC |
| 7 | ALBUMIN | 150 | CK, TOTAL | 178 | GLUCOSE, DIABETES SCREEN | 294 | LH, SERUM |
| 7 | ALKALINE PHOS | 157 | CREATININE | 161 | GLUCOSE 2 HR PP | 200 | MAGNESIUM |
| 2 | ALT/SGPT | 172 | GAMMA GT | 180 | GLUCOSE TOL, 3 HR | 505 | PSA, TOTAL(PROSTATE-SPECIFIC ANTIGEN) |
| 2 | AST/SGOT | 176 | GLUCOSE | 418 | GLYCOHEMOGLOBIN | 426 | RA (RHEUMATOID FACTOR) |
| 1 | BILIRUBIN, DIR | 194 | LDH, TOTAL | 450 | HCG, QUAL SERUM (PREG SCREEN) | 695 | RPR |
| 3 | BILIRUBIN, TOTAL | 208 | PHOSPHORUS | 468P | HCG, QUANT (PREGNANCY) | 427 | RUBELLA SCREEN |
| 8 | BUN | 167 | POTASSIUM | 4711 | HELICOBACTER PYLORI ABS, IGG & IGA | 438 | T-3, TOTAL |
| 0 | CALCIUM | 218 | PROTEIN, TOTAL | 4546 | HELICOBACTER PYLORI AB, IGG | 366 | T-4, FREE |
| 8 | CHLORIDE | 169 | SODIUM | 498 | HEPATITIS A AB, IGM | 380 | TSH |
| 2 | CHOLESTEROL, TOTAL | 228 | TRIGLYCERIDES | 499 | HEPATITIS B CORE AB | 380R | TSH, REFLEX TO FREE T-4 |
| 9 | CHOLESTEROL, HDL | 230 | URIC ACID | 500 | HEPATITIS B SURFACE AB | 270 | 244 ☐ VITAMIN B-12  269 ☐ FOLATE |

CULTURE, MISCELLANEOUS*
O & P, STOOL
RAPID STREP A SCREEN
RECEIPT NUMBER

TOTAL COST

CO-PAYMENT

AMOUNT DUE ➡

Medicare only pays for tests that it considers medically necessary to treat or diagnose a patient. Generally, tests for screening purposes are not considered medically necessary

M F-3086 Rev. 3/01

# fmla-refusal

**Date:** 6/11/2001

**From:** William A. Herrera

**RE:** TONY ASHTIANI

---

This will serve as a memo for record concerning Tony Ashtiani's refusal of FMLA. Tony had called in sick for the last 4-½ days to care for his son-who is ill. I spoke to him this morning at 1115 hours and he told me his situation and requested PBs for the rest of the week. I informed him of the FMLA program, but he declined and stayed with the PB request. I acknowledge the PB for the remaining week, but charged sick for the days claimed earlier.

*[signature]* 1/24/02

6/11/2001

**001047**

**EXHIBIT Q**

**From:** Herrera, William A
**Sent:** Tuesday, June 26, 2001 21:22
**To:** Atalig, Baltazar
**Cc:** Crisostomo, Robbi; Benjamin Babauta; Bertha Tydingco; Glenn Mendoza; William Herrera
**Subject:** FMLA-Tony Ashtiani

*Attention all concern,*

*Tony Ashtiani has received and accepted FMLA paperwork for his absence for the month of June 2001. I will forward the original paperwork to Adrienne for disposition.*

*William A. Herrera*
*CMI Maintenance Supervisor*
*(671 )632-8910/8912*
*wherrera@csair.com*

1/24/02

**001053**

5

To:        Tony Ashtiani                                    June 26, 2001

From:      William A. Herrera

Subject:   Attendance


We are currently investigating your attendance for the period June 3 through June 19,
2001. Because of the possibility that FMLA may apply, we are including FMLA forms
to have completed by your physician. In keeping with our policy for FMLA, these forms
must be returned within 15 days of receipt in order for FMLA to apply.

William A. Herrera

Tony has taken the FMLA Forms as of 1900 this date.


Tony Ashtiani

Pra Aguilo

Mike Pablo
IBT Shop Steward


**000017**

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE McDONALD
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel. No. (671) 472-6813

Attorneys for Defendant
Continental Micronesia, Inc.
dba Continental Micronesia
and Continental Airlines, Inc.

