

CARLSMITH BALL LLP

ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Continental Micronesia Inc. dba
Continental Micronesia and
Continental Airlines, Inc.



FILED
DISTRICT COURT OF GUAM
NOV 28 2003
MARY L. M. MORAN
CLERK OF COURT

105

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TONY H. ASHTIANI,<br><br>       Plaintiff,<br><br>vs.<br><br>CONTINENTAL MICRONESIA, INC. dba<br>CONTINENTAL MICRONESIA and<br>CONTINENTAL AIRLINES, INC.,<br><br>       Defendant. | CIVIL CASE NO. CV02-00032<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AFFIDAVIT OF J DIXON MCKINZIE; EXHIBITS A - N; DECLARATION OF DAVID LEDGER; DECLARATION OF SERVICE** |

4840-4465-2288.1.013280-00079

# TABLE OF CONTENTS

                                                                                                    **Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND FACTS ............................................................................................ 1

        A.      CONTINENTAL'S ATTENDANCE POLICIES .................................................. 2

        B.      ASHTIANI'S EMPLOYMENT HISTORY ........................................................... 2

III.    STANDARD FOR SUMMARY JUDGMENT ............................................................. 5

        A.      ASHTIANI'S BURDEN ..................................................................................... 5

        B.      ASHTIANI'S PRO SE STATUS .......................................................................... 6

IV.     ANALYSIS ................................................................................................................. 7

        A.      INTRODUCTORY REMARKS ........................................................................... 7

        B.      CONSTRUCTIVE TERMINATION .................................................................... 8

        C.      WRONGFUL TERMINATION ........................................................................... 8

        D.      NEGLIGENT SUPERVISOR ............................................................................ 10

        E.      UNLAWFUL DISCRIMINATION BASED UPON RACE AND
                NATIONAL ORIGIN ....................................................................................... 11

        F.      INTENTIONAL DISCRIMINATION, INTENTIONAL RETALIATION
                POST 9/11 ....................................................................................................... 14

V.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .................................... 15

VI.     CONCLUSION ........................................................................................................... 17

i.

# TABLE OF AUTHORITIES

Page

**Cases**

Beaulieu v. Northrop Grunman Corp.,
  161 F. Supp. 2d 1135, 1148 (D. Haw. 2000) ................................................................. 10,15

Bergene v. Salt River Project Agricultural Improvement and Power Dist.,
  272 F.3d 1136, 1144 (9th Cir. 2001) ..................................................................... 8

Blough v. Hawkins Market, Inc.,
  51 F. Supp. 2d 858, 865-66 (N.D. Ohio 1999) ................................................... 10

Braunling v. Countrywide Home Loans, Inc.,
  220 F.3d 1154 (9th Cir. 2000) ............................................................................ 16

Canada v. Blain's Helicopters,
  831 F.2d 920,925 (9th Cir. 1987) ....................................................................... 6

Celotex Corp. v. Catrett ,
  477 U.S. 317, 323 (1986)..................................................................................... 5

Clearly v. Ameican Airlines,
  168 Cal.Rptr. 722 (1980) ..................................................................................... 9

Flores v. Hawaiian Rock Prods. Guam,
  CV812-02 (Super. Ct. Guam, Decision and Order dated Aug. 8, 2003 at 9) ....... 9

Folkerson v. Circus Circus Ents., Inc.,
  107 F.3d 754, 755 (9th Cir. 1997) ..................................................................... 15

Gantt v. Sentry Ins.,
  824 P.2d 680 (Cal. 1992)..................................................................................... 8

Green v. Ralee Eng'g Co.,
  960 P.2d 1046 (Cal. 1998) ................................................................................. 8

Gruenberg v. Aetna Ins. Co.,
  9 Cal.3d 566 (1973) ............................................................................................ 9

Guz v. Bechtel Nat. Inc.,
  100 Cal. Rptr.2d 352 (Cal 2000)......................................................................... 9

Hine v. Dittrich,
  278 Cal. Rptr. 330, 333 (Ct. App. 1991)............................................................ 11

Indland Mediation Bd. v. City of Pomona,
  158 F. Supp. 2d 1120 (C.D. Cal 2001) .............................................................. 16

Jacobson v. Filler,
  790 F.2d 1362, 1364-65 (9th Cir. 1985) ............................................................ 6

Johnson v. Hondo, Inc.,
  125 F.3d 408, 418 (7th Cir. 1997) ................................................................. 10,15

McDonnell Douglas Corp. v. Green,  411 U.S. 792, 802 (1973) ......................................... 11,12

Orr v. Bank of America, NT & SA,
  285 F.3D 764, 773 (9th Cir. 2002).................................................................... 5,6

# TABLE OF AUTHORITIES

Page

Oates v. Discovery Zone,
    116 F.3d 1161, 1171 (7th Cir. 1997) ................................................................ 12

Padilla v. Carrier Air Conditioning,
    67 F. Supp. 2d 650 (E.D. Tex. 1999) ................................................................ 10

Pickett v. Colonel of Spearfish,
    209 F. Supp. 2d 999 (D.S.D. 2001) ................................................................ 10

Sengupta v. Morrison-Knudsen Co., Inc.,
    804 F.2d 1072, 1075 (9th Cir. 1986) ................................................................ 12

Shoemaker v. Myers,
    276 Cal. Rptr. 303 (Cal. 1990 ................................................................ 15

Stevenson v. Superior Court,
    66 Cal. Rptr. 2d 888 (1997) ................................................................ 9

Texas Dep't of Cmty. Affairs v. Burdine,
    450 U.S. 248, 253-54 (1981) ................................................................ 12

United States v. Dibble,
    429 F.2d 598, 601 (9th Cir. 1970) ................................................................ 5

**Statutes**
22 G.C.A. § 9101 et seq ................................................................ 10
22 G.C.A. § 9104 ................................................................ 10
22 G.C.A. § 9106 ................................................................ 10

**Rules**
Fed. R. Civ. P. 56 ................................................................ 5,6

**Other Authorities**
Rest. 2d Torts § 46 ................................................................ 16

## I.    **INTRODUCTION**

Like his entire lawsuit, Plaintiff Tony H. Ashtiani's Motion for Partial Summary Judgment contains no support in either the facts or the law.  Ashtiani's motion was filed simultaneously with Defendant Continental Micronesia Inc.'s own Motion for Summary Judgment on November 22, 2002.  With the exception of two counts (Violation of the Family Medical Leave Act and Sales of Fraudulent Insurance Policy), Ashtiani asserts that summary judgment is proper in his favor on all remaining counts.

However, Ashtiani has not provided any admissible or authenticated evidence in support of his Motion.  Instead, the only basis for his motion are the unsupported allegations, which are restatements of his Second Amended Complaint.  Such allegations are improper forms of proof in a motion for summary judgment.

As Ashtiani clearly fails to carry his burden in his Motion for Partial Summary Judgment, any granting of summary judgment in favor of Ashtiani would be improper.  Rather, as this Memorandum discusses, summary judgment is instead appropriate in favor of Continental, as there are no genuine issues of material fact in this case, and Continental is entitled to judgment as a matter of law on all counts.

## II.    **BACKGROUND FACTS**

Facts pertinent to Plaintiff's Motion for Partial Summary Judgment are primarily the same as those presented in Defendant's Motion for Summary Judgment.  Defendant herein restates those facts, with the exception of facts related to Plaintiff's claim for Violation of FMLA, which he did not discuss in his motion, and the claim for Fraudulent Sales of Insurance, which he did not raise.

4840-4465-2288.1.013280-00079

## A.    CONTINENTAL'S ATTENDANCE POLICIES

The principal facts at issue in this case pertain to Ashtiani's attendance at Continental during the month of June 2001. In this case, the procedures Ashtiani must follow for reporting an absence from work were governed by the Agreement between Continental and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "IBT Agreement"). See Affidavit of Dixon McKinzie (hereinafter "McKinzie Aff.") (attached hereto) at ¶ 5. The IBT Agreement specifies that "an employee hereunder who is prevented from reporting for duty shall notify *the supervisor on duty* prior to the start of his shift and shall give the reason for his inability to report for duty." Ex. A, Art. 18, § A (emphasis added). The IBT Agreement further states that an "employee may be discharged for cause if he is absent from work for two (2) consecutive days without notifying the Company of the reason for his absence." Ex. A, Art. 18, § B.1.

Continental also maintains and enforces its own attendance policy. McKinzie Aff. at ¶ 6. The attendance policy states that a "NO SHOW is the most serious type of absenteeism." Ex. B. "More than one incident of no show may result in an acceleration of discipline. Two (2) consecutive days . . . absence from duty without notification may result in discipline that does not exclude termination." Ex. B.

## B.    ASHTIANI'S EMPLOYMENT HISTORY

Throughout his employment until his termination on July 3, 2001, Ashtiani was employed as an aircraft mechanic at Continental. Compl.[1] at 3, 5; McKinzie Aff. at ¶ 4. During his employment at Continental, Ashtiani had received a number of disciplinary warnings. McKinzie Aff. at ¶ 8; Ex. D. Towards the end of his employment, Ashtiani developed a serious attendance problem. For example, in 2000, as his Absentee Record demonstrates, Ashtiani

---

[1] All references to "Compl." refer to Ashtiani's Second Amended Complaint, filed on May 15, 2003.

began trading days off with other employees to such an extent that, combined with a few "sick" days, he completely failed to report for work from August 14, 2000, through December 12, 2000. Ex. E.

Continental continued to endure Ashtiani's serious attendance problems in 2001. In that year, prior to his termination, Ashtiani worked only 61 days. McKinzie Aff. at ¶ 10; Ex. F. On June 3, 2001, Ashtiani left work early on the basis that his son was ill. Ashtiani later requested, and was granted, "sick" time for June 4 and 5, 2001, again, because of his son's condition. McKinzie Aff. at ¶ 11; Ex. G. After his regularly scheduled days off on June 7 through June 9, Ashtiani requested "personal business" time off, which was later approved by one of his supervisors, William Herrera. McKinzie Aff. at ¶ 11; Exs. G and H.[2] Herrera also approved days off from June 10 through 12. McKinzie Aff. at ¶ 11; Ex. G.

On June 16, Ashtiani called supervisor Glenn Mendoza for approval of a "personal business" day, which Mendoza approved. McKinzie Aff. at ¶ 12; Exs. F and I. Ashtiani, however, failed to appear for work on June 17, 18, and 19, 2001, and failed to secure approval for his absences on those days. McKinzie Aff. at ¶ 13; Exs. F, I, and J. As he did not report his absences to a supervisor, as required under the IBT Agreement and Continental's Attendance Policy, he was subject to discipline.

