FILED
DISTRICT COURT OF GUAM

JAN 30 2004

MARY L. M. MORAN
CLERK OF COURT

154

Tony H. Ashtiani
P.O.Box 12723
Tamuning Guam 96931
671-688-4844
671-653-5575

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

Tony H. Ashtiani,                          )
                                           )
            Plaintiff,                     )  Civil Case No.: 02-00032
                                           )
       Vs.                                 )  **PLAINTIFF'S OPPOSITION TO**
                                           )  **DEFENDANT'S MOTION TO STRIKE**
Continental Micronesia Inc,                )  **DECLARATION OF TONY ASHTIANI**
                                           )  **AND EXHIBIT 56 (FILED JANUARY**
Dba, Continental Micronesia,               )  **9, 2004).**
                                           )
Continental Airlines,                      )
                                           )
            Defendant                      )
                                           )
_____           )


Plaintiff files his opposition to defendant's Motion to strike Exhibit (56) which is a shift schedule log of Continental Micronesia Inc. maintenance Dept, dated June 19, 2001, prior to Ashtiani's wrongful termination. Defendant has filed a repetitive Motions to Strike with different caption on the same document as previously been filed as ("Motion to Strike all unauthenticated evidence preferred by Ashtiani on December 5, 2003.").

Defendant **citing** *Jones v. Menard* 559 F.2d 1282 1285 n.5 (5th Cir. 1977) Defendant here, not only modifies the cited case but omits some important and key elements surrounding the case law. Defendants motion at (3). States " Its submission violates the Federal Rules of Civil Procedures and the <u>court's inherent power to control the proceeding before it.</u>" **Exhibit A.**

The case law herewith attached states "As to Menard's Affidavit, it was submitted during oral argument on the motion rather than being served prior to day of hearing, as Rule 56 (C) requires; thus, <u>it ran afoul not only of federal rule of procedure but also of trial court's inherent power to control the proceedings before it.</u> **Exhibit B.**

No doubt, that the court has the power to control the proceedings however, Defendant modified and fabricated cited case and omitted important issues that technicality has no role in summary judgment proceeding and on that grounds the case was reversed.

A. <u>**STATEMENT OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION.**</u>

As set forth in detail below, Ashtiani will provide sufficient case law that technicality has no place for summary judgment whether pro se or under advise of counsel.

THORNBERRY, Circuit Judge, specially concurring: ("Although I am in complete agreement with a reversal on the ground that summary judgment was improper, I have trouble with footnote 5 of Judge Gee's opinion, which intimates that the trial court's refusal to consider the Reineke Report and Captain Menard's affidavit was correct. Certainly this language is unnecessary to our disposition of this case. The fact that the Reineke Reports was unsworn hardly seems to be an insurmountable problem. "If the trial court was seriously concerned with determining if evidence did exist, it had the capability to "test this out" by requesting that the appellant submit a supplemental affidavit simply the same report, this time sworn. Rule 56(e) Such procedure is consistent with the purpose of summary judgment: to inquire and determine whether competent evidence exists"). See C. Wright, Law of Federal Courts s 99, at 492 (3d ed. 1976). "Likewise, the rejection of Captain Menard's affidavit, submitted in proper form but on the day of the hearing, was perhaps not an abuse of discretion". Again, however, it seems the trial court seized upon an available technicality to exclude sound evidence, in contravention of the truism that courts should grant opponents all benefits of doubt in summary judgment proceedings.")

Honorable Judge Thornberry continued on to state ("I cannot improve on the words of the eminent Judge Hutcheson, who remarked: ("It is quite clear that technical rulings have no place in this (summary

judgment) procedure and particularly that exclusionary rules will not be applied to strike, on grounds of formal defects in the proffer, evidence proffered on tendered issues"))" *Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir. 1940). **Exhibit C.**

("Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists") *Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir. 1940). **Exhibit D.**

"The rights of *pro se* litigants require careful protection where highly technical requirements are involved, especially when enforcing those requirements might result in a loss of the opportunity to prosecute or defend a lawsuit on the merits". (citation omitted)

Defendant *citing Orr v. Bank of AM., NT & SA*, 285 F3d 764, 774 (9th Cir.2002). "In order to be admissible, evidence must be authenticated, meaning that it be attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." Again defendant by

creative writing modifies and fabricates the case law, in fact upon a close examination, Defendant completely leaves legitimate issue of "personal knowledge" case law states: ("In a summary judgment motion, documents authenticated through **personal knowledge** *(FN8)* must be "attached to an affidavit that meets the requirements of [Fed. R. Civ.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *(FN9)*.