## IN THE DISTRICT COURT FOR GUAM

| | |
|---|---|
| TONY H. ASHTIANI, | CIVIL CASE NO. CIV02-00032 |
| Plaintiff, | |
| vs. | **AFFIDAVIT OF JEANNE K. WILSON** |
| CONTINENTAL MICRONESIA, INC. dba CONTINENTAL MICRONESIA, and CONTINENTAL AIRLINES, INC. | |
| Defendant. | |

State of Texas )
) ss.
County of Harris )

I, Jeanne K. Wilson, after being duly sworn, say:

1.    I am over the age of 18 years, and make this affidavit from personal knowledge. I am a senior attorney employed by Continental Airlines, Inc. and its subsidiary Continental Micronesia, Inc.

2.    Continental Airlines, Inc. offers an Accidental Death and Dismemberment policy, now known as Personal Accident Insurance, which is the same insurance coverage extended to Continental Micronesia Inc.'s (a subsidiary of Continental Airlines Inc.) employees. Continental

4826-9959-1168.1.013280-00079

IMANAGE 51794v1

**EXHIBIT R**

Micronesia began offering the AIG insurance coverage to its employees on January 1, 1998.

3.    I wrote to AIG by e-mail on November 5, 2003 regarding the conversion provisions of this policy. A true and correct copy of my e-mail is attached.

4.    AIG responded by e-mail with a letter attached to the e-mail. The attached e-mail is a true and accurate copy of AIG's response to my letter.

Further Affiant sayeth naught.

Executed this __19th__ day of November, 2003.



_Jeanne K. Wilson_
Jeanne K. Wilson

Subscribed and sworn to me this __19th__ day of November, 2003.

_Kathleen M. Plumley_

KATHLEEN M. PLUMLEY
Notary Public, State of Texas
My Commission Expires
MAY 6, 2004

4826-9959-1168.1.013280-00079

IMANAGE 51794v1

# Wilson, Jeanne

| | |
|---|---|
| **From:** | Wilson, Jeanne |
| **Sent:** | Wednesday, November 05, 2003 1:48 PM |
| **To:** | 'Betty.Isaac@AIG.com' |
| **Cc:** | Lee, Kay; Duenas, Annie |
| **Subject:** | Continental Airlines, Inc. |

**Importance:** High

Betty:

I have been copied on your very recent correspondence asserting that employees of Continental Airlines, Inc. who are non US citizens, non US residents are excluded from the conversion privileges in policy # PAI 804 9278.

I note that the policy clearly covers Air Micronesia (which is now doing business under the name Continental Micronesia, Inc.). CMI has a number of employees in Guam and in the Federated States of Micronesia (FSM) as well as other non-US places. There are numerous scenarios under which CMI may have employees who are neither US citizens nor US residents.

Can you please point me to the provisions that would exclude these folks (or any other non-resident, non-US citizens) from participation in the policy and conversion rights under the policy? Specifically, I point to Master Application for Group Insurance which clearly lists Air Micronesia as a "subsidiary to be covered" and to the "Conversion Privilege Rider" both of which indicate that employees who work more than 20 hours a week are covered. No exclusion appears anywhere in the policy.

It is my understanding that your company is now attempting to retroactively impose such a restriction without any notice to our Company. The matter has come up in litigation in that we are being sued by an employee who was improperly denied the right to convert coverage. Would you please immediately provide me with supporting documentation to show that you are not in breach of your contract with us?

Best regards,

Jeanne Wilson
Senior Attorney
Continental Airlines, Inc.

*Confidential.* The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

1

# Wilson, Jeanne

| | |
|---|---|
| From: | Isaac, Betty [Betty.Isaac@AIG.com] |
| Sent: | Friday, November 07, 2003 8:55 AM |
| To: | Wilson, Jeanne; Isaac, Betty |
| Cc: | Lee, Kay; Duenas, Annie |
| Subject: | RE: Continental Airlines, Inc. |

Jeanne, please note my response in the attachment.

Thanks.

-----Original Message-----
From: Wilson, Jeanne [mailto:jwilso05@coair.com]
Sent: Wednesday, November 05, 2003 1:48 PM
To: 'Betty.Isaac@AIG.com'
Cc: Lee, Kay; Duenas, Annie
Subject: Continental Airlines, Inc.
Importance: High

Betty:

I have been copied on your very recent correspondence asserting that employees of Continental Airlines, Inc. who are non US citizens, non US residents are excluded from the conversion privileges in policy # PAI 804 9278.

I note that the policy clearly covers Air Micronesia (which is now doing business under the name Continental Micronesia, Inc.). CMI has a number of employees in Guam and in the Federated States of Micronesia (FSM) as well as other non-US places. There are numerous scenarios under which CMI may have employees who are neither US citizens nor US residents.