On June 19, Ashtiani called Herrera and expressed interest in taking a formal Leave of Absence from the company. McKinzie Aff. at ¶ 14; Exs. K and L. Herrera informed Ashtiani that he needed to consult with the Human Resources department to formally apply and obtain such leave. McKinzie Aff. at ¶ 14; Exs. K and L. During that conversation, Ashtiani did not request for, and Herrera did not grant, any further time off from work. McKinzie Aff. at ¶

---

[2] Exhibits G and H are Absence from Duty Reports, which employees submit to report an absence from duty. See McKinzie Decl. at ¶ 11.

14; Exs. K and L.

On June 23, Ashtiani again failed to show up to work and failed to notify his supervisor on duty - Glenn Mendoza - that he will not be coming in to work. McKinzie Aff. at ¶ 15. Ashtiani claims that he called in to work on June 23 and spoke to Joseph Pangelinan, another aircraft mechanic, and asked Pangelinan to inform Mendoza that he would not be in to work on that day. See Plaintiff's Mot'n for Partial Summary Judgment. Joseph Pangelinan was not Ashtiani's supervisor. McKinzie Aff. at ¶ 22. Furthermore, a phone call to another aircraft mechanic to relay a message that one will not be in to work does not constitute proper Continental protocol for reporting such absence. McKinzie Aff. at ¶ 16. Rather, as the IBT Agreement requires, the employee must speak directly with a supervisor and provide the reasons for his non-appearance at work. Ex. A, Art. 18.

On June 24, once again Ashtiani failed to call in to or report for work. McKinzie Aff. at ¶ 15. On that day, Herrera called Ashtiani, who stated that he thought he was given time off until June 25. Ex. K. Neither Herrera nor Mendoza had ever approved June 23 and 24 as further days off. McKinzie Aff. at ¶ 17; Exs. K and M. As Ashtiani failed to receive authorization to take those days off, under Continental's attendance policy and the IBT Agreement, he was subject to discipline, including termination. See Exs. A and B.

Finally, on June 25, Ashtiani appeared for work. See Ex. F. On June 26, Herrera met with Ashtiani and his union representative to discuss the absences on June 23 and 24. Ex. K. At that meeting, Ashtiani explained that he believed he was permitted to take those days off. Ex. K. He was then suspended pending further investigation. Ex. K. On June 27, Herrera emailed Ashtiani regarding a further meeting on July 2 pertaining to his absences, and requesting confirmation of his attendance at the meeting. McKinzie Aff. at ¶ 18; Ex. N. Ashtiani failed to

confirm, and failed to appear at that meeting. Ex. K. Continental then terminated Ashtiani on July 3, 2001, for his no-shows on June 23 and 24, 2001. Ex. C. Ashtiani later appealed his termination and was offered reinstatement, which he then declined. McKinzie Aff. at ¶ 19.

As Ashtiani failed to secure supervisor approval for his absences on June 23 and 24, he did not fill out an Absence from Duty Report, which serves as a record of his absence, and upon which a supervisor approves such absence. McKinzie Aff. at ¶ 20. After Ashtiani's discharge on July 3, 2001, his supervisor, William Herrera, on October 30, 2001, filled out an Absence from Duty Report to record that Ashtiani failed to show for work on June 23 and 24, 2001. McKinzie Aff. at ¶ 20.

## III.   STANDARD FOR SUMMARY JUDGMENT

### A.   ASHTIANI'S BURDEN

In a motion for summary judgment, the moving party has the burden of showing that there exists no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Federal Rule of Civil Procedure 56 permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A plaintiff moving for summary judgment on his complaint "must offer evidence sufficient to support a finding upon every element of his claim for relief." United States v. Dibble, 429 F.2d 598, 601 (9th Cir. 1970). A trial court can only consider admissible evidence when ruling on a motion for summary judgment. Fed. R. Civ. P. 56(e); Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). In order to be admissible, evidence must be authenticated, meaning that it be attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into

evidence. 285 F.3d at 774.

> **It is well settled that unauthenticated documents cannot be considered on a motion for summary judgment.** In order to be considered by the court, 'documents must be authenticated by and attached to an affidavit that meets the requirements of [Fed. R. Civ. P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.

Canada v. Blain's Helicopters, 831 F.2d 920, 925 (9th Cir. 1987) (emphasis added); 285 F.3d at

773. Production during the discovery phase does not authenticate a document. 285 F.3d at 777.

B.    ASHTIANI'S PRO SE STATUS

Ashtiani's status as a pro se litigant does not entitle him to any special treatment

by the Court with respect to his Motion for Partial Summary Judgment. The Ninth Circuit

specifically and strictly prohibits courts from any such leniency:

> [P]*ro se* **litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record.** Trial courts generally do not intervene to save litigants from their choice of counsel, even when the lawyer loses the case because he fails to file opposing papers. A litigant who chooses *himself* as legal representative should be treated no differently. . . . it is not for the trial court to inject itself into the adversary process on behalf of one class of litigant.

Jacobsen v. Filler, 790 F.2d 1362, 1364-65 (9th Cir. 1985) (footnotes omitted) (emphasis added).

In Jacobsen, in responding to a motion for partial summary judgment, the pro se plaintiff failed

to provide a written opposition or any evidence in support of his position, arguing that he was

unaware of these requirements. The Ninth Circuit rejected the idea that a court inject itself into

the summary judgment proceedings by affording a pro se litigant leniency in complying with the

rules, especially when the Supreme Court and its Advisory Committee "already apprise litigants

of their summary judgment obligations." Id. at 1366.

Accordingly, Ashtiani should not receive any special treatment or leniency by his

blatant failure to comply with the rules pertaining to motions for summary judgment.

## IV. ANALYSIS

### A. INTRODUCTORY REMARKS

Ashtiani's motion is based on unsupported bare assertions and numerous unauthenticated exhibits. Ashtiani provides an unsworn Declaration that fails to refer to any of the exhibits, submitted with the motion, and a sworn Affidavit that attaches five exhibits, including two statistical studies. Ashtiani fails to explain how these "studies" were performed, what they measure, or even the basis of the study. Overall, they offer no helpful information, and are not even accurate, as one person listed as "terminated" on Exhibit A in fact resigned from Continental. See McKinzie Aff. at ¶ 21. The other exhibits are discovery documents and an email having no relevance to this case.

In all, Ashtiani fails to provide any authentication for any of his exhibits. Accordingly, the Court should not refer to any of his exhibits in considering his motion, except those that overlap with exhibits Continental has introduced and authenticated through its own Motion for Summary Judgment. Absent these exhibits, what remains of Ashtiani's motion, are restatements of allegations in the Complaint that have no support in any evidence or in the law, and citations to legal authority without explanation or application. On this basis alone, the Court may deny Ashtiani's Motion for Partial Summary Judgment in its entirety.

Nevertheless, this Memorandum in Opposition will discuss each of Plaintiff's claims, in the order presented in his Motion, and demonstrate that not only is summary judgment in Ashtiani's favor improper, but rather, summary judgment is completely appropriate in favor of Continental.[3]

---

[3] Ashtiani does not raise his claim for Violation of FMLA and Sales of Fraudulent Insurance Policy, although the former is mentioned peripherally in the beginning of the Motion. As there is no discussion on these claims, summary judgment on either in favor of Ashtiani would be improper.

Case 1:02-cv-00032    Document 117    Filed 11/28/2003    Page 11 of 57

## B.   CONSTRUCTIVE TERMINATION

As Defendant stated in its Motion for Summary Judgment, to prove his claim for constructive termination, Ashtiani must demonstrate that Continental intentionally made his working conditions so intolerable that a reasonable person would feel compelled to resign. Bergene v. Salt River Project Agricultural Improvement and Power Dist., 272 F.3d 1136, 1144 (9th Cir. 2001). There are no genuine issues of material fact that Continental terminated Ashtiani, and that Ashtiani did not resign. As Ashtiani himself recognizes, Compl. at ¶ 44, he was terminated by Continental. In fact, Plaintiff's motion states as an undisputed fact that Continental executed a letter terminating him. See Plaintiff's Mot'n for Partial Summary Judgment at 4; see also Plaintiffs' Affidavit in Support of Mot'n for Partial Summary Judgment at 2 ("On July 03, 2001 the plaintiff was discharged from his employment. . . .").

Plaintiff completely misunderstands the legal concept of constructive termination, which is not a cause of action, but rather, a means of satisfying the discharge element in a claim for wrongful discharge. 54 P.3d 785. Thus, as Constructive Termination is not a cause of action, and as in any event, Plaintiff was not forced to resign, but rather, terminated, the Court should deny Plaintiff's motion with regard to this claim, and grant summary judgment for Continental instead.

## C.   WRONGFUL TERMINATION

Generally, a wrongful termination cause of action, also known as "retaliatory discharge," holds that an employee may not be discharged for acting in furtherance of public policy. See Gantt v. Sentry Ins., 824 P.2d 680 (Cal. 1992) (en banc) overruled on other grounds by Green v. Ralee Eng'g Co., 960 P.2d 1046 (Cal. 1998). Actions "in furtherance of public policy" include: (1) refusing to violate a statute, (2) performing a statutory obligation, such as jury duty, (3) exercising a statutory right or privilege, such as union activities, or (4) reporting an

alleged violation of a statute of public importance. 824 P.2d at 684. Overall, the claim must involve questions genuinely concerning public policy, as opposed to ordinary disputes between employer and employee. Stevenson v. Superior Court, 66 Cal. Rptr. 2d 888 (1997).

Plaintiff bases his claim for Wrongful Termination on his supervisors' withholding information from each other and acting in ill will, false motive, malice and willful misconduct. Plaintiff completely fails to provide any facts to support these claims, fails to discuss the elements of Wrongful Termination, and as a result, completely fails to sustain his burden on the motion.

Plaintiff also cites Clearly v. American Airlines, 168 Cal. Rptr. 722 (1980) and Gruenberg v. Aetna Ins. Co., 9 Cal.3d 566 (1973), which do not relate to wrongful termination, but rather to the tort of good faith and fair dealing in the employment context. In any event, California law holds that there is no cognizable claim of the duty of good faith and fair dealing in the employment context. See Guz v. Bechtel Nat. Inc., 100 Cal. Rptr. 2d 352 (Cal. 2000) (disapproving Clearly). In addition, at least one Guam case has similarly dismissed the tort of good faith and fair dealing as not cognizable under Guam law. See Flores v. Hawaiian Rock Prods. Guam, CV812-02 (Super. Ct. Guam, Decision and Order dated Aug. 8, 2003 at 9) ("there is no local case law indicating that a plaintiff can maintain a wrongful termination claim by alleging a breach of the covenant of good faith and fair dealing"). Thus, there is no recognized tort of good faith and fair dealing even if the Court were to construe Ashtiani's claim for wrongful termination into a claim alleging breach of good faith and fair dealing.