**FLAG NOTE 8:** "A document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so." 31 Wright & Gold, Federal Practice & procedure: 7106, 43 (2000).

**FLAG NOTE 9:** Federal Rule of Civil procedure 56(e) requires that affidavits be made on personal knowledge, that the affiant be competent to testify to the matters stated therein, and that sworn or certified copies of all papers referred to in an affidavit be attached thereto. *See* Fed. R. Civ.P. 56(e).

Authentication is a "condition to precedent to admissibility"

> Once the trial judge determines that there is *prima facie* evidence of genuineness, the evidence is admitted, and the trier of fact makes its own determination of the evidence's authenticity and weight. *See Alexander Dawson Inc. v. NLRB, 586 F.2d 1300, 1302 (9th Cir. 1978)* (per curiam).

# B. PLAINTIFF'S BURDEN TO PROFF HIS CASE UNDER TITLE VII.

It is plaintiff's duty to submit facts to ultimate trier of fact, for the forgoing reasons: An employee disciplined can defended on grounds that similar situated employee received lesser penalties or no penalties at all. But individual treatment accordingly to individual differences merely implements the basic principles that all employees must be judged by the same standard, **rules must be uniformly enforced, and penalties must be equally applied.** Accordingly Ashtiani's <u>exhibit (56)</u> does just that. Title VII cases are concerned with whether treatment varies according to protected statue attitude concerning classes of people than it is a response to specific behavior, the specificity of the reasons for discharge is a critical concern: a general reason unsupported by specific facts particular events does little to rebut an alleged wrongful motive.

"Title VII comes into play before the harassing conduct leads to a nervous breakdown. ("Discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance to such a degree as to be actionable under title VII") *Harris v. Forklift system, Inc.* 114 S.Ct. 367. Thus, discourage employees from remaining on the job, or keep them from advancing in their careers.

Adhtiani here, has suffered emotional and psychological harm over a decade from racial slurs, intolerable job assignment, deprived of administrative hearings, failure to investigate, deprived Insurance benefits ,ERISA, to *other* protected statue in title VII. Plaintiff asserts that, this types of malice and reckless act of discrimination effects the mind of any humans regardless of their race of nationality. Psychological Causes and Consequences of Racism. **Exhibit E.**

## C. THE COURT HAS BEEN MISLED ON APPLICABLE LAW INCLUDING CONTENTS OF CMI AND IBT CONTRACT.

On December 12, 2003 parties appeared before the court for plaintiff's partial summary judgment and defendants motion for summary judgment.

Prior to ruling on Summary judgment, plaintiff strongly objects that Defendant appeared in Person while they requested for an ORDER to appear telephonically and their order was granted, this had created such emotional turmoil and shocking at the time of hearing for plaintiff.

There were issues discussed before the court that needs to be addressed. Plaintiff seeks to discuss this matter because defendant statement of law including CMI and IBT contract was based on flaws

presented by Continental and proof of that inaccuracy and misleading is herewith governed by an official transcript.

Ms. McDonald: page 4 lines (5,6,7,8) states; ("both documents say that if an employee is going to be absent for work, he needs to call in and talk to his supervisor.") **Exhibit F.**

Ms. McDonald: page 4 lines (11,12,13,14,15) states; ("In those two documents, the two attendance policies, two days no reporting to work and not showing up for work is cause for discipline, not to exclude termination. And it says that in both documents") **Exhibit G.**

The union contract states (" An employee **may** be discharged for cause if he is **absent from** work for two (consecutive days **without** notifying the company of the reason for his absence However, he **shall not be** discharged if a satisfactory reason is given for not notifying the Company. **Exhibit H.**

Attendance policy states: ("Two (2) consecutive days (or duty assignments) absence from duty **without** notification **may** result in discipline that does not exclude termination. **Exhibit I.**

These documents that defendant is referring to is far from what is stated by defendant in official transcript.