Can you please point me to the provisions that would exclude these folks (or any other non-resident, non-US citizens) from participation in the policy and conversion rights under the policy? Specifically, I point to Master Application for Group Insurance which clearly lists Air Micronesia as a "subsidiary to be covered" and to the "Conversion Privilege Rider" both of which indicate that employees who work more than 20 hours a week are covered. No exclusion appears anywhere in the policy.

It is my understanding that your company is now attempting to retroactively impose such a restriction without any notice to our Company. The matter has come up in litigation in that we are being sued by an employee who was improperly denied the right to convert coverage. Would you please immediately provide me with supporting documentation to show that you are not in breach of your contract with us?

Best regards,

Jeanne Wilson
Senior Attorney
Continental Airlines, Inc.

Confidential. The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

Visit continental.com. Check-in, choose your seat, print your boarding pass and earn 1,000 OnePass bonus miles each time you book a trip.

http://www.continental.com

# AIG

Domestic Accident & Health Division
8144 Walnut Hill Lane
Suite 1600
Dallas, Texas 75231
Tel: 214-932-2337
Fax: 214—932-2342

November 6, 2003

Ms. Jeanne Wilson
Senior Attorney
Continental Airlines
P. O. Box 4607
1600 Smith Street, HQSLG
Houston, TX 77002

Re: Continental Airlines, Inc.
Policy No. PAI 804 9278

Dear Ms. Wilson:

I am acknowledging receipt of your e-mail and your letter that was faxed to me today. Please be advised that AIG will honor all conversions of employees who enrolled in the Personal Accident Plan.

Coverage under the Individual Policy may not be less than $50,000 and may not exceed the greater of: (1) the amount for which the Insured Person was covered under the Policy; or (2) $500,000.

If you have any questions, please let me know.

Sincerely,

*Betty Isaac*

Betty Isaac
Regional Underwriting Manager
Domestic Accident & Health Division

/bi

**Tony H. Ashtiani**
P.O.Box 12723
Tamuning Guam 96931
671-688-4844
671-653-5575

к в U в г v в
CARLSMITH BALI
Date: 8/29/03
in _____ By: _____

# IN THE DISTRICT COURT OF GUAM

Tony H. Ashtiani,                      )
                                       )
                    Plaintiff,         )  Civil Case No.: **02-00032**
                                       )
            **Vs.**                    )
                                       )
Continental Micronesia Inc,            )  **PLAINTIFF TONY H. ASHTIANI'S**
dba, Continental Micronesia,           )  **RESPONSE TO DEFENDANT'S FIRST**
Continental Airlines, Inc.             )  **REQUEST FOR PRODUCTION OF**
                                       )  **DOCUMENTS; DECLARATION OF**
                                       )  **SERVICE**
                    Defendant.         )
                                       )
                                       )
_____)

   Pro se Plaintiff Tony H. Ashtiani hereby responds to Defendant continenatl Micronesia, Inc.'s First Request of Production of Documents.

## GENERAL OBJECTION

   Each of the following general objections is hereby incorporated into each of the plaintiff's responses, each of which shall be read as if these objections were printed therein in thier entirly.

   1. Plaintiff objects to defendant that its ability to respond fully to Defendants' requests is hampered by the fact that Defendant had served First set of production of documents simoulteniously with set of interrogetories on pro se plaintiff which exceeded in numbers , non compliance of **LR 33.1 (a)** and appropriate rules of civil procedures.

   2. Plaintiff objects to Defenadant's requests to the extent they call for the production of documents not subject to discovery based on the pro se plaintiff's self research and work product

COPY SENT TO CLIENT
Via : FAX To t. 0804 re. O.Hc Kiw2(t
Date : 09/02/2003
By Page
**EXHIBIT S**

3. Plaintiff objects to Defendants' requests to the extent they call for the production of documents already in Defendants' possesion.

4. Plaintiff objects to so much of the instructions accompanying Defendants' requests as purport to impose on Defendant duties or obligations more extensive than those imposed by the appropriate rules of civil procedure.

## OBJECTIONS AND RESPONSES TO DEFENDANTS' REQUESTS

### REQUEST NO. 1:

Any and all documents evidencing or reflecting any economic and/or out of-pocket loss you claim to have suffered as a result of the alleged discrimination and unlawful acts by Defendants.