In any event, because Ashtiani's claim only deals with a private dispute between himself and his supervisors, containing no public policy implications at all, not only does his motion fail, but summary judgment should be granted in favor of Continental on this issue

instead.

D.    NEGLIGENT SUPERVISOR

Plaintiff bases his claim of "Negligent Supervisor" on the fact that his supervisor, William Herrera, filed an Absence from Duty Report on October 30, 2001, and stated that the reason for Ashtiani's absence was his no-show from work. Ashtiani calls this act "unlawful."

First and foremost, Guam's Worker's Compensation Laws bar Ashtiani's claim of Negligent Supervision. See 22 G.C.A. § 9101 et seq. Under the worker's compensation law, an employee who receives a personal injury arising out of or in the course of his employment is entitled to compensation. 22 G.C.A. § 9104. Employer liability under the worker's compensation law is exclusive and in place of all other liability of the employer to the employee. 22 G.C.A. § 9106. In this case, Ashtiani's negligent supervision claims, which are considered personal injuries arising out of the course of employment, are barred by the Guam's Worker's Compensation law.

Other jurisdictions routinely dismiss negligence claims barred by state worker's compensation laws, based on exclusivity provisions within such legal frameworks. See, e.g., Johnson v. Hondo, Inc., 125 F.3d 408, 418 (7th Cir. 1997) (negligent supervision claim barred by Wisconsin Worker's Compensation Act); Pickett v. Colonel of Spearfish, 209 F. Supp. 2d 999 (D.S.D. 2001); Beaulieu v. Northrop Grunman Corp., 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000); Blough v. Hawkins Market, Inc., 51 F. Supp. 2d 858, 865-66 (N.D. Ohio 1999); Padilla v. Carrier Air Conditioning, 67 F. Supp. 2d 650 (E.D. Tex. 1999).

Guam's Worker's Compensation Law works no differently. Acts of negligence committed in the workplace constitute work injuries arising from the conditions of employment. See 161 F. Supp. 2d at 148. The proper and exclusive remedy for an injured employee is to seek compensation under Guam's Worker's Compensation law. As Ashtiani failed to follow this

procedure, his Negligent Supervision claim is barred.

Moreover, Ashtiani's Negligent Supervision claim is no more than a wrongful termination claim couched in the language of negligence. Such a claim cannot stand independently, as the alleged negligence is simply part of the allegedly discriminatory conduct resulting in Ashtiani's termination. See Hine v. Dittrich, 278 Cal. Rptr. 330, 333 (Ct. App. 1991) (a plaintiff "can no more turn a contractual wrongful discharge action into a negligent supervision tort claim than could a terminated employee plead negligence simply because the employer negligently failed to follow prescribed procedures before the firing").

In general, Ashtiani's claim of "Negligent Supervisor" makes no sense. The motion provides no authority describing this cause of action or its elements. The motion refers to a company document that has been unauthenticated, and that also fails to demonstrate any "negligence" on his supervisor's behalf. Moreover, the cause of action of Negligent Supervision is completely barred under Guam law. For all these reasons, Ashtiani's Motion for Partial Summary Judgment should not be granted on the claim for Negligent Supervision, and instead, summary judgment is proper in favor of Continental.

E.    UNLAWFUL DISCRIMINATION BASED UPON RACE AND NATIONAL ORIGIN

The Court must analyze Ashtiani's claim under the test established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In that case, the Supreme Court held that a plaintiff claiming to be a victim of racial discrimination must demonstrate in a prima facie case (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. Id.

Adopting the McDonnell Douglas factors to a discriminatory discharge context, an employee claiming discharge or termination on the basis of race must demonstrate (1) that he was within the protected class; (2) that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance; and (3) that his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills. Sengupta v. Morrison-Knudsen Co., Inc., 804 F.2d 1072, 1075 (9th Cir. 1986).

Only if Ashtiani proves all elements of his prima facie case does the burden shift to Continental to produce evidence that Ashtiani was terminated for legitimate, non-discriminatory reasons. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981). The burden then shifts back to Ashtiani to show Continental's reason was a pretext for discrimination. Id. at 265.

Within his prima facie case, Ashtiani must show that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance. However, Ashtiani's absenteeism demonstrates inadequate job performance. See, e.g., Oates v. Discovery Zone, 116 F.3d 1161, 1171 (7th Cir. 1997) ("an employee's 'performance is not necessarily confined to an appraisal of his or her substantive work," but rather includes whether he follows established attendance policies). Ashtiani thus fails to provide any genuine issue of material fact that he complied with the procedures established for reporting an absence from work. Ashtiani's implication that Continental has adopted a policy by which approval may be sought through relaying messages to nonsupervisory co-workers is irrelevant, as the IBT Agreement clearly states that employees must speak to a supervisor to report their absence from work.

In further support of his motion, Ashtiani restates allegations contained in his Second Amended Complaint and points to unauthenticated letters from Vince Diaz and Ron Roberts. These unauthenticated exhibits and bare allegations are of no help, as Ashtiani simply has failed to carry his burden on any element of his prima facie case. He fails to establish that he was doing his job well enough to rule out the possibility that he was terminated for inadequate job performance. In any event, his frequent absenteeism without securing approval from his supervisors, pursuant to the terms of the IBT Agreement, provided grounds for Continental to terminate him.

Ashtiani claims that Continental's reasons for terminating him were pretextual, but has not provided any basis for this assertion. Ashtiani first points to unauthenticated letters written from Joseph Pangelinan to the EEOC stating that Ashtiani spoke with Pangelinan on June 23, and Pangelinan informed Mendoza that Ashtiani would not be in on that day. However, as already noted, Pangelinan is not Ashtiani's supervisor, not did he have any capacity to grant approval of the absence. Without having spoken to a supervisor, under the terms of the IBT Agreement, Ashtiani was subject to discipline for not showing up to work.

Ashtiani also points to a statement by Ron Roberts in which Roberts refers to a conversation with William Herrera that "if Glenn [Mendoza] would of told me Tony called in all this would not be happening." Plaintiff's Mot'n for Partial Summary Judgment, Ex. E. Not only is this document unauthenticated, it is pure hearsay, also inadmissible under the Rules of Evidence and thus improper to support a motion for summary judgment. Fed. R. Evid. 802. Furthermore, a review of the letter reveals that it really says nothing relevant to this case. The same analysis applies to Vince Diaz's unauthenticated letter, Exhibit N to Ashtiani's Motion for Partial Summary Judgment, Attorney Mark William's Declaration, Exhibit F, and Teresa Sage's

email, Exhibit H.

Ashtiani also cites a memorandum written by Baltazar Atalig, one of Ashtiani's supervisors, dated June 28, 2001, and entitled "Final Paycheck - Tony Ashtiani." Plaintiff's Mot'n for Partial Summary Judgment, Ex. I. Once again, besides not containing any inference of discrimination, this document is unauthenticated, and fails to demonstrate any pretext.

Overall, Ashtiani has failed to show that he was performing his job well in light of his absences and failure to secure approval for those absences. On that ground alone, the Court may deny his motion. Furthermore, the fact that Ashtiani was absent for two consecutive days without approval provides a legitimate nondiscriminatory reason for Continental to terminate him under the terms of the IBT Agreement. Ashtiani has not put forth any evidence that that reason was pretextual, and on that basis, summary judgment is proper in favor of Continental.

F.    INTENTIONAL DISCRIMINATION, INTENTIONAL RETALIATION POST 9/11

Ashtiani claims that Continental discriminated and retaliated against him by lying to the EEOC during the EEOC investigation of his charge. In particular, Ashtiani claims that Continental withheld information pertaining to Mahdi Ali and Bruce Lee, former Continental employees, in response to a letter from the EEOC requesting a list of all mechanics who were "no-shows" for two consecutive days between June 1999 to June 2001. As Ashtiani's own Exhibit Q demonstrates, Continental does inform the EEOC of. Lee's termination. Continental was also under no obligation to disclose anything pertaining to Ali, who *resigned* from Continental effective January 22, 2002, and was not terminated. McKinzie Aff. at ¶ 21. There was no cover-up.

Moreover, Ashtiani's claim that he was discriminated against and retaliated against during the EEOC proceedings simply does not constitute a cause of action under the law.

Also, contrary to his assertion, Ashtiani has not suffered any harm as he is not entitled to a decision from the EEOC in his favor, and as the same issues brought before the EEOC are now being litigated in this forum.

Furthermore, the elements of retaliation are (1) the plaintiff engaged in conduct protected by Title VII of the Civil Rights Act of 1964; (2) the plaintiff was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. Folkerson v. Circus Circus Ents., Inc., 107 F.3d 754, 755 (9th Cir. 1997). Even if Ashtiani is asserting that Continental "retaliated" against him, as a matter of law, because the alleged retaliatory activity - lying to the EEOC - occurred after Ashtiani was terminated, Continental could *not* have subjected Ashtiani to adverse employment action.

In sum, Ashtiani's retaliation claim is wholly unsustainable by the law and by the facts of this case. Summary judgment on this issue is proper in favor of Continental.

## V.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

First and foremost, as with the claim for Negligent Supervision, Ashtiani's claim for Intentional Infliction of Emotional Distress is likewise barred by Guam's Worker's Compensation Law. As already stated, the worker's compensation law provides compensation to an employee in the event of an injury arising out of and in the course of employment. As the worker's compensation law provides the exclusive remedy for litigating the IIED claim, such claim is therefore barred. See Johnson, 125 F.3d 418; Beaulieu, 161 F. Supp. 2d at 1148; Shoemaker v. Myers, 276 Cal. Rptr. 303 (Cal. 1990).[4]

Furthermore, in order to prove his claim for Intentional Infliction of Emotional Distress, Ashtiani must demonstrate (1) acts committed by Continental amounted to extreme and

---

[4] This Honorable Court also reached the same conclusion in a similar employment case, Tolentino v. Greenhill, CV00-00001 (Apr. 10, 2001 Order).

outrageous conduct transcending the bounds of decency; (2) such acts were committed intentionally or recklessly; (3) causation; and (4) damages amounting to severe emotional distress. Inland Mediation Bd. v. City of Pomona, 158 F. Supp. 2d 1120 (C.D. Cal. 2001). The "extreme and outrageous conduct" complained of must exceed the bounds of what is generally tolerated in a civilized society. Braunling v. Countrywide Home Loans, Inc., 220 F.3d 1154 (9th Cir. 2000). Unreasonable job assignments, verbal abuse, and a failure to investigate an employee's complaint hardly rises to the level of extreme and outrageous conduct exceeding the bounds of a civilized society. See, e.g., Rest. 2d Torts § 46, com. d (liability does not extend to insults).