Further more counsel states "the supreme court has prescribed a formula, as you're well aware, with McDonell Douglas" Ashtiani has met every element in that formula and plaintiff was qualified for his position as Ashtiani held a valid certified aircraft mechanic license.

Defendant went to state about Ashtiani's "performing adequately" The letter of termination does not state Ashtinai was not performing and even so, defendant has failed to use performance evaluation, procedure and many other tools to evaluate employee performance by company's own internal procedural mechanism, defendant failure to elect to remedy their allegations as part of scheme of conspiracy of constructive discharge to discriminate, Rather defendant sets up plaintiff to force him out.

Plaintiff takes this matter very seriously and defendant given the Court an inaccurate overview of the Supreme Court case law and the contract to the extend that I am forced to point out the inaccuracies presented before the District Court of Guam. The judicial process has been taken lightly by the defendant, whether Ashtiani appears Pro se or presented by counsel defendant has no right to mislead the Court.

////
////

## D. CONCLUSION

For all the reasons set forth above, Defendant is well aware that technicality has no place for summary judgment proceedings in their own reversed cited case. Thus, flooding the Court with never ending Motion to Strike. Therefore, Plaintiff respectfully request that defendant motion to strike be denied, and plaintiff motion for partial summary judgment be granted.

Submitted respectfully,. This 30th day of January 2004.

Tony H. Ashiani

Pro Se, Plaintiff

Ashtiani was employed at Continental. This exhibit pertains to issues presented during the summary judgment proceedings in this case. Ashtiani has not requested permission from the Court to file this exhibit and additional information. Ashtiani thus has no grounds for filing this untimely exhibit. Its submission violates the Federal Rules of Civil Procedure and the court's inherent power to control the proceedings before it. See, e.g., Jones v. Menard, 559 F.2d 1282, 1285 n. 3 (5th Cir. 1977).

Federal Rule of Civil Procedure 6 governs the approach in the event of late filings. It requires that a motion be made and a late filing be permitted where the failure to meet the deadline was the result of excusable neglect. In order to accept Ashtiani's late submissions, the Court must regard the very filing of the late document as a motion made to file it, and infer for itself - for Ashtiani provides no explanation - what constituted his excusable neglect. The Supreme Court in Lujan v. National Wildlife Federation, 497 U.S. 871, 894-98 (1990), found that a district court did not abuse its discretion in rejecting affidavits filed untimely, when the party provided no motion nor just cause in support of the late filings. Similarly, here, the Court should strike Exhibit 56 and all other untimely filed exhibits from the record.

## IV.  EXHIBIT 56 LACKS AUTHENTICATION

In order to be admissible, evidence must be authenticated, meaning that it be attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774 (9th Cir. 2002).

Ashtiani fails to provide any foundation for this exhibit or to authenticate it. Ashtiani has not stated whether he has any personal knowledge of this exhibit, nor has he furnished a declaration from any person that does. Ashtiani claims to have received the document from

EXHIBIT "A"

grade of pipe too weak for the purpose intended.[4] If this be true, and if Glazer could so establish as a matter of law, doubtless it would be entitled to summary judgment. It has yet to do so, however. Assuming that the trial court correctly rejected St. Charles' proffer of Captain Menard's affidavit and Mr. Reineke's report,[5] there

remains the deposition of Murray Reed, a crewman of the vessel who stated that the boom broke when under no load. This testimony at least raises an inference that the pipe may have been flawed, as does also the drawing attached to Reed's deposition, which indicates that the boom collapsed at its top and not near the deck end, where a