### RESPONSE :

Not all facts supporting this response have been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26. 1) Plaintiff has lost approximatly 26 months of pay as of now due to wrongful termination resulting from the retaliation ,Amount may be calculated in pay rate scale as between the agrement between CMI and Internatinal Brotherhood of Teamsters. 2) Plaintiff paid $ 7747.21 in attorney Fees to the law offices of Tarpley and Moroni. Plaintiff still making payments on this loan to First Hawaiian Bank. 3) Plaintiff cashed out his 401k 0f approximatly 9600 shares of New Asia Funds after his worngful termination , this fund was designed to fund his childerens' education and was withdrawn early due to finanacial hardship. 4) plaintiff Paid for court filings and copies, 5) transporation cost and Gas, 6) Time of the pro se plaintiff to and from the northern part of Guam to the law library 7) Spending endless hours at Guam Terrotorial Law Library. 8) Plaintiff also sold his H.D Motorcycle and Automobiles to continue to provide good education to his two childeren and will continue to do so through out.

**REQUEST NO. 2:** All documents submitted as complaints made by Plaintiff or any other person known to Plaintiff regarding James Hammer and Dixon McKinzie,s capacity as supervisors at Defendant Continental Micronesia, Inc., including grievance reports submitted to the International Brotherhood of Teamsters.

**RESPONSE :** Not all documents supporting this response have been discovered, and thus, the answer to this request may be supplemented under Federal Rule of Civil procedure Rule 26. Plaintiff objects to this request because the request for production of document seeks information that is as easily available to the requesting party as to the responding party. Plaintiff had submitted a grievence regarding Mr. Glenn Mendoza and the authority over seen Mendoza's action were in fact Mr. Hammer and Mr. Mckinzie all responsible for EEO and affarmative action in their official capacity,  which resulted in grievence filed on July 13, 2001.

**REQUEST NO. 3:** All documents demonstrating a plan or scheme to "cover-up" during EEOC proceedings in your case and in all "similar cases" you are aware of, as mentioned in paragraph 49 of the Second Amended Complaint.

Case 1:02-cv-00032    Document 105    Filed 11/21/2003    Page 71 of 76

**RESPONSE :**    Not all facts supporting this response have been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26.  Plaintiff in second amended complaint provided Exibits to demonstrate "cover up" of malice and reckless act of the respondent during the EEOC investiagtion. The similar cited cases will be produced in trial and the resarch work of the pro se plaintiff at the law library in preperation for trial is privilege from disclosure persuant to work product and other legal privilage.

**REQUEST NO. 4.**    All reports by experts retained by you who you intend to call as witnesses during the trial of this action.

**RESPONSE:**    Plaintiff objects to this request because the request for production of document seeks information that is as easily available to the requesting party as to the responding party. Facts supporting the Answer to this request have not been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26. however plaintiff will rely on the studies , opinions , reserch materials of professioanls . these materials are matter of public records and defendant also has access to them as well.

**REQUEST NO. 5:** All documents, writings and/or communications that are the foundation for your belief that Continental Micronesia, Inc. dba Continental Micronesia and/or Continental Airlines, Inc. retaliated against you.

**RESPONSE:**    Not all documents supporting this response have been discovered, and thus, the answer to this request may be supplemented under Federal Rule of Civil procedure Rule 26.  Plaintiff in good faith effort produces documents based on the following facts that 1) Plaintiff had threatened to report CMI to EEOC in a grievance filed in 1999 thus under the provision of the Federal statute plaintiff was categorized as "opposition" and a "public policy enforcer", accordingly retaliation by Mr. Glenn Mendoza was orchestrated.  2) Exhibits in Second Amended Complaint in regards to retaliation against the charging party for filing charge by concealing curtail information with no regards for the plaintiff's livelihood and children 3) Mr. Hammer made statement to Ron Roberts in regards to plaintiff after 9/11. 4) Mendoza withheld information to other supervisors in reference to my call to work.

**REQUEST NO 6:**    All documents relevant to your Eighth Cause of Action in the Second Amended Complaint (Sales of Fraudulent Insurance Policies by Defendant to Employees).

**RESPONSE:**    Not all documents supporting this response have been discovered, and thus, the answer to this request may be supplemented under Federal Rule of Civil procedure Rule 26. Plaintiff had presented exhibits and documents in second amended complaint and some documents have previously been produced.

**REQUEST NO. 7:**    Any and all documents evidencing or reflecting any economic and/or out of-pocket loss you claim to have suffered as a result of the alleged discrimination by CMI.

**RESPONSE:**    Documents supporting this response have not yet been discovered, and thus, the response may be supplemented under Federal Rule of Civil Procedure 26.Plaintiff not only is entitled to out of pocket expenses. He is also seeking allowable damages under the law.