   Ashtiani's motion only baldly asserts that he has "suffered loss of motivation, loss of self esteem, loss of energy, . . . " and that, based on an unauthenticated an illegible doctor's report, he has been suffering from "decrease energy, elev [sic] fatigue, chronic fatigue syndrome [sic], depression." Plaintiff's Mot'n for Partial Summary Judgment at 16. This claim for intentional infliction of emotional distress wholly relies on the success of Ashtiani's discrimination claim, which itself has no merit. See § IV.E, infra. Reviewing Ashtiani's Motion for Partial Summary Judgment alone, it is obvious that he has completely failed to carry his burden in proving this claim. He offers no evidence that Continental committed any extreme and outrageous conduct transcending the bounds of decency; that such acts were committed intentionally or recklessly; that such acts caused him harm; or that he suffered any damages amounting to severe emotional distress. Ashtiani's bald assertions of suffering distress do not sustain a grant of summary judgment in his favor.

   On the other hand, Continental is entitled to summary judgment in its favor. First, Continental, in justly terminating Ashtiani for failing to show up for work, has not committed

4840-4465-2288.1.013280-00079      16.

Case 1:02-cv-00032   Document 117   Filed 11/28/2003   Page 20 of 57

any act exceeding the bounds of decency. Moreover, Ashtiani has not produced any evidence that he suffered severe emotional distress. Dr. Alix Chenet's report revealed no such indications of emotional distress. See Ledger Decl. at ¶ 3. Furthermore, Ashtiani failed to release any other doctor's reports under the guise of psychotherapist-patient privilege. See Ledger Decl. at ¶ 4. Without the release and admission of any such evidence, Ashtiani has not and cannot demonstrate that he suffered severe emotional distress, and thus cannot prove his claim for intentional infliction of emotional distress. Summary judgment is proper in Continental favor on this claim.

## VI.   CONCLUSION

Ashtiani's Motion for Partial Summary Judgment, accompanied by numerous unauthenticated exhibits, and wholly lacking legal foundation for any of his claims, has no merit. He has not provided a single strand of admissible evidence to sustain any of his claims.

After weeding out all the unauthenticated evidence and bare assertions, there remains no genuine issue of material fact that Continental was justified in terminating Ashtiani as he failed to follow established procedures for reporting an absence from work. Continental is entitled to judgment as a matter of law on all of Ashtiani's claims.

/ / /

/ / /

/ / /

/ / /

/ / /

For those reasons and the reasons discussed in Continental's Motion for Summary

Judgment, summary judgment is not proper in Ashtiani's favor, but rather appropriate for

Continental.

DATED: Hagåtña, Guam, November 26 , 2003.

for ELYZE MCDONALD
Attorneys for Defendant
CONTINENTAL MICRONESIA INC. DBA
CONTINENTAL MICRONESIA AND
CONTINENTAL AIRLINES, INC.

CARLSMITH BALL LLP

ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Continental Micronesia Inc. dba
Continental Micronesia and
Continental Airlines, Inc.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TONY H. ASHTIANI, | CIVIL CASE NO. CV02-00032 |
| Plaintiff, | **AFFIDAVIT OF J DIXON MCKINZIE IN SUPPORT OF DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| CONTINENTAL MICRONESIA, INC. dba CONTINENTAL MICRONESIA and CONTINENTAL AIRLINES, INC., | |
| Defendant. | |

GUAM, U.S.A.                          )
                                              ) ss:
Municipality of Hagåtña           )

I, J DIXON MCKINZIE, being first duly sworn, depose and say:

1.    All the statements made in this Affidavit are based on my personal

knowledge.

2.    All exhibits referred to herein and attached are business records found in

Tony H. Ashtiani's personnel file at Continental Micronesia, Inc., and kept in the ordinary course

of business at Continental. I have reviewed all of these documents in my capacity as the Director

4845-9889-0240.1.013280-00079

of Human Resources at Continental, and thus have personal knowledge of these documents and the information contained therein.

3. I am currently the Director of Human Resources at Continental Micronesia Inc., and acted in that capacity at all times relevant to Ashtiani's Second Amended Complaint.

4. Attached hereto as Exhibit A is a true and correct copy of pertinent pages of the Agreement between Continental and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("IBT Agreement"). Ashtiani, a former Continental aircraft mechanic, was a member of the IBT during the periods relevant to his Complaint.

5. The IBT Agreement and Continental's Attendance Policy governs the procedures that Continental employees who are also IBT members must follow for reporting an absence from work.

6. Attached hereto as Exhibit B is a true and correct copy of Continental's Attendance Policy, which Continental enforces for all of its employees.

7. Attached hereto as Exhibit C is a true and correct copy of the July 3, 2001 letter terminating Ashtiani's employment with Continental.

8. Throughout Ashtiani's employment with Continental, he received a number of disciplinary warnings. True and correct copies of several of those warnings are attached hereto as Exhibit D.

9. Attached hereto as Exhibit E is a true and correct copy of Ashtiani's 2000 Absentee Record.

10. Attached hereto as Exhibit F is a true and correct copy of Ashtiani's 2001 Absentee Record, which demonstrates that he only worked 61 days during that year prior to his termination on July 3, 2001.

4845-9889-0240.1.013280-00079

11.     Ashtiani was granted "sick" time off on June 3 through June 5, and "personal business" time off on June 7-9, and June 11-12, 2001. Attached hereto as Exhibits G and H are true and correct copies of Absence from Duty Reports exhibiting approval for the days off mentioned in this paragraph. Absence from Duty Reports are forms that employees fill out when seeking approval for their absences.

12.     On June 16, 2001, Ashtiani called Continental maintenance department supervisor Glenn Mendoza for approval of a "personal business" day off which Mendoza granted. Exhibit F reflects that approval. Also, attached hereto as Exhibit I is a true and correct copy of an email sent by Mendoza to another Continental maintenance department supervisor, William Herrera, reflecting the approval of the "personal business" day off on June 16, 2001.

13.     Ashtiani, however, failed to show up for work or secure approval for his absences on July 17-19, 2001. Exhibit F reflects that these absences were considered absences without leave. Also, Exhibit I demonstrates that he failed to secure approval for his absences on those days. Additionally, attached hereto as Exhibit J are true and correct copies of emails written by Herrera regarding Ashtiani's no-shows on July 17-19, 2001.

14.     Attached hetero as Exhibit K is a true and correct copy of notes kept by William Herrera in the ordinary course of business pertaining to the events surrounding Ashtiani's attendance in June 2001. Exhibit K shows that on June 19, Ashtiani expressed interest in taking a formal leave of absence from Continental. As Herrera did not have the authority to grant a formal leave of absence, he directed Ashtiani to contact the Human Resources department. However, as Herrera states in his notes, he "did not tell [Ashtiani] not to come in until [June 25, 2001]." Ashtiani's request is also recorded in an email by Herrera, a true and correct copy of which is attached hereto as Exhibit L.

15.     On June 23 and 24, 2001, Ashtiani failed to appear for work or to notify his supervisors that he would not be in on that day. Exhibit F reflects these absences were considered absences without leave.

16.     As the IBT Agreement and Continental's Attendance Policy state, when reporting an absence from work, an employee must speak directly with a supervisor. A phone call to non-supervisory personnel, such as to another aircraft mechanic, does not constitute proper Continental protocol for reporting such absence.

17.     Attached hereto as Exhibit M is a true and correct copy of a letter drafted by Mendoza and kept in the ordinary course of business stating that he did not give Ashtiani June 24 off. Neither Mendoza nor Herrera gave Ashtiani June 23 and 24 off.

18.     Attached hereto as Exhibit N is a true and correct copy of an email from Herrera to Ashtiani informing him of the July 2, 2001 meeting.

19.     Ashtiani appealed his termination, and was later offered reinstatement with certain conditions, which he declined.

20.     As Ashtiani failed to secure supervisor approval for his absences on June 23 and 24, he did not fill out an Absence from Duty Report, which serves as a record of his absence, and upon which a supervisor approves such absence. After Ashtiani's discharge on July 3, 2001, his supervisor, William Herrera, on October 30, 2001, filled out an Absence from Duty Report to record that Ashtiani failed to show for work on June 23 and 24, 2001, and was considered a "no show."

21.     Mr. Mahdi Ali  was formerly employed at Continental, and resigned in January 2000. He was not terminated.

22.     Joseph Pangelinan is employed as an aircraft mechanic at Continental Micronesia Inc., and was employed as such in June 2001. He was a temporary leadman aircraft

mechanic on June 23, 2001. Mr. Pangelinan in June 2001 did not have any supervisory role or supervisory capacity at Continental.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Further the Affiant sayeth naught.

Executed this __26th__ day of November, 2003 at Tamuning, Guam.

J DIXON MCKINZIE

SUBSCRIBED AND SWORN to before me, this __26th__ day of November 2003, by J Dixon McKinzie.

NOTARY PUBLIC

EUNICE J. MENDIOLA
NOTARY PUBLIC
In and for Guam, U.S.A.
My Commission Expires: April 8, 2006
257 Assumption Drive Piti, Guam 96915

4845-9889-0240.1.013280-00079


# ARTICLE 7

## HOURS OF SERVICE

A. Eight (8) consecutive hours, exclusive of an unpaid meal period, shall constitute a normal day or afternoon shift and eight (8) consecutive hours, inclusive of a thirty (30) minute meal period shall constitute a normal night shift. Based on the needs of the service, a ten (10) hour shift may be established as set forth in paragraph B below. A thirty (30) minute lunch will be given during the fourth or fifth hour of an employee's regularly assigned shift. Where a meal period is delayed and does not commence during the fourth and fifth hours, an employee shall be entitled to thirty (30) minutes at time and one half for the lunch period.

B. Five (5) consecutive work days of eight (8) hours each followed by two (2) consecutive days off shall constitute a standard work week or four (4) consecutive days of ten (10) hours each followed by three (3) consecutive days off shall constitute a standard work week. The working hours shall be properly posted on the bulletin board.

C. For the purpose of relaxation, all employees shall be granted a ten (10) minute rest period during the first half of their work shift and a ten (10) minute rest period during the second half of their work shift and a ten (10) minute rest period after completion of a regular shift before working overtime. Also, ten (10) minutes rest period for every two (2) hours of overtime worked without loss of time.

D. Shift and days off will be rebid without penalty:

1. Shift and days off will be bid without penalty each quarter of the year. Deviation may be made in order to accomplish this bid concurrently with a schedule change that takes place at approximately the same time.

2. Bids will be awarded in accordance with Article 20, Seniority. In order for an employee to participate along with the eligible employees in a rebid, he must be actively at work. If an employee is on vacation he must leave a preferential bid with the union and the company.

3. Each shift starting time during the rebid period for each classification may be changed by two (2) hours in either direction without penalty, two (2) times during each rebid period.