[4]. If St. Charles chose the wrong pipe for the job, it was guilty of misusing the product. Misuse is a traditional defense in products cases; it began in suits brought under negligence theories and was later carried over to strict liability actions. See W. Prosser, Handbook of the Law of Torts § 102, at 668 (4th ed. 1971). Misuse is a multi-faceted concept, which can best be understood in context. There are three types of products cases: those alleging inadequate warning, those alleging inadequate design, and the more common case of defective manufacture. See Rey v. Cuccia, 298 So.2d 840, 844 n. 2 (La.1974) (discussing inadequate warning and inadequate design); Fox v. American Steel Bldg. Co., 299 So.2d 364 (La.Ct.App.1974) (defective manufacture); Gauthier v. Sperry Rand, Inc., 252 So.2d 129 (La.Ct.App.) cert. denied, 259 La. 940, 253 So.2d 382 (1971) (defective warning and design); Albert v. J. & L. Engineering Co., 214 So.2d 212 (La.Ct.App.1968) (warning and design case). See also W. Prosser, supra, § 99, at 659. In inadequate warning cases misuse means that the seller had no duty to warn against unforeseeable uses of its products, while in design cases misuse means that the manufacturer had no duty to design a product so as to prevent injuries arising from unforeseeable uses of that product. In Rey v. Cuccia both of these arguments were rejected. 298 So.2d at 844 n. 2. In defective manufacture cases, however, misuse means that the injury was not caused by some inherent defect in the product but by the consumer's abnormal use of it. See Fox v. American Steel Bldg. Co., 299 So.2d at 372 (misuse of crane rather than defect in product alleged to have caused accident); Meche v. Farmers Drier & Storage Co., 193 So.2d 807 (La.Ct.App), cert. denied, 250 La. 369, 195 So.2d 644 (1967) (improper installation of elevator, not defective product, found as cause of accident). Since in the case at hand St. Charles is claiming that Glazer furnished it with defectively manufactured pipe, the defense of misuse goes to the element of causation. Thus, it is irrelevant that Glazer did not know the purpose for which St. Charles purchased the pipe; the pertinent questions are whether the pipe in fact failed and, if so, whether that failure was caused by a flaw in the metal or by appellant's misuse.

[5]. Captain Menard stated in his affidavit three things of importance to this case: (1) the boom was not loaded when it broke, (2) the break

occurred at the top of the boom rather than at the deck end, and (3) the boom had never been overloaded. Mr. Reineke wrote a three-page report on stationery presenting himself as a "Naval Architect-Marine Engineer" and as a registered professional engineer of the state of Louisiana. Reineke concluded that the boom failed from fatigue and suggested that Glazer had furnished higher quality steel than St. Charles had requested, which may have meant that different welding rods should have been used for constructing the boom.

Reineke's report seems clearly inadmissible at a hearing on a summary judgment motion. First of all, Reineke himself was not qualified as an expert. His report, therefore, provides no proof of evidence that St. Charles could have adduced at trial, which is of course what a summary judgment proceeding is designed to uncover, see Slagle v. United States, 228 F.2d 673, 679 (5th Cir. 1956), quoting Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir. 1940). Beyond this serious shortcoming, the Reineke report satisfies none of the evidentiary requirements set forth in Rule 56(c): it is not a sworn affidavit, an interrogatory, a deposition, or an admission. "Material that does not come within [the categories enumerated in Rule 56(c)] should not be considered." 6 Moore's Federal Practice ¶ 56.11 [1–8], at 56–207 (2d ed. 1976) (footnote omitted). See Adickes v. S. H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142, 155 n. 19 (1970) (witness' statement, offered in opposition to motion, implied as not complying with Rule 56(c) because unsworn); Schwartz v. Compagnie General Transatlantique, 405 F.2d 270, 273 (2d Cir. 1968) (answers to interrogatories not to be considered in opposition to motion because, inter alia, not verified); Piper v. United States, 392 F.2d 462, 464 (5th Cir. 1968) (denials in unverified pleading insufficient to controvert affidavit offered in support of motion). See also 6 Moore's Federal Practice ¶ 56.22[1] at 56–1304 n. 5 (2d ed. 1976) ("Unsworn statements cannot be considered.").

As to Menard's affidavit, it was submitted during oral argument on the motion rather than being served prior to the day of the hearing, as Rule 56(c) requires; thus, it ran afoul not only of the Federal Rules of Procedure but also of the trial court's inherent power to control the proceedings before it.

EXHIBIT
"B"

As to Menard's affidavit, it was submitted during oral argument on the motion rather than being served prior to the day of the hearing, as Rule 56(c) requires; thus, it ran afoul not only of the Federal Rules of Procedure but also of the trial court's inherent power to control the proceedings before it.

**REVERSED.**

THORNBERRY, Circuit Judge, specially concurring:

Although I am in complete agreement with a reversal on the ground that summary judgment was improper, I have trouble with footnote 5 of Judge Gee's opinion, which intimates that the trial court's refusal to consider the Reineke Report and Captain Menard's affidavit was correct. Certainly this language is unnecessary to our disposition of this case.