**REQUEST NO. 8:** Please produce any chronology of events referencing, relating or referring to the facts made the basis of this lawsuit prepared by you or your behalf, including but not limited to notes, calendars, diaries, or day timers for the period 1998 through present.

**RESPONSE:** Not all facts supporting this response have been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26.

**REQUEST NO. 9: Please** produce a copy of all documents and communications to and from your Supervisors while employed with CMI.

**RESPONSE:** This response may be supplemented under Federal Rule of Civil Procedure 26. Plaintiff in his course of his employment had a personal file located in Human resources department that had kept accurate events of communication by plaintiff and his supervisors however after plaintiff several visits to his files during the EEOC investigation Plaintiff had noticed several times that documents were added and expunged, file would get thinner or thicker at any given time. Plaintiff mentioned that to Mr. Crisostomo on Feb 08, 2002. Document requested are discoverable in the CMI human resources department.

**REQUEST NO. 10:** Please produce any and all documents evidencing or reflecting any lawsuits in which you have been a party, including, without limitation, any and all pleadings, discovery, depositions, and other documents of any kind evidencing such lawsuits.

**RESPONSE:** Plaintiff objects to this request because it is irrelevant and immaterial. Plaintiff has been named in GCA violation in regards to domestic violence as defendant. further more plaintiff has sued Baby Johns used cars for property damage in small claims court and received compensation.

**REQUEST NO. 11:** Please produce a copy of any documents, notes or records of any kind that you made or kept while employed by CMI concerning the facts made the basis of this lawsuit.

**RESPONSE:** Facts supporting the Answer to this request have not been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26.Plaintiff objects to this request in the ground That it is vague, overboard, and ambiguous.

**REQUEST NO. 12:** Please produce any and all documents evidencing or reflecting your receipt of any compensation from any source other than CMI.

**RESPONSE:** This response may be supplemented under federal rule of Civil Procedure 26. Plaintiff objects to this request on the ground that it is vague, overboard, and ambiguous, although plaintiff had received payments for compensation of his on call service.

**REQUEST NO. 13:** Please produce any tape recordings, audio, video or both, that you obtained and/or produced regarding the facts made the basis of this lawsuit.

**RESPONSE:** Plaintiff objects to this request on the ground that is unreasonably burdensome, oppressive, or vexatious, Facts supporting the Answer to this request have not been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26.

**REQUEST NO. 14:** Please produce any and all notes, memoranda or other documents which are mentioned, discussed or referred to in any of the interrogatories served toghethr with this request for production.

**RESPONSE:** Plaintiff objects to this request on the ground that is unreasonably burdensome, oppressive, or vexatious. Not all facts supporting this response have been discovered, and thus this response may be supplemented under Federal Rule of Civil Procedure 26.

Dated this 29th day of August 2003.

Tony H. Ashtiani

*Pro se plaintiff*

## DECLARATION OF SERVICE

I, Tony H. Ashtiani  pro se plaintiff declare under penalty of perjury of the united states laws that on August 29th 2003. I personally hand delivered a true and correct copy of **PLAINTIFF    TONY H. ASHTIANI'S RESPONSE TO DEFENDANT CONTINENTAL MICRONESIA INC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS ; DECLARATION OF SERVICE .** Upon defendant the papers were left with the receptionist who appeared to be in charge or associate of Law firm CARLSMITH BALL LLP , Suite 401, Bank of Hawaii , 134 West Soledad Avenue, Hagatna, Guam 96910.

Executed this 29 <sup>th</sup> day of August of 2003

Tony H. Ashtiani

*Pro se plaintiff*

## DECLARATION OF SERVICE

I, David P. Ledger, hereby certify that on the 21st day of November, 2003, I caused to be personally served by making said following documents available for pick-up at Carlsmith Ball LLP, Bank of Hawaii Bldg., Suite 401, 134 West Soledad Avenue, P.O. Box BF, Hagåtña, Guam 96932-5027 during normal business hours, and served by mail at the last known address for service, true and correct copies of the documents listed below upon Plaintiff, Tony H. Ashtiani:

    1.     Motion for Summary Judgment; Memorandum In Support of Motion; Affidavit of Dixon McKinzie; Declaration of David P. Ledger; Exhibits A thru S; Declaration of Service.

    2.     Agreement on Hearing Date; and

    3.     Defendants Request to Appear Telephonically for Hearing on Defendants' Motion for Summary Judgment.

Executed this 21st day of November, 2003.

_____
DAVID P. LEDGER

4818-4650-9056.1.013280-00079