4. The Company will post a bid date along with the approximate number of available positions and days off for each shift. The employee will have seven (7) days from the date of posting to return his completed written bid sheet. The first incident of failure to file a preferential bid will result in the employee being assigned a shift equal to his present shift and days off if available at his point of seniority bidding. If unavailable, the employee will be assigned a shift as close as possible to his current shift. If there is more than one (1) failure to bid within each calendar year, the second incident will result in the employee being bypassed and assigned a shift equal to his present shift and days off if available. If unavailable, the employee will be assigned a shift as close as possible to his current shift.

12

**EXHIBIT A**

E. When it becomes necessary to temporarily assign an employee to another shift between rebid periods, the following procedure will be followed:

1. Employees on the shift where the transfer is to be made from will be polled by seniority as to their preference for accepting the temporary assignment. If no one accepts the temporary transfer, inverse seniority will be used to select the employee to be transferred.

2. Such assignment will provide for a penalty of one and a half times the base rate for the first four (4) hours of assignment to the temporary shift.

3. If a seven-and-a-half-hour rest period is not provided to the employee between the shifts, the four-hour penalty will not apply, but the overtime provisions of Article 9 will be applicable for penalty payments.

4. A temporary assignment between shifts shall not be of more than twenty (20) normal working days. An extension of this period shall be by mutual agreement between the Company and the Union.

F. No full-time employee will be called to work or required to report for a work shift of less than eight (8) hours of pay, except on a recall after having worked a previous shift the same day, when the minimum allowance will be four (4) hours pay at the regular hourly rate.

Any employee who reports for work when there is temporarily no work because of an act of God or other circumstances over which the Company has no control (including strikes by employees of the Company curtailing flight operations by fifty percent (50%) or more system-wide), will receive a minimum of four (4) hours pay at the regular hourly rate unless notified that there will be no work at the close of the last shift worked, or four (4) hours before the start of the employee's regular shift, whichever period is shorter. Notification can also be via media. releases from the Company.

G. Vacation Relief Procedural Rules

1. Vacation relief may be assigned to all or any portion of a vacation period.

2. Vacation relief assumes the shift and days off the employee on vacation. Except in the event of a shift rebid, the vacation relief will assume the new shift and days off the employee on vacation.

3. When not working vacation relief, the relief employee has a basic shift and days off. 

4. If the vacation relief constitutes less than an eighty (80) hour pay period at the employee's option, the relief employee will be assigned to work additional time without penalty.

13

15



## H. DAY AND SHIFT TRADES

1. Employees may agree among themselves, qualifications permitting, to: (1) trade one or more of their days off with each other ("day trade"); (2) exchange shifts on the same day, or another day ("shift trade"); or (3) work in place of another employee without the other employee doing likewise ("one way trade") in accordance with paragraph 5. below. If one employee is on ten hour shifts and the other employee is on eight hour shifts, then both employees will work each other's assigned shifts. The foregoing trades may result in an employee working more than four (4) days (in the case of 10 hour shifts) or five (5) days (in the case of 8 hour shifts) in a work week, and/or more than eight (8) or ten (10) hours, as the case may be, in a twenty-four (24) hour period. In all such cases those employees will be paid straight time.

2. Employees who agree to make a specific trade should fill out and sign a form stating the dates and times of the trade. That form must then be submitted to the appropriate supervisor who shall acknowledge receipt of it with his signature, even though his approval of the trade is not required. Each of the employees is then responsible for his own attendance on the dates and times of the agreed trade, as well as ensuring both parties are qualified in accordance with the Company's definitions of qualifications. Upon reporting for work, a trading employee must give the appropriate supervisor the name of the employee whose place he is taking.

3. However, an employee who orally arranges for a trade without filling out the appropriate form, and without obtaining a supervisor's written receipt, will be held responsible for his own attendance and that of the other employee agreeing to the trade.

4. If it is necessary to temporarily transfer an employee from one shift to another, the supervisor will ask for a volunteer. If no one volunteers, a qualified employee will be selected by the supervisor by reverse craft seniority.

5. One way trades are limited to two (2) days per two week pay period, unless otherwise authorized by the appropriate supervisor. Two way trades are limited to five (5) days/shift per pay period, unless otherwise authorized by the appropriate supervisor. Trades must be completed within a bid period.



## ARTICLE 18

### ABSENCE FROM DUTY

A.  Unless otherwise provided by special departmental bulletin, an employee hereunder who is prevented from reporting for duty shall notify the supervisor on duty prior to the start of his shift and shall give the reason for his inability to report for duty. Such notification shall be necessary only once in any continuous period of absence providing that the employee has notified his immediate supervisor of the approximate duration of his absence and the date on which he will return to work.

B.  An employee hereunder shall not be absent from duty without prior permission in writing, except for sickness, injury, or other cause beyond the control of the employee.

1.  An employee may be discharged for cause if he is absent from work for two (2) consecutive days without notifying the Company of the reason for his absence. However, he shall not be discharged if a satisfactory reason is given for not notifying the Company.

2.  It is the employee's responsibility to initiate the Absence from Duty report and submit to his immediate supervisor for processing on each absence from duty for any cause whatsoever. Such report should be submitted prior to the employee taking any scheduled time off. However, it must be submitted prior to the employee returning to his first scheduled shift. The only exceptions to the prior approval are occupational injury or sickness. All other items listed in Article 9, Paragraph D must have prior approval or he will not receive any pay for such absence until such document is submitted regardless of other provisions of this Agreement.

C.  When it is necessary for an employee to be absent from duty because of death in his immediate family (wife, husband, child, mother, father, sister, brother, grandparents of employee, his mother-in-law or his father-in-law, grandchildren and dependents living in the employee's household), he shall have four (4) twenty-four (24) hour work periods to be taken within ten (10) twenty-four (24) hour periods starting from the time of death, during which he will not be required to report for duty and shall not suffer any loss of his base pay. If the above defined death in the immediate family occurs, the employee taking such time off will be allowed at that time up to and including a maximum of forty (40) hours of unused vacation days or earned unused sick leave in conjunction with the above referenced four (4) days bereavement time. Such use of sick time will not count for attendance/disciplinary purposes.

.42

44

D.  Employees may request a day or portion of a day off without pay to attend to business that cannot be accomplished except during their normal working hours. When a justifiable reason exists and when the requirements of the service will permit, such time off will be permitted on a first-request basis. Failure to secure such authorization at least twenty-four (24) hours in advance (except in the event of personal emergency) or other abuses of the privilege, shall result in loss of the right to request and be granted such privilege for a period of one (1) calendar year.

E.  An employee required to serve as a juror shall furnish evidence to his supervisor of the required time and place of reporting.

   1.  An employee absent from work while on jury duty shall suffer no loss of pay provided the employee furnishes the Company a Court Validated Statement of Attendance.

   2.  When an employee serves on jury service for six hours or more on any scheduled work day, he shall not be required to report for work on that day.

43

45

# ATTENDANCE POLICY

Regular attendance and punctuality are essential factors in insuring the personal success of each Employee, the success of the Department to which we are assigned and the successful achievement of Continental Micronesia's Corporate Goals. Excessive absenteeism and lateness places an unfair burden on our fellow Employees and has a profound adverse effect on our ability to achieve our personal success and the continued success of Continental Micronesia. This attendance program is designed to assist each Employee by setting forth a standard for acceptable attendance so each Employee knows what is expected of them. It is also designed to assist our Management team in monitoring and managing Employee attendance and punctuality in a fair and consistent manner.

Eight (8) incidents within a twelve month period is normally considered to be excessive and can subject the Employee to serious disciplinary action.

## A. DEFINITIONS

1. ACCOUNTABLE ABSENCES are defined as an instance when an Employee is absent from work (a) due to sickness involving the Employee or his/her spouse or dependent child, (b) is late reporting for duty of more than 5 minutes, (c) is unable to report with prior notice to supervisor, (d) fails to report (no show) without prior notification to supervisor, and (e) departs early without authorization.

2. NO SHOW is the most serious type of absenteeism. When an Employee fails to show for work, it creates a hardship on the operation and other Employees. More than one incident of no show may result in an acceleration of discipline. Two (2) consecutive days (or duty assignments) absence from duty without notification may result in discipline that does not exclude termination.

3. SICK is an incident due to the illness of the Employee or his/her spouse or dependent child. Absence due to sickness is considered one incident even if it extends for consecutive days. The Employee must notify his/her supervisor in advance of each shift or duty assignment unless a doctor has prescribed a certain number of days free from work and the supervisor has been provided this information.

4. LATE REPORT – An employee is considered late for disciplinary purposes if he/she reports for work more than 5 minutes late. Three incidents of reporting five or less minutes late within a six month period will trigger the issuance of one Late incident to the Employee's attendance record and will disqualify the Employee from participation in the ATTENDANCE INCENTIVE AWARDS PROGRAM.

5. PATTERNS AND TRENDS OF ABSENCE – An Employee's attendance record will be reviewed to determine attendance patterns and trends. Patterns and trends may include absenteeism consistently falling in conjunction with an Employee's scheduled days off, scheduled vacation, holidays, surrounding day trade off, or when absenteeism frequently occurs on the same days of the month. In some cases, the attendance guidelines may be accelerated to promote attendance improvement by the Employee.

EXHIBIT B

Case 1:02-cv-00032    Document 117    Filed 11/28/2003    Page 33 of 57

6. NON-ACCOUNTABLE ABSENCES – Absences from duty for the following reasons will not count for discipline related attendance tracking and will not disqualify the Employee from participation in the ATTENDANCE INCENTIVE AWARDS PROGRAMS.

   a. Vacation

   b. Holidays

   c. Trade Days Off

   d. Death/Critical Illness*

   e. Jury Duty

   f. Approved leaves of Absence

   g. Occupational Injury Time

   h. Compensatory Time Off

   i. Approved Unpaid Time Off

   j. Company Declared Adverse Weather Time Off

   k. Lates in accordance with Paragraph A.4. above

B. *A*TTENDANCE POLICY GUIDELINES

Employees incurring attendance incidents will be counseled according to the following:

**LEVEL ONE**                   **1 Accountable Incident**

Notation is to be placed on Employee's Attendance Tracking Sheet/File. A copy of the notation is placed in Employee's mail file.

**LEVEL TWO**                   **2 Accountable Incidents**

Notation is to be placed on Employee's Attendance Tracking Sheet/File. A copy of the notation is placed in Employee's mail file.

**LEVEL THREE**                 **3 Accountable Incidents**

Supervisor will personally give Employee a copy of the third incident notification on the Employee's attendance file. If the incidents indicate a potential pattern (see definition of patterns/trends), supervisor will discuss with Employee.

**LEVEL FOUR**                  **4 Accountable Incidents**

Supervisor will personally give Employee a copy of the fourth incident notification on the Employee's attendance file and will counsel Employee on the 8th incident policy to ensure the Employee understands expectations. If the incidents indicate a potential pattern (see definition of patterns/trends), supervisor will again discuss with Employee.