The fact that the Reineke Reports was unsworn hardly seems to be an insurmountable problem. If the trial court was seriously concerned with determining if evidence did exist, it had the capability to "test this out" by requesting that the appellant submit a supplemental affidavit simply the same report, this time sworn. Rule 56 (e), Fed.R.Civ.Proc. Such procedure is consistent with the purpose of summary judgment: to inquire and determine whether competent evidence exists. See C. Wright, Law of Federal Courts s 99, at 492 (3d ed. 1976).

Likewise, the rejection of Captain Menard's affidavit, submitted in proper form but on the day of the hearing, was perhaps not an abuse of discretion. Again, however, it seems the trial court seized upon an available technicality to exclude sound evidence, in contravention of the truism that courts should grant opponents all benefits of doubt in summary judgment proceedings. I cannot improve on the words of the eminent Judge Hutcheson, who remarked:

It is quite clear that technical rulings have no place in this (summary judgment) procedure and particularly that exclusionary rules will not be applied to strike, on grounds of formal defects in the proffer, evidence presented on tendered issues.

Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir. 1940).

C.A.La. 1977

Jones v. Menard,

559 F.2d 1282, 1978 A.M.C. 2356

END OF DOCUMENT

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT
"C"

: there was a
fact whether
within the
been deprived
We think it
so deprived
be reversed
d procedure,
hrough sham
nd in the way
ath of a case,
deprive a liti-
on, his right

ple provisions
sential limita-
o proceed to
sufficient then
dit testimony
It must ap-
ntial evidence
tendered evi-
credible to be
, or that con-
egal probative
offer of proof
irs that an is-
to a jury trial
ed against him.

alty Company
88, 90 (follow-
in Columbia
, 81 F.2d 281,

e cause pro-
a motion for
the affidavit
tion to what
: "I had the
at 'any time
I used it and
de any objec-
ave used her
ices and some-
went that I
On other oc-
nsing her car
she never ob-
way."
fered this affi-

Insured' wher-
aly the named
on while using
rson or organ-
, for the use
, declared and
ile is 'pleasure
rcial', each as
ed further that
, permission of

and Standard Accident Insurance Co. v. Rivet, 5 Cir., 89 F.2d 74, in both of which coverage was denied because the use was in violation of express prohibition), we have recently said: "Permission to use a car may be implied in the absence of express prohibition." [3] The evidence in this case, if Jones' statements are believed, is stronger for coverage than the evidence in Windham's case was. Appellant had demanded a jury and it was not for the judge in summary proceedings to determine Jones' credibility. But, says appellee, in the first case Jones' affidavit was not offered but only a transcript of his testimony on his former trial and because of defects in its certification and presentation, the judge was justified in refusing to receive this transcript as proffered evidence, while on the second trial, though Jones' affidavit was offered the judgment was res judicata in the first case and this, pleaded as such, entitled it to summary judgment in the second case. We think that this will not at all do. Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists. Rule 56 is carefully drawn to effectuate this purpose. Subdivisions (a) and (b) provide for the institution of the procedure. Subdivisions (c) and (d) provide, the one for complete, the other for partial determination of the existence of genuine issues as to material facts. Subdivision (e) provides for affidavit and other forms of proof while Subdivision (f), making it further clear that the judgment is to be rendered only where it clearly appears that there is no issue, provides for the granting of a continuance to obtain proofs which appear to be existent but not then available. It is quite clear that technical rulings have no place in this procedure and particularly that exclusionary rules will not be applied to strike, on grounds of formal defects in the proffer, evidence proffered on tendered issues. While therefore, it does not appear from the record that the transcript of Jones' testimony was in any manner defective or why its offer was refused, this is, we think immaterial. For the offer of the transcript certainly apprised the judge that there was relevant and important evidence which defendant appellant could and would tender on the trial and notwithstanding this, he was refused a continuance to get the evidence and the matter was pressed at once and erroneously, to summary judgment.