**000960**

**LEVEL FIVE**                    **5 Accountable Incidents**

Employee will be given a written letter of counseling (1st Written Warning) indicating the incidents on record and clear notification that further disciplinary action my be necessary if attendance improvement is not shown. If there is reason to believe that Employee Assistance may be needed, Supervisor should request assistance from Employee Relations/Human Resources.

**LEVEL SIX**                    **6 Accountable Incidents**

Employee will be given a second Written Warning letter expressing the need for immediate corrective action.

**LEVEL SEVEN**                    **7 Accountable Incidents**

Employee is placed on written termination warning. Employee Relations/Human Resources is notified of the termination warning and may request a meeting with supervisor and/or Employee for intervention purposes.

**LEVEL EIGHT**                    **8 Accountable Incidents**

Employee is subject to discharge. Supervisor should consult with Employee Relations/Human Resources prior to discharge of Employee.

C.    *A*DMINISTRATION OF POLICY

1.    **Rolling 12 Months Calendar** – The above guidelines are administered on a rolling 12-month period from the date of the first incident. Although incidents drop off in a rolling calendar year, once an Employee has reached termination warning, termination will be considered with each absence over the next twelve months until such time as the attendance record returns to a Level Five.

Consideration will be given to individuals with extenuating circumstances. These special situations should be reviewed by supervision and Human Resources to establish a more lenient progression if circumstances warrant. It is also possible that supervision may, in some cases, accelerate the program depending upon the severity of the incident the overall record, and the Employee's length of service.

2.    **Abuse** – Employees, including supervision, are expected to work as a team toward maintaining satisfactory attendance. Dishonesty associated with sick leave or any other absence is a serious matter. An Employee who calls in sick when they are not, who misleads the Company, who uses travel benefits without prior permission, is dishonest regarding a lost time incident, or refuses a duty assignment is subject to termination of employment.

HRMG (6/97)
Attendance Pg. 3

**000961**

3.   Medical Verifications – Supervision will advise the Employee when a written medical verification by a doctor is required which includes:

   a.   Diagnosis/Prognosis

   b.   Date and time of visit

   c.   Date of next visit, if applicable

   d.   Medication prescribed

   e.   Anticipated date Employee will return to work

The verification must be submitted to the supervisor on or before report time of the Employee's first duty assignment following the absence. Failure to provide such verification may result in the Employee being withheld from duty.

To:         Hamid (Tony) Ashtiani

From:       William A. Herrera

Subject:    Disciplinary Action

Date:       July 3, 2001

At the end of our discussion on June 26, 2001 with Prudencio Aguilo and IBT Representative, Mike Pablo present, you were advised that you would be contacted for a meeting on Monday. I had also advised you to contact me by Tuesday, 1600 if you had not heard from me. The meeting was scheduled to discuss your no-call/no-show of your shifts of June 23 and 24, 2001.

After numerous attempts, starting with my e-mail sent on June 27 to the address you had provided and also voice messages left on the answering machine associated with telephone number 653-5575, we have been unable to set a formal meeting date. Because of the faxed received at 1701 on July 3, 2001 it is apparent that you don't want to meet to complete this investigation. With the information that I have available and based on no reasonable explanation for not securing authorization for your absences on June 23 and 24, 2001 I have made the decision to terminate your employment with Continental Micronesia effective July 3, 2001.

Because your refusal to meet and discuss this situation any further, it is with regret that I am reduced to sending this certified letter concerning your status with Continental Micronesia. Your final paycheck is available and may be retrieved from the Human Resources department by contacting Robbi Crisostomo, 642-8727 or Teresa Sage, 642-8852.

Should you elect to appeal this termination, you may do so in accordance with Article 24 of the current bargaining agreement between Continental Micronesia, Inc. and The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

William A. Herrera

Cc:     Baltazar Atalig
        Employee Relations
        Union Representative
        P-file

1/24/02

**000983**

**EXHIBIT C**

## Planning / M.O.C. Discrepancy report

Date: _9-12-95_          Control #: _95-09-01_

Completed by: _BILL BALOW~_          Title: _Sup. A/c PLANNING_

Department:          M.O.C.     or     (A/C Planning)

Aircraft # _073_          Date _9-11-95_          Time _15:15_

Items overflown:

| | |
|---|---|
| M&E # : _02-0572-8-0055_ | Description : _L/P 49E2443 DIP D INSA MAG PLUG_ |
| M&E # : | Description : _W/I 100 FLT HRS_ |
| M&E # : | Description : |

Explanation/Cause of discrepancy: _LOG PAGE 49E2443 WAS OPENED BY_
_CUM MX ON 9/1. MX DID NOT ENTR THE L/P IN SCEPTRE TIL_
_9/8 BEING THE WEEKEND RECORDS PERSONEL DID NOT START_
_TRACKING THE TIME TIL MONDAY 9/11 APPOX. ~ 1200 9/11 PLANNING_
_WAS NOTIFIED THE A/C HAD ALREADY OVERFLOWN IT'S LIMIT_
_BY 0.06 HRS._

Action taken: _MAG PLUG INSPECTION WAS C/W IN EWR_
_DEF T: 12 9/11/95_

Corrective action: _MR. BUD PARRY HAS BEEN FAXED A COPY OF THIS_
_DISCREPANCY REPORT FOR HIS EXPLANATION OF_
_THE CORRECTIVE ACTION_

(Note: If a discrepancy is caused by other than M.O.C. or A/C Planning, that department is to provide a written explanation of corrective action taken to the Director of Quality Assurance within 5 business days.)

Distribution :     Director of Quality Assurance  . . . .
                   Director of Aircraft Planning
                   Director of Maintenance Control

**000964**

**EXHIBIT D**

Case 1:02-cv-00032    Document 117    Filed 11/28/2003    Page 38 of 57

Gayle / Don

This did not get accomplished in the reqd time limit because the individual did not complete a DP. I feel the individual should get a do-better / warning letter. Please advise as I need to close out with the ____.

Johnson

# Continental Micronesia



09/19/95

Continental Micronesia
P.O. Box 8778
Tamuning, Guam 96931

Tel 671 649 9102
Fax 671 649 9106

MANAGER OF Quality control
THOMAS RAMIREZ.

Dear THOMAS.

I knowledged RECIEVING THE mentioned DOCUMENTS AND complied WITH STEPS 1 THRU 4 OF THE PROCEDURES AlTHough observing "X" MARk ON THE INSPECTION Block AT THE Top OF THE PAGE, I logisTicly Believed A FAX copy WAS SENT TO CAl-QC OFFICES, Since's CONTINENTAl MICRONESIA HAS NO jeoaristriction oVER DC-10-30's FleeT's DIP AND control#:

in All RETRORESPECT I PERFORMED my DUTY TO THE BEST of my Ability HOW EVER if I AM knew To Be AT FAUIT I will TAKE FULL RESPONSIBILITY AND will STAND THE consequences wiTHouT DISPUTE To THE REasanable level OF REPIRMENT.

SINCErly YoURS.

000966

# Continental Micronesia



02 March 1993

To:      Tony Ashtiani

Subj:    Exceeding AOA Speed Limits/Absence From Assigned Work
         Area

At approximately 11:15 A.M., 03-02-93, you left your assigned job
area on ACFT 790 B-check and was witnessed leading up to the Terminal
area on tow tractor exceeding AOA speed limit.

This letter is to serve as a notification of warning that any future
occurences of this nature will result in a higher state of discip-
linary action.

Thank you,

Frank Perez

cc:  Bud Parry
     Fred Comas
     Personal File

**000967**

TO: HAMID ASHTIANI
FR: GLENN MENDOZA
SUBJ: ATTENDANCE
DATE: 14NOV99

ON NOV 20, 1999, YOU WERE SCHEDULED TO WORK SWINGSHIFT. YOU WERE REGARDED A
"NO SHOW" FOR FAILURE TO SHOW FOR WORK AND NO NOTICE GIVEN TO A SUPERVISOR.
DUE TO THE SERIOUS NATURE OF THIS INCIDENT AND YOUR PASS ATTENDANCE RECORD,
I WILL PLACE YOU AT THIRD INCIDENT LEVEL WHICH REQUIRES ME TO COUNSEL YOU
AND PLACE THIS DOCUMENT IN YOUR PERSONAL FILE. TONY, YOUR "NO SHOW"
CREATED A HARDSHIP TO THE OPERATION AND YOUR FELLOW EMPLOYEE. PLEASE
REMEMBER THE STATUS YOU HOLD IN REGARDS TO SENIORITY. THE EXAMPLE YOU SET
AFFECTS A GREAT NUMBER OF OUR AIRCRAFT TECHNICIANS. IF YOU HAVE ANY
QUESTIONS REGARDING THIS LETTER, PLEASE ASK.

GLENN MENDOZA
LINE MX SUPV.

338

**Continental**

EMPLOYEE ABSENTEE RECORD
CALENDAR YEAR 2000

EMPLOYEE NAME ASHTIANI, Hamid "Tony"
EMPLOYEE NO. 05963
COMPANY SENIORITY ___

FORM: 40.000-
DATE: REV 11/99

PREVIOUS YEAR TOTAL (INSTANCES)
SICK ___   OCC. ___
P.B. ___   AWL ___
TARDY ___
OTHER ___

Months columns: JANUARY, FEBRUARY, MARCH, APRIL, MAY, JUNE, JULY, AUGUST, SEPTEMBER, OCTOBER, NOVEMBER, DECEMBER

**ABSENCE FROM DUTY CODES**

- DO - REGULAR DAY OFF
- S - SICKNESS
- OI - OCCUPATIONAL INJURY
- V - VACATION
- W - ABSENCE WITHOUT LEAVE
- H - HOLIDAY
- P - PERSONAL BUSINESS
- CC - COMPANY CONVENIENCE
- PC - PERSONAL CONVENIENCE
- J - JURY DUTY
- K - DEATH IN IMMEDIATE FAMILY
- L - TARDY
- TO - TRADE DAY OFF
- TW - TRADE DAY WORKED
- T - 737 training

**ACTION TAKEN BY SUPERVISOR**

Annual Audit - Notification letter lvl 2
1/05/0 lvl 1 from 4/14/0 certified ltr sent to emp directing rtn to work on 16 Dec 00. pending drug test. Emp
16 Dec 00 comp conference await drug test results