[6] Nor does appellee stand any better on its position that though the judgment in the declaratory suit must be reversed, the judgment in the damage suit must be affirmed because when it was entered, the judgment in the declaratory suit stood unappealed and unreversed and, pleaded as res judicata, it entitled appellee to a judgment in the second suit. For while there is some difference of opinion under the authorities as to whether a judgment which is in process of being appealed, may be pleaded as res judicata, 34 C.J. 898, Section 1307, and notes, it is settled law that when it is brought to the attention of the appellate court on the appeal of the second judgment that the first judgment has been reversed, that court will reverse the second judgment. Ransom v. City of Pierre, 8 Cir., 101 F. 665, especially will this be done where the court to which the second judgment is appealed, is the court that reversed the first judgment. Butler v. Eaton, 141 U.S. 240, 11 S.Ct. 985, 35 L.Ed. 713, and more especially will it be done where as here, the two suits were tried, the two judgments entered in the same court in causes, proceeding pari passu, and the appeals were heard and submitted in the same appellate court at the same time. The judgments on both appeals are reversed and the causes are remanded for further and not inconsistent proceedings.

Reversed and remanded.

---

3 There we held that the court was justified in finding, from the fact that the driver when not on the road was permitted to retain possession of the car, kept it at his house and used it for the convenience of himself and family in and around Macon; that he had implied permission to use it for a trip beyond the county.

EXHIBIT
"D"



## Psychological Causes and Consequences of Racism, Racial Discrimination, Xenophobia and Related Intolerances

Intervention of the American Psychological Association Delegation
to the World Conference Against Racism (WCAR)

Durban, South Africa 31 August to 7 September, 2001

### Preamble

We respectfully thank the Chair of this United Nations' Plenary Session and the
Conference organizers for this invitation to address the full body of this historic
conference. As representatives of a United States Non-Government Organization,
and several International Psychological Associations, we are especially pleased to
have this opportunity to add our voice to the world-wide victims of racism.

We are members of a NGO committed to the eradication of the psychological torture
and wasted human potential resulting from the barbaric, inhumane, and illegitimate
racist systems of human relationships. We are even more resolved to the
development of a workable, vital, and living WCAR document; a document that
reflects the legitimate concerns and human rights of hundreds of millions of people
world-wide for improving the quality of their lives by removing the intolerable weight
of racism, poverty, discrimination, and psychological torture.

Racism in all its horrific forms is transmitted across generations and is manifested in
individual behaviors, institutional norms and practices, and cultural values and
patterns. Racism serves simultaneously both to rationalize the hierarchical
domination of one racial or ethnic group over other group(s), and maintain
psychological, social, and material advantages for the dominant group. Both active
racism and passive acceptance of race-based privilege disrupt the mental health and
psychological functioning of both victims, and perpetrators, of racial injustice.

We strongly believe that respect for the inherent dignity and well-being of each
member of the human family is the psychological foundation of freedom, human
justice, and peace in the world. This important principle is recognized in the United
Nations Charter (1945), the Universal Declaration of Human Rights (1948), and
every subsequent human rights declaration and convention, including the
International Convention on the Elimination of all Forms of Racial Discrimination
(1965). Therefore, we urge the integration of psychological and positive mental
health concerns into the framework of the WCAR as a necessary condition for the
effective implementation of remedies, and corrective and preventive measures and
strategies.

### Develop Remedies and Corrective Strategies

The causes of racism and related intolerance and the means for their perpetuation
are complex, involving legal vulnerability and discrimination, economic and
educational disadvantage, social and political marginalization, and psychological
victimization. Thus, we urge governments, academic, and professional,

EXHIBIT
"E"

philanthropic, religious, humanitarian, professional, and corporate institutions, non-governmental organization and other civil society groups, and the United Nations to:

- Acknowledge, protect, and promote the quality of life of victims of racism and other forms of intolerances, especially women and children, migrants and refugees, members of multi-ethnic states, indigenous peoples, African and African descendent peoples, victims of disabilities, and physical and mental disorders;

- Establish, endorse, and actively support financially, Institutes on Racial and Ethnic Equity and Mental Health Promotion, at the highest levels. These Institutes should place a high priority on research and public policy development and the promotion of research and program development related to tracking the effects of racism, racial discrimination, xenophobia, and related intolerances; and the status of related racial and ethnic disparities in social, educational, economic, political, health, and psychological statuses;

- Establish programmatic support for mental health on a par with physical health within the World Health Organization and the UN system. Give priority to racism, racial discrimination, xenophobia and related intolerances as deterrents to psychological well-being and positive health and mental health, including discrimination in health and mental health care access and treatment, and the lack of effective culturally competent education of medical and mental health care providers;

- Eliminate biases in research and diagnostic instruments, methods and procedures that reflect and perpetuate racial and ethnic disparities and racism in medical, psychological and psychiatric, educational, employment and other institutional assessments;

- Recognize and support using the impressive wealth of existing educational curricula and resources against racism at all levels of formal education to promote understanding of human rights, especially historical and intercultural approaches developed by UNESCO.