000969

EXHIBIT E

Case 1:02-cv-00032    Document 117    Filed 11/28/2003    Page 43 of 57

# Continental.

**EMPLOYEE ABSENTEE RECORD**
CALENDER YEAR 2001

EMPLOYEE NAME: TONY ASHTIANI
EMPLOYEE NO.: 057663
COMPANY SENIORITY: 1/14/85    class: 8/04

# of Days Worked in 2001 : 61

Case 1:02-cv-00062   Document 117   Filed 11/28/2003   Page 44 of 57

EXHIBIT F

FORM: 40.0004
DATE: REV 101

PREVIOUS YEAR TOTAL (INSTANCES)
SICK _____ OCC. _____ TARDY _____
P.B. _____ AWL _____ OTHER _____

**ABSENCE FROM DUTY CODES**

DO - REGULAR DAY OFF
S - SICKNESS
OI - OCCUPATIONAL INJURY
V - VACATION
W - ABSENCE WITHOUT LEAVE
H - HOLIDAY
P - PERSONAL BUSINESS
CC - COMPANY CONVENIENCE
PC - PERSONAL CONVENIENCE
J - JURY DUTY
K - DEATH IN IMMEDIATE FAMILY
L - TARDY
TO - TRADE DAY-OFF
TW - TRADE DAY WORKED

**ACTION TAKEN BY SUPERVISOR**
4/3/01 - In e 1001 - Date e 1044
(3 Hours worked) (Sick
6/24/01 - In e 1324 - Date e 2000 (0.5 Hours)
(0.5 Hours) (Suspension)
Worked

00009775

TOTALS: WP Non/Jan Pr.
INSTR. S = SICKNESS
CON/PD V = VACATION

V = Vmain (3/5)
V = 3 min. (3/6)
V = 4 min. (4/10)
V = lemin. (4/23)
V = Vmain (4/5)
HP = Condision Pr
HP = Memorial Of  S = SICKNESS
P = Personal Business
W = NO CALL/NO SHOW
SU = SUSPENSION



# Continental Micronesia

**Employee Number:** 05963

## ABSENCE FROM DUTY REPORT

**Date Prepared:** 6/11/01

M: P-138CM
E#: 00-0703-3-1415
f: 02/95

1. SICK LEAVE: Immediately upon return to work or at the end of each pay period whichever first occurs.
2. OCCUPATIONAL INJURY LEAVE: Immediately when injury necessitates absence from duty.
3. VACATION: Prior to the start of the vacation period; OR when a paycheck is desired before the start of the vacation period, this form must be **received** in Payroll FOURTEEN (14) CALENDAR days **prior** to the date the check is desired.
4. OTHER: Immediately upon return to work or at the end of each pay period whichever first occurs.
   Distribution: White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Employee

---

**(Attach Doctor's Certificate When Requesting)**

I, __Tony Ashtiani__ PRINT NAME , employed at __(UMMX__ WORK LOCATION and ____ COST CENTER

Employee Number _05963_ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE _6/3 – 6/8 – 2001_        TOTAL HOURS _20.85_

BRIEF DESCRIPTION, NATURE OF ABSENCE _Son Sick_

Signature of Employee _For Tony_     ACKNOWLEDGED ____ SUPERVISOR     _6/11/01_ DATE

CIRCLE REGULAR DAYS OFF: S M T (W)(T)(F) S

---

**(Attach Doctor's Certificate When Requesting)**

I, ____ PRINT NAME , employed at ____ WORK LOCATION and ____ COST CENTER

Employee Number ____ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE ____        TOTAL HOURS ____

Signature of Employee ____     ACKNOWLEDGED ____ SUPERVISOR     ____ DATE

CIRCLE REGULAR DAYS OFF: S M T W T F S

*(left margin: OCCUPATIONAL INJURY LEAVE)*

---

I, ____ PRINT NAME , employed at ____ WORK LOCATION and ____ COST CENTER

Employee Number ____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicated below.

**000257**

VACATION (HOURS) ____

DEFERRED HOLIDAYS (HOURS) ____

DATES OF VACATION (FROM) ____ (TO) ____        TOTAL HOURS ____

MY PAYCHECK TO BE ISSUED ON ____ (DATE)     is herewith requested for ____ (DATE)

Signature of Employee ____     ACKNOWLEDGED ____ SUPERVISOR     ____ DATE

CIRCLE REGULAR DAYS OFF: S M T W T F S

*(left margin: VACATION)*

---

**(Personal Business, Authorized Leave, Jury Service, etc.)**

I, __Tony Ashtiani__ PRINT NAME , employed at __(UMMX__ WORK LOCATION and ____ COST CENTER

Employee Number ____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicted below.

DATE OF ABSENCE _6/11 – 6/12 2001_        TOTAL HOURS _20_

REASON FOR ABSENCE _PB_

If because of death in the immediate family, what relation to the employee? ____

Signature of Employee _For Tony_     ACKNOWLEDGED ____ SUPERVISOR     _6/11/01_ DATE

CIRCLE REGULAR DAYS OFF: S M T (W)(T)(F) S

*(left margin: OTHER)*

Distribution: White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Employee

**EXHIBIT G**

M: P-138CM<br>
#: 00-0703-3-1415<br>
: 02/95

# Continental Micronesia

**Employee Number:** 05963

## ABSENCE FROM DUTY REPORT

**Date Prepared:** 6/11/01

1. SICK LEAVE: Immediately upon return to work or at the end of each pay period whichever first occurs.
2. OCCUPATIONAL INJURY LEAVE: Immediately when injury necessitates absence from duty.
3. VACATION: Prior to the start of the vacation period; OR when a paycheck is desired before the start of the vacation period, this form must be <u>received</u> in Payroll FOURTEEN (14) CALENDAR days <u>prior</u> to the date the check is desired.
4. OTHER: Immediately upon return to work or at the end of each pay period whichever first occurs.

Distribution: White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy - Employee

---

**(Attach Doctor's Certificate When Requesting)**

I, _Tony Ashtiani_ , employed at _GUMMY_ and _____
PRINT NAME                          WORK LOCATION        /        COST CENTER

Employee Number _05963_ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE _SICK 6/9 - 6/10 2001_    TOTAL HOURS _20_

BRIEF DESCRIPTION, NATURE OF ABSENCE _SICK_

Signature of Employee _For Tony_    ACKNOWLEDGED _BH_    6/11/01
                                                        SUPERVISOR        DATE

CIRCLE REGULAR DAYS OFF: S  M  T (W) T (F) S

---

**(Attach Doctor's Certificate When Requesting)**

I, _____ , employed at _____ and _____
PRINT NAME                          WORK LOCATION        /        COST CENTER

Employee Number _____ , hereby certify that I was absent due to sickness for the period of the time indicated below and that I was unable during such period to perform my regularly assigned duties.

DATE OF ABSENCE _____    TOTAL HOURS _____

Signature of Employee _____    ACKNOWLEDGED _____
                                                        SUPERVISOR        DATE

CIRCLE REGULAR DAYS OFF: S  M  T  W  T  F  S

*INJURY LEAVE*

---

I, _____ , employed at _____ and _____
PRINT NAME                          WORK LOCATION        /        COST CENTER

Employee Number _____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicated below.

VACATION (HOURS) _____

DEFERRED HOLIDAYS (HOURS) _____

DATES OF VACATION (FROM) _____ (TO) _____ TOTAL HOURS _____

MY PAYCHECK TO BE ISSUED ON _____ is herewith requested for _____
                          ( DATE )                                   ( DATE )

Signature of Employee _____    ACKNOWLEDGED _____
                                                        SUPERVISOR        DATE

CIRCLE REGULAR DAYS OFF: S  M  T  W  T  F  S

---

**(Personal Business, Authorized Leave, Jury Service, etc.)**

I, _____ , employed at _____ and _____
PRINT NAME                          WORK LOCATION        /        COST CENTER

Employee Number _____ , hereby certify that I will be on vacation in accordance with my approved vacation schedule for the period of time indicted below.

DATE OF ABSENCE _____    TOTAL HOURS _____

REASON FOR ABSENCE _____

If because of death in the immediate family, what relation to the employee? _____

**000256**

Signature of Employee _____    ACKNOWLEDGED _____
                                                        SUPERVISOR

CIRCLE REGULAR DAYS OFF: S  M  T  W  T  F  S

**EXHIBIT H**

Distribution: White copy - Payroll • Yellow copy - Division Head File • Pink copy - Supervisor File • Gold copy -

**Crisostomo, Robbi**

From: Herrera, William A
Sent: Monday, July 02, 2001 2:17 PM
To: Crisostomo, Robbi
Subject: FW:

-----Original Message-----
From: Mendoza, Glenn R
Sent: Sunday, June 17, 2001 15:15
To: Herrera, William A
Subject:

*Per Glenn, ____ ca ____ ____*

BILL, TONY A. CALLED FOR AN EXTRA PB ON SAT 16JUN, I APPROVED IT. ON SUNDAY 17JUN I DID NOT GET ANY CALLS FROM HIM, HE WAS DUE TO WORK, SO FAR IT'S A NO CALL/ NO SHOW UNLESS YOU SOMETHING I DON'T KNOW. FROM WHAT I CAN SEE HE WAS SICK 3,4,5,9, AND 10JUN. ON 11 AND 12 JUN HE GOT PB. HIS WIFE CALLED ON 16JUN 1300 HRS TO ASK FOR AN EXTENSION ON HIS PB, I GRANTED IT. NOW 17 JUN NO CALL/NO SHOW. I WILL BE FLYING TO OKJ MONDAY 18JUN SEE ME IF YOU HAVE ANY QUESTIONS. GLENN

**000925**

**EXHIBIT I**

## Cruz, Adrienne

**From:** Herrera, William A
**Sent:** Monday, June 18, 2001 9:32 PM
**To:** Cruz, Adrienne
**Cc:** Babauta, Benjamin C; Tydingco, Bertha S; Mendoza, Glenn R; Baltazar Atalig
**Subject:** ~~Tony Ashtiani~~

*Adrienne,*

*I just wanted something in writing concerning Tony Ashtiani and his current status of 2 days No-Call/No-Show. I e-mailed him earlier today and left numerous messages on his answering machine. I had Mike Pablo call him again at 2100 and he too left a message to call us and talk to a Supervisor. Crew scheduling shows that his wife is off for the rest of the month-I was checking to see if I can talk to her to get better information as to his disposition. I am writing this to you to serve as a memo for record to ensure I have tried to cover all the bases as far as trying to get a hold of Tony. Let me know if you have any other ideas anything short of going to his house to ensure he okay.*
*Bill*

*William A. Herrera*
*CMI Maintenance Supervisor*
*(671)632-8910/8912*
*wherrera@csair.com*

**000020**



1

**EXHIBIT J**

Case 1:02-cv-00032    Document 117    Filed 11/28/2003    Page 48 of 57




**Subject: CONTACT WORK**
 **Date:** Mon, 18 Jun 2001 17:29:56 +1000
 **From:** "Herrera, William A" <wherrera@csair.com>
   **To:** "'ashtiani@ite.net'" <ashtiani@ite.net>
  **CC:** "Cruz, Adrienne" <acruz@csair.com>, Baltazar Atalig <batalig@csair.com>,
      Benjamin Babauta <bbabauta@csair.com>, Bertha Tydingco <btydingco@csair.com>,
      Frank Perez <fperez@csair.com>, Glenn Mendoza <gmendoza@csair.com>,
      James Lujan <jlujan2@csair.com>, William Herrera <wherrera@csair.com>