- Establish a "focal point" on racial equality based in the UN Office of the Secretary General, to oversee and monitor the integration of issues relating to racial equality into the work of all functional bodies and special mechanisms of the UN, at least equal to those provided for women and children;

- Establish an "International Research and Public Policy Institute" on the Program of Action adopted at the WCAR to monitor and evaluate capacity building for the fulfillment of WCAR goals.

Thank you for your attention to our analyses and recommendations. The system of racism, racial discrimination, xenophobia and related intolerances is broadly entrenched and involves generationally transmitted material deprivation and disparities, institutional arrangements and norms, beliefs and ideologies of cultural superiority, and negative psychological consequences for the oppressed and oppressors. Each of these dimensions of the racism system must be addressed, if we are to reverse their influences in order to create a more humane, just, and peaceful world.

Contact: nama@apa.org or INTERNATIONAL@APA.org

Case 1:02-cv-00032    Document 176    Filed 01/30/2004    Page 16 of 21

About Public Interest Conferences Executive Director Messages
Public Interest Home Page
Program Areas Publications Student Information

American Psychological Association
Public Interest Directorate
750 First Street, NE
Washington, DC 20002
E-mail: publicinterest@apa.org

PsychNET®
© 2003 American Psychological Association

1          The first undisputed fact is that attendance

2     procedures at Continental are governed both by

3     Continental attendance policy and by the union

4     agreement between Continental and the International

5     Brotherhood of Teamsters.  Both documents say that if

6     an employee is going to be absent for work, he needs

7     to call in and talk to his supervisor.  That's an

8     undisputed fact.

9          The second undisputed fact is that

10    Mr. Ashtiani did not call in for work on two

11    consecutive days, June 23rd and 24th, 2001.  In those

12    two documents, the two attendance policies, two days no

13    reporting to work and not showing up for work is cause

14    for discipline, not to exclude termination.  And it

15    says that in both documents.

16          The last undisputed fact is that Continental

17    discharged Mr. Ashtiani on July 3rd, 2001.  And as

18    you'll see from our Exhibit C, it was for the basis

19    that he didn't show up and call in to report his

20    absence to his supervisor for June 23rd and June 24th.

21          With that in mind, the standard that the Court

22    needs to engage in analyzing this motion is that the

23    plaintiff, in order to defeat summary judgment, needs

24    to provide significant probative evidence for his case

25    that any genuine issue of material fact exists.

Wanda M. Miles
Official Court Reporter
District Court of Guam
Case 1:02-cv-00032    Document 176    Filed 01/30/2004    Page 18 of 21

EXHIBIT
"F"

1    The first undisputed fact is that attendance

2 procedures at Continental are governed both by

3 Continental attendance policy and by the union

4 agreement between Continental and the International

5 Brotherhood of Teamsters. Both documents say that if

6 an employee is going to be absent for work, he needs

7 to call in and talk to his supervisor. That's an

8 undisputed fact.

9    The second undisputed fact is that

10 Mr. Ashtiani did not call in for work on two

11 consecutive days, June 23rd and 24th, 2001. In those

12 two documents, the two attendance policies, two days no

13 reporting to work and not showing up for work is cause

14 for discipline, not to exclude termination. And it

15 says that in both documents.

16    The last undisputed fact is that Continental

17 discharged Mr. Ashtiani on July 3rd, 2001. And as

18 you'll see from our Exhibit C, it was for the basis

19 that he didn't show up and call in to report his

20 absence to his supervisor for June 23rd and June 24th.

21    With that in mind, the standard that the Court

22 needs to engage in analyzing this motion is that the

23 plaintiff, in order to defeat summary judgment, needs

24 to provide significant probative evidence for his case

25 that any genuine issue of material fact exists.