Tony,
It is imperative that you call work and talk to a supervisor.  Glenn tried
to contact you yesterday and I have been trying to reach you for several
hours today.  I need to know you are alright due to the fact that you have
been a no call-no show for the last two days and the contact numbers you
have provided have gone unanswered.  Again, please call the maintenance
department ASAP.
Bill

William A. Herrera
CMI Maintenance Supervisor
(671 )632-8910/8912
wherrera@csair.com

**000021**

Case 1:02-cv-00032    Document 117    Filed 11/28/2003    Page 49 of 57

**June 11, 2001:**
My second day back from days off. I talked to Tony around 1105 and he requested 2 days of Personal Business (P.B.). to take care of his son who was sick, due to his wife having flights with layovers this month. I offered him FMLA-he declined stating that he did not want the company paying him sick leave to take care of his child. I authorized the two days P.B.
**Ref: 1**

**June 18, 2001:**
First day back from days off, Glenn mentions that Tony has not shown up for work the last couple of days. I tried calling his home and cell throughout the afternoon, but was not successful. I sent e-mail in the evening (1730) stating that he has been considered no show and advised him to call the maintenance department ASAP to find out what was going on.
I made several phone calls to his cell and home numbers, but was unsuccessful. I asked Mike Pablo the shift union steward to try and get a hold of him at 2100. He was not able to talk to him either. I went to crew scheduling to see if they had another number available for Cathy (Tony's spouse) so I can use it to get a hold of Tony-the same numbers I had been using was given.
I sent e-mail to Adrienne at 2130 to let her know what I did earlier today.
**Ref: 2, 2a**

**June 19, 2001:**
Tony called me at 1105 to let me know he was interested in taking a Leave of Absence because he has been doing the aircraft maintenance thing for a long time and was burned out and needed a break. He wanted to submit paperwork to me to forward to our Maintenance Manager and I explained that he needed to contact the Human Resources department to submit his request, as that was the procedure to my understanding. He explained that he was going to do that on Monday.
I wished him luck in that, and reminded him of our meeting on Monday, June 25th to discuss my investigation on the incident of aircraft 081. He acknowledges and we hang up.
**Ref: 3, 3a**

**June 24, 2001:**
First day back from days off. Turnover from Glenn that Tony did not show up for work this week. I called Tony, after he didn't show up for my shift. I got a hold of him and asked him why he was not at work. He said he misunderstood what I told him on the 18th concerning the meeting I had set up for the June 25th. He said that he thought he was off until the meeting with Robbi at HR concerning his LOA request. I explained that I had nothing to do with the request and I did not tell him not to come in until Monday. I told him that he must come in tomorrow Monday, June 25, 2001.
**Ref: 4**

**June 25, 2001:**
Tony shows up for work, but the workload prevents me from meeting with him.

**000987**

**June 26, 2001:**
I had a meeting with Tony, Mike Pablo and Pru Aguilo to find out about the Jun 23rd/Jun 24th absences. Tony explains that he thought he had secure the time off. I asked him who authorized it after realizing that this version was different than my conversation with him on the 24th. He stated the Glenn Mendoza had and wanted to know what the big deal was, he was just trying to take care of his son. I asked him about his LOA request and he stated that he read a section in the "Working Together" guidelines that showed the company did not have to offer him his job back if his position was already filled-shows me page 44.
I offered him FMLA again and he accepted this time.
I informed him that I was suspending him until I concluded my investigation. I took possession of his company I.D; AOA badge and Kronos card. I advised him that I should be able to contact him by Monday because I would be on days off, but if he did not hear from me by 1600 Tuesday July 3, 2001 to contact me.
Ref: 5, 5a

**June 27, 2001:**
Sent email message to advise Tony that I set up a meeting at HR on July 2, 2001 at 1600 after I completed my investigation. Did not get a confirmation from Tony via e-mail or telephone.
Ref: 6

**July 2, 2001:**
I requested the Adrienne get a hold of Tony to ensure he knows to show up for the 1600 meeting. Adrienne could not get a hold of him after several attempts.

Ref: 7

**July 3, 2001:**
Received fax regarding "limited" contact with me is not advised and after consulting with HR department. I signed the termination letter for Tony and requested that Adrienne send it out certified mail per the IBT agreement.
Ref: 8

**\*Reference:**
1=FMLA REFUSAL-6/11/01
2=TONY CONTACT WORK-6/18/01
2A=E-MAIL TO ADRIENNE 6/18/01
3=TONY CALLED-6/19/01
3A=LOA REQUEST FAX 6/22/01
4=MENDOZA TURNOVER 6/23/01
5=FMLA ACCEPTANCE 6/26/01
5A=SUSPENSION ADVISEMENT 6/26/01
6=EMAIL ON JUL 2 MEETING AT HR
7=ADRIENNE'S CONTACT EFFORTS 7/2/01
8=LIMITED CONTACT FAX
9=TERMINATION LETTER

1/24/02

**000988**

**From:** Herrera, William A
**Sent:** Tuesday, June 19, 2001 14:47
**To:** Herrera, William A
**Subject:** MEMO FOR RECORD

*Tony called me at 1107 today, he indicated that he is considering a Leave of Absence request. I wished him good luck in that endeavor, however I need to see him on Monday, June 25, 2001 to settle or clarify the 081 incident involving the delaminated/separated wing root panel.*

*William A. Herrera*
*CMI Maintenance Supervisor*
*(671 )632-8910/8912*
*wherrera@csair.com*

1|24|02

Robbie,
REMEMBER - I DO
ADMINISTRATIVE
ON weekdays.
get thing

**001050**

**EXHIBIT L**

January 24, 2002

On 9 Jun 2001, when Tony Ashtiani's wife called work to tell us that he will not be into work, this was when I told her to have Tony call a supv asap. I told her we needed to know what was happening so we could offer FMLA or emergency leave. She said she will pass the message to Tony.

On 16 June 2001, at approx. 1320 hrs I was told by Joe P. that Tony's wife had called requesting a PB extension and that he told her it would not be a problem. I informed Joe he did not have the authorization to grant any time off and he should have told her to have Tony call me himself. Being Joe was my acting leadman and he had told Tony's wife it would not be a problem I granted the 16th of June PB off for Tony.

On 23 June 2001, at approx. 1340 hrs while I was conducting shift briefing Joe P. told me to check Bill's mailbox for a fax Tony had sent. He told me it might be the reason Tony's not in to work today. After the briefing I took the fax out of Bill's mailbox and read it. I did not know what it meant, so I assumed because it was addressed to Bill he had it under control. At approx 1650 hrs I sent an e-mail to Bill questioning the whereabouts of Tony. I was curious because of the fax he had sent concerning the LOA he was going to ask for. At approx 1745 hrs I get a phone call in my office from Tony himself. I asked him where's he's been and why didn't he come into work today. He asked me did I read his fax to Bill and I answered yes. He than told me he was to meet with Bill on Monday for the LOA. He gave me the impression Bill had given him time off until Monday. He thanked me for my help and hoped the guys enjoyed the food he offered to them.

On 24 June 2001, Bill called me at home to ask me did I give Tony Sunday 24 Jun off. I told him "no" but Tony gave me the impression Bill gave him 23rd Sat off on my shift. Bill told me he did not give Tony 23rd and 24th off and that he will call him to get to the bottom of this.

_____    24 Jan 02
Glenn Mendoza                Date

**000973**

**EXHIBIT M**

| | |
|---|---|
| **From:** | Herrera, William A |
| **Sent:** | Wednesday, June 27, 2001 19:08 |
| **To:** | Herrera, William A; 'ashtiani@ite.net' |
| **Cc:** | Cruz, Adrienne; Crisostomo, Robbi; Sage, Teresa; Atalig, Baltazar; Babauta, Benjamin C; Tydingco, Bertha S; Mendoza, Glenn R |
| **Subject:** | RE: Meeting |

Tony,

I have scheduled a meeting at HR on Monday July 2, 2001 at 1600 (4 p.m.) please respond acknowledging this. You need to be there at the scheduled time and you may have a union representative present as well.

If you have any questions feel free to address them to myself or the supervisor on duty.

William A. Herrera
CMI Maintenance Supervisor
(671 )632-8910/8912
wherrera@csair.com

[signature] 1/24/02

**001023**

Engine          **EXHIBIT N**

CARLSMITH BALL LLP

ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam  96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Continental Micronesia, Inc. dba
Continental Micronesia and
Continental Airlines, Inc.

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TONY H. ASHTIANI, | CIVIL CASE NO. CV02-00032 |
| Plaintiff, | |
| | **DECLARATION OF DAVID LEDGER** |
| vs. | |
| CONTINENTAL MICRONESIA, INC. dba CONTINENTAL MICRONESIA and CONTINENTAL AIRLINES, INC., | |
| Defendant. | |

I, David P. Ledger, declare:

1. I am an attorney at law licensed to practice before the Courts of the Territory of Guam and before this Court. I am a partner with the law firm of Carlsmith Ball LLP, attorneys of record for Defendant Continental Micronesia, Inc.

2. If called as a witness, I would and could competently testify thereto to all facts within my personal knowledge except where stated upon information and belief.

3. Defendant subpoenaed Dr. Alix Chenet, Ashtiani's physician, for doctor's reports indicating evidence of emotional distress. Dr. Chenet complied with the subpoena, and

none of the documents provided contained any such indications of emotional distress. Defendant

is prepared to provide those documents to the Court for examination upon the Court's request.

        4.     Defendant also subpoenaed Dr. Juan Rapadas, Ashtiani's psychologist.

Dr. Rapadas object on grounds of privilege, and Ashtiani refused to waive the psychotherapist-

patient privilege to allow Dr. Rapadas to turn over the documents.

        Executed this 28th day of November, 2003, at Hagåtña, Guam.


DAVID P. LEDGER

## DECLARATION OF SERVICE

I, David P. Ledger, hereby certify that on the 1st day of December, 2003, I will
cause to be personally served by making Defendants' Memorandum in Opposition to Plaintiff's
Motion for Partial Summary Judgment; Affidavit of J Dixon McKinzie; Exhibits A - N;
Declaration of David P. Ledger; Declaration of Service available for pick-up at Carlsmith Ball
LLP, Bank of Hawaii Bldg., Suite 401, 134 West Soledad Avenue, P.O. Box BF, Hagåtña, Guam
96932-5027 during normal business hours, and served by mail at the last known address for
service, true and correct copies of the documents listed below upon Plaintiff, Tony H. Ashtiani:

Executed this 28th day of November, 2003.

_____

DAVID P. LEDGER

4818-4650-9056.1.013280-00079