EXHIBIT
"G"

# ARTICLE II

## ABSENCE FROM DUTY

A. Unless otherwise provided by special departmental bulletin, an employee hereunder who is prevented from reporting for duty shall notify the supervisor on duty prior to the start of his shift and shall give the reason for his inability to report for duty. Such notification shall be necessary only once in any continuous period of absence providing that the employee has notified his immediate supervisor of the approximate duration of his absence and the date on which he will return to work.

B. An employee hereunder shall not be absent from duty without prior permission in writing, except for sickness, injury, or other cause beyond the control of the employee.

1. An employee may be discharged for cause if he is absent from work for two (2) consecutive days without notifying the Company of the reason for his absence. However, he shall not be discharged if a satisfactory reason is given for not notifying the Company.

2. It is the employee's responsibility to initiate the Absence from Duty report and submit to his immediate supervisor for processing on each absence from duty for any cause whatsoever. Such report should be submitted prior to the employee taking any scheduled time off. However, it must be submitted prior to the employee returning to his first scheduled shift. The only exceptions to the prior approval are occupational injury or sickness. All other items listed in Article 9, Paragraph D must have prior approval or he will not receive any pay for such absence until such document is submitted regardless of other provisions of this Agreement.

C. When it is necessary for an employee to be absent from duty because of death in his immediate family (wife, husband, child, mother, father, sister, brother, grandparents of employee, his mother-in-law or his father-in-law, grandchildren and dependents living in the employee's household), he shall have four (4) twenty-four (24) hour work periods to be taken within ten (10) twenty-four (24) hour periods starting from the time of death, during which he will not be required to report for duty and shall not suffer any loss of his base pay. If the above defined death in the immediate family occurs, the employee taking such time off will be allowed at that time up to and including a maximum of forty (40) hours of unused vacation days or earned unused sick leave in conjunction with the above referenced four (4) days bereavement time. Such use of sick time will not count for attendance/disciplinary purposes.

42

EXHIBIT "H"



# ATTENDANCE POLICY

Regular attendance and punctuality are essential factors in insuring the personal success of each Employee, the success of the Department to which we are assigned and the successful achievement of Continental Micronesia's Corporate Goals. Excessive absenteeism and lateness places an unfair burden on our fellow Employees and has a profound adverse effect on our ability to achieve our personal success and the continued success of Continental Micronesia. This attendance program is designed to assist each Employee by setting forth a standard for acceptable attendance so each Employee knows what is expected of them. It is also designed to assist our Management team in monitoring and managing Employee attendance and punctuality in a fair and consistent manner.

Eight (8) incidents within a twelve month period is normally considered to be excessive and can subject the Employee to serious disciplinary action.

## A. DEFINITIONS

1.    **ACCOUNTABLE ABSENCES** are defined as an instance when an Employee is absent from work (a) due to sickness involving the Employee or his/her spouse or dependent child, (b) is late reporting for duty of more than 5 minutes, (c) is unable to report with prior notice to supervisor, (d) fails to report (no show) without prior notification to supervisor, and (e) departs early without authorization.

2.    **NO SHOW** is the most serious type of absenteeism. When an Employee fails to show for work, it creates a hardship on the operation and other Employees. More than one incident of no show may result in an acceleration of discipline. Two (2) consecutive days (or duty assignments) absence from duty without notification may result in discipline that does not exclude termination.

3.    **SICK** is an incident due to the illness of the Employee or his/her spouse or dependent child. Absence due to sickness is considered one incident even if it extends for consecutive days. The Employee must notify his/her supervisor in advance of each shift or duty assignment unless a doctor has prescribed a certain number of days free from work and the supervisor has been provided this information.

4.    **LATE REPORT** – An employee is considered late for disciplinary purposes if he/she reports for work more than 5 minutes late. Three incidents of reporting five or less minutes late within a six month period will trigger the issuance of one Late incident to the Employee's attendance record and will disqualify the Employee from participation in the ATTENDANCE INCENTIVE AWARDS PROGRAM.

5.    **PATTERNS AND TRENDS OF ABSENCE** – An Employee's attendance record will be reviewed to determine attendance patterns and trends. Patterns and trends may include absenteeism consistently falling in conjunction with an Employee's scheduled days off, scheduled vacation, holidays, surrounding day trade off, or when absenteeism frequently occurs on the same days of the month. In some cases, the attendance guidelines may be accelerated to promote attendance improvement by the Employee.

EXHIBIT "I"